IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
CHARLESTON DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | CRIMINAL NO.: 2:19-cr-550-DCN |
| | ) | |
| | ) | |
| vs. | ) | |
| | ) | |
| LAMAR LOUISE JOHNSON | ) | |
| | ) | |
| | ) | |
| | ) | |
| | ) | |
| | ) | |

## UNITED STATES' RESPONSE IN OPPOSITION TO DEFENDANT'S MOTION PURSUANT TO 28 U.S.C. § 2255 FOR INEFFECTIVE ASSISTANCE OF COUNSEL

Lamar Louise Johnson ("Defendant") has filed a motion pursuant to 28 U.S.C. § 2255 claiming ineffective assistance of counsel[1]. Defendant's arguments are clearly contradicted by his sworn statements before the Court and fail to satisfy the *Strickland* requirements. Defendant's allegations are conclusory and unsupported by any evidence and his motion should be summarily denied for these reasons.

### I.    FACTUAL AND PROCEDURAL BACKGROUND

Beginning at least in March 2017, Defendant and sixteen others operated as members of a drug trafficking street gang known as the "Dorchester Terrace Crew" and "4-Mile." The gang obtained significant quantities of heroin, cocaine, methamphetamine, and other drugs from out-of-state suppliers for distribution to street-level drug dealers in the greater Charleston, South Carolina area. The gang members, members of the drug conspiracy, and their associates threatened violence and used firearms to defend themselves and their criminal enterprise from rival gangs and drug dealers.

---

[1] Defendant's counsel, Bill Runyon, Jr. died on November 24, 2022.

1

On February 25, 2020, a grand jury in the District of South Carolina returned a multi-count Superseding Indictment charging Defendant and sixteen others. ECF No. 230. Count 1 charged Defendant with conspiracy to possess with intent to distribute 5 kilograms or more of cocaine, and a quantity of marijuana, in violation of 21 U.S.C. §§ 841(a)(1) and 846. *Id.* Count 12 charged Defendant with possession with intent to distribute 500 or more grams of cocaine, in violation of 21 U.S.C. §§ 841(a)(1) and 841(b)(1)(B). *Id.* Counts 24 – 26 and 38 – 46 charged Defendant with unlawful use of a telephone to facilitate drug felonies, in violation of 21 U.S.C. § 843(b). *Id.*

On December 8, 2020, pursuant to a plea agreement, Defendant pled guilty to Count 1 of the Superseding Indictment. ECF Nos. 666 and 711. The Government agreed to dismiss the remaining Counts of the Superseding Indictment against Defendant at sentencing. Following Johnson's guilty plea, the probation office prepared a Presentence Investigation Report (PSR) that recommended a guidelines range of 324 to 405 months' imprisonment. The advisory range was calculated based on a total offense level 36 and criminal history category VI. Exhibit D, PSR at p. 34. Defendant filed multiple objections to the assessment of eighteen criminal history points, which determined his criminal history category. *See* Exhibit E, PSR Addendum.

Defendant's sentencing was held on September 29, 2021. ECF No. 933. After an exhaustive discussion, the court overruled each of Defendant's PSR objections. *See* Exhibit C, Sentencing Transcript at ps. 1-15. The court also confirmed that Defendant had reviewed the PSR and had discussed it with his attorney. *Id.* at ps. 15-19. After Defendant advised the court he had not sufficiently reviewed the PSR, the Court granted a recess so Defendant had additional time to speak with his counsel. *Id.* Defendant confirmed he spoke about his concerns with his lawyer, he understood why the court ruled the way it did on the objections and was comfortable proceeding

with sentencing. *Id.* at 16, 19. Defendant was sentenced to 324 months followed by 5 years of supervised release on September 29, 2021. ECF Nos. 940.

Defendant immediately appealed his sentence. ECF no. 948. Defendant challenged the calculation of his criminal history score. The Fourth Circuit granted Government's motion to dismiss this claim based on Defendant's waiver of his appellate rights in his plea agreement. ECF No. 1144 at p. 2. The Fourth Circuit also denied Defendant's challenge to the conditions of his supervised release and affirmed the district court's sentencing order. *Id.* at p. 4.

On September 11, 2024, Defendant filed a *pro se* motion to vacate alleging that his counsel was ineffective for several reasons, but mainly dealing with the findings of the PSR. ECF No. 1235. Defendant contends that his lawyer failed to sufficiently challenge the PSR and mislead him, so he was unable to make an intelligent decision about going to trial or accepting a plea. ECF No. 1235 at p. 11.

## II.    LAW

### A. Law Governing 28 U.S.C. § 2255 Generally

Prisoners in federal custody may attack the validity of their sentences pursuant to 28 U.S.C. § 2255. In order to move the court to vacate, set aside, or correct a sentence under § 2255, a petitioner must prove that one of the following occurred: (1) a sentence was imposed in violation of the Constitution or laws of the United States; (2) the court was without jurisdiction to impose such a sentence; (3) the sentence was in excess of the maximum authorized by law; or (4) the sentence is otherwise subject to collateral attack. 28 U.S.C. § 2255(a).

In deciding a motion to vacate, a court may summarily dismiss the motion "[i]f it plainly appears from the motion, any attached exhibits, and the record of prior proceedings that the moving party is not entitled to relief." Rules Governing Section 2255 Proceedings 4(b); *see* 28 U.S.C. § 2255(b) (stating that a hearing is not required on a motion to vacate if the record of the case

conclusively shows that petitioner is entitled to no relief). Conclusory allegations contained within affidavits do not require a hearing. *Strong v. Johnson*, 495 F.3d 134, 139–40 (4th Cir. 2007). "Thus, no hearing is required if the petitioner's allegations 'cannot be accepted as true because they are contradicted by the record, inherently incredible, or conclusions rather than statement of fact.'" *Arredondo v. United States*, 178 F.3d 778, 782 (6th Cir. 1999) (quoting *Engelen v. United States*, 68 F.3d 238, 240 (8th Cir. 1995)).

## B. Law Governing Ineffective Assistance of Counsel

"The benchmark for judging any claim of ineffectiveness must be whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result." *Bunch v. Thompson*, 949 F.2d 1354, 1363 (4th Cir. 1991) (quoting *Strickland v. Washington*, 466 U.S. 668, 686 (1984)). To prevail on an ineffective assistance of counsel claim, Petitioner must show (1) "that counsel's performance was deficient," and (2) "that the deficient performance prejudiced the defense." *Sharpe v. Bell*, 593 F.3d 372, 382 (4th Cir. 2010) (quoting *Strickland*, 466 U.S. at 687). The standard that the defendant must meet is both "rigorous" and "highly demanding" and requires a showing of "gross incompetence" on counsel's part. *Kimmelman v. Morrison*, 477 U.S. 365, 381-82 (1986). A defendant is not entitled to relief based upon unsupported conclusory allegations. *See United States v. Dyess*, 730 F.3d 354, 359-60 (4th Cir. 2013) ("vague and conclusory allegations contained in a § 2255 petition may be disposed of without further investigation by the District Court."). If the defendant fails to establish either component – deficient performance or prejudice – the court "must dismiss the claim." *United States v. Sanchez-Cervantes,* 282 F.3d 664, 672 (9th Cir. 2002).

*Strickland* sets a "high bar" for ineffective assistance claims and surmounting it "is never an easy task." *Harrington v. Richter*, 562 U.S. 86, 105 (2011). The *Strickland* standard is "a most deferential one" that must be applied "with scrupulous care." *Id.*

4

"Under the first prong of *Strickland*," a reviewing court applies a strong presumption that a trial counsel's conduct falls "within the wide range of reasonable professional assistance." *Strickland*, 466 U.S. at 689; *Harrington*, 562 U.S. at 109 (holding that courts must not "insist counsel confirm every aspect of the strategic basis for his or her actions" because there is "a 'strong presumption' that counsel's attention to certain issues to the exclusion of others reflects trial tactics rather than 'sheer neglect'") (quoting *Yarborough v. Gentry*, 540 U.S. 1, 8 (2003) (per curiam)). With respect to the first prong, a petitioner bears the burden of affirmatively showing deficient performance. *See Spencer v. Murray*, 18 F.3d 229, 233 (4th Cir. 1994).

A court should not "second guess" defense counsel's performance. *Strickland*, 466 U.S. at 689; *Roach v. Martin*, 757 F.2d 1463, 1476 (4th Cir. 1985). Instead, the Court must recognize that "[o]missions are inevitable" and determine what is "constitutionally compelled," not just what might appear "prudent or appropriate" in "the artificial light of hindsight." *United States v. Giannone*, 2011 WL 1576198, at *2 (D.S.C. Apr. 26, 2011) (citations omitted). Counsel's performance must be evaluated in light of the circumstances of the representation. *United States v. Roane*, 378 F.3d 382, 404 (4th Cir. 2004) (the "reasonableness of a lawyer's trial performance must be evaluated from counsel's perspective at the time of the alleged error and in light of all the circumstances, and the standard of reasonableness is highly deferential.") (quotation marks and citations omitted). "Perfection is not required" and the test is not "whether the best criminal defense attorneys might have done more" but merely whether the attorney's actions fell "within the wide range of reasonable professional assistance." *Id.* (citations and internal quotation marks omitted). Counsel need not challenge the best of his peers in every statement, question, or action.

"In order to establish prejudice under *Strickland's* second prong," Petitioner "must show that 'there is a reasonable probability that, but for counsel's unprofessional errors, the result of the

5

proceeding would have been different.'" *Giannone*, 2011 WL 1576198, at *2 (quoting *Strickland*, 466 U.S. at 694). "In assessing prejudice under *Strickland*, the question is not whether a court can be certain counsel's performance had no effect on the outcome or whether it is possible a reasonable doubt might have been established if counsel acted differently." *Harrington*, 131 S. Ct. at 791-92. Instead, *Strickland* asks whether it is "reasonably likely" the result would have been different. *Harrington*, 131 S. Ct. at 791-92 (quoting *Strickland*, 466 U.S. at 696). "This does not require a showing that counsel's actions 'more likely than not altered the outcome,' but the difference between *Strickland*'s prejudice standard and a more probable than not standard is slight and matters 'only in the rarest case.'" *Id.* (quoting *Strickland*, 466 U.S. at 693, 697). "The likelihood of a different result must be substantial, not just conceivable." *Id.*

A defendant who alleges ineffective assistance of counsel following entry of a guilty plea has an even higher burden to meet. *See, e.g., Hill v. Lockhart*, 474 U.S. 52, 53-59 (1985); *United States v. Dyess*, 478 F.3d 224, 237 (4th Cir.) (ineffective assistance alleged as basis for withdrawal of guilty plea *post-sentencing), cert. denied,* 552 U.S. 1063 (2007). The Fourth Circuit described the defendant's additional burden in a post-guilty plea claim of ineffective assistance of counsel in *Hooper v. Garraghty*, 845 F.2d 471 (4th Cir. 1988). The Court found in this situation, the "prejudice" prong of *Strickland* is slightly modified. *Id.* at 475. "Such a defendant must show that there is a reasonable probability that, but for counsel's errors, he would not have pleaded guilty and would have insisted on going to trial." *Id.*

In evaluating a post-guilty plea claim of ineffective assistance, statements previously made under oath affirming satisfaction with counsel – typically in a Rule 11 proceeding – are binding on the defendant absent "clear and convincing evidence to the contrary. *Fields v. Attorney General of State of Md*, 956 F.2d, 1290, 1299 (4th Cir. 1992), *citing Blackledge v. Allison*, 431 U.S. 63, 74-

75 (1977). *Accord United States v. Lemaster*, 403 F.3d 216, 220-23 (4th Cir. 2005) (affirming summary dismissal of § 2255 motion, including ineffective assistance claim, noting inconsistent statements made during Rule 11 hearing.) The fact that a plea bargain is "favorable" to a defendant and that accepting it was "a reasonable and prudent decision" is itself evidence of "[t]he voluntary and intelligent" nature of the plea. *Fields*, 956 F.2d at 1299.

A petitioner claiming ineffective assistance of counsel at the sentencing stage must show "a substantial likelihood that his counsel's ineffective performance prejudiced the outcome of his sentencing." *Smith v. United States*, 871 F. Supp. 251, 256 (E.D. Va. 1994) (granting habeas relief where the petitioner "in all probability ... would have received a lower sentence" but for his attorney's failure to challenge an erroneous criminal history calculation).

## C. Summary Judgement Standard

The Government moves for summary judgment in its favor. "To grant a motion for summary judgment, this Court must find that there is no genuine issue as to any material fact." *Gibson v. Bazzle*, 383 F. Supp. 2d 870, 872 (D.S.C. 2005) (internal quotation marks omitted). "If no material factual disputes remain, then summary judgment should be granted against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which the party bears the burden of proof." *Id.*

## III.   ARGUMENT

Defendant alleges multiple reasons why his counsel was ineffective.[2] Defendant's claims are centered around his guilty plea and sentencing and focus primarily on arguments that his counsel failed to challenge the PSR and correctly calculate his guidelines. Defendant ultimately states that

---

[2] Defendant's *pro se* filing alleged multiple grounds for relief. In the event the Court finds a claim with merit that the Government missed, the Government respectfully requests permission to file a supplemental response to address that particular claim.

he was misled by his counsel to such a degree, that he was unable to make an informed decision about whether to plead guilty or go to trial. *See* ECF No. 1235 at p. 11. Defendant's arguments are clearly contradicted by his sworn statements before the Court and fail to satisfy the *Strickland* requirements. Defendant's allegations are conclusory and unsupported by any evidence and his motion should be summarily denied for these reasons.

### A. Defendant's claim that counsel was ineffective contradicts his sworn statements during the change of plea and sentencing hearing.

The Fourth Circuit has held that, "generally, a § 2255 motion that contradicts the plea colloquy should be dismissed." *See United States v. Kidwell*, 2023 WL 5751476, at *4 *citing Lemaster*, 403 F.3d at 221—22 (internal quotations omitted). Defendant's claims nearly three years later about his counsel's ineffective representation are clearly contradicted by his own previous statements under oath. Defendant made multiple statements and affirmations on the record and under oath that he was satisfied with his counsel's performance and received effective representation.

On December 8, 2020, Defendant pled guilty to Count 1 of the Superseding Indictment. ECF No. 711. Defendant made several statements under oath during the hearing affirming his satisfaction with his counsel's effectiveness. *See* Exhibit A, Change of Plea Transcript. Defendant was sworn prior to questioning by the Court. *Id.* at p. 2. Specifically, as to the performance of counsel, Defendant engaged in a colloquy regarding his satisfaction with counsel's performance:

Court: Now, have you had plenty of time to discuss your case with your lawyer?

Defendant: Yes, Sir.

Court: Are you satisfied with the job he's done for you?

Defendant: Yes, sir.

Court: Has he done everything you asked him to do?

8

Defendant: Yes, sir.

Court: Has he failed to do anything you asked him to do?

Defendant: No, sir.

*Id*. at 4-5.

In addition to acknowledging, under oath, that Defendant was satisfied with counsel's performance, Defendant signed a plea agreement, which the Court accepted, representing the same. ECF No. 666. *See* Exhibit B, Filed Plea Agreement. Paragraph 9 of the Plea Agreement sets forth that Defendant acknowledged having met with his attorney and discussed the details of his case, including issues related to determining whether to accept guilt or go to trial. The Plea Agreement was signed by Defendant, his counsel, and the Assistant United States Attorney (AUSA) who prosecuted the case.

The Court sentenced Defendant on September 29, 2021. ECF No. 933. During the proceeding, counsel advised the Court that Defendant was objecting to a portion of his PSR. Defendant raised 5 specific objections including: (1) his criminal history score was miscalculated, and his previous marijuana convictions should not be factored; (2) he should not receive a manager role enhancement; (3) he should not receive a weapons enhancement; (4) his health should be factored into his sentence; and (5) the guidelines were not mandatory. *See* Exhibit C, Sentencing Transcript; Exhibit E, PSR Addendum. The Court overruled Defendant's first objection and adopted the United States Probation Office's (USPO) reasoning in finding the criminal history score was properly calculated. Exhibit C, Sentencing Transcript at p. 8. The Court specifically addressed the marijuana conviction issue raised by Defendant's counsel. The Court denied the objection on that ground and advised that it would affect the 3553(a) factors and would be considered as part of that argument. *Id.* As to relevant conduct, the Court overruled Defendant's

2nd and 3rd objections regarding sentencing enhancements. *Id.* at ps. 11, 13. The government conceded the 4th and 5th objections, and the Court granted them.

It is important to note that after the Court ruled on the objections, Defendant advised the Court he felt that he did not have enough time to review the PSR with his counsel. Defendant explained his perspective stating, "I really thought the objections, you know, that's what threw me for a loop. I thought the objections were really clear that, you know, but I spoke to him (counsel) and I see that I guess we can't get over it, you know?" *Id* at ps. 15-16.

In sum, at the change of plea hearing on December 8, 2020, Defendant, under oath, told the Court that he was satisfied with the performance of counsel, that he had done everything asked of him, and that he had discussed all relevant issues prior to entering a guilty plea, and there were not any additional things he wanted him to do prior to changing his plea. Nine months later, Defendant appeared for sentencing, at which time counsel objected to the guideline calculations based on marijuana convictions and relevant conduct enhancements. Defendant told the Court his only concern was his time to review the PSR, which the Court cured by allowing Defendant additional time to meet with his attorney and receiving a detailed explanation of the issue from Defendant which the Court specifically addressed.

The Fourth Circuit has held that statements previously made under oath affirming satisfaction with counsel – typically during a Rule 11 proceeding – are binding on the defendant absent "clear and convincing evidence to the contrary." *Fields*, 956 F.2d at 1299. Assuming Defendant's claims are true, which the Government is not conceding, Defendant has presented nothing but speculation and vague statements about how things might have been different had his counsel provided different advice. Defendant has not presented the clear and convincing evidence required to overcome his binding statements under oath that he was satisfied with his counsel's

effectiveness. Therefore, Defendant's claim that counsel's performance was deficient is at odds with his sworn statements to the contrary and his motion should be summarily denied on this basis.

### B. Defendant's claims about his counsel's failure to challenge the PSR are incorrect and meritless.

Defendant claims his counsel failed to attack previous state court marijuana convictions. *See* ECF No. 1235 at p. 3. This is not accurate and contradicted by the PSR addendum and sentencing transcript. Counsel objected to Defendant's criminal history score and argued that the marijuana convictions should not be considered. *See* Exhibit C, Sentencing Transcript at ps. 4-5; Exhibit E, PSR Addendum at p. 1. Defendant's argument fails the first prong of *Strickland* on this basis. Defendant then jumps to the conclusion that had counsel challenged them in some other way, they would have resulted in a lower criminal history points and guidelines. *See* ECF No. 1235 at p. 3. Defendant's claim is based on the assertion that he was unrepresented in court during his previous marijuana convictions. Specifically, Defendant argues that prior unrepresented marijuana convictions are subject to collateral attack, and they could have been excluded from the PSR and lowered his guideline range. *Id.* at ps. 7-8. He makes this argument with no further analysis or proof. The Court should disregard this argument for two reasons. First, Defendant's argument is conclusory and offers no proof. Second, representation is irrelevant. USSG § 4A1.2(c) states that sentences for all felony offenses are counted. A background comment in USSG § 4A1.2 application notes states that "prior sentences, not otherwise excluded, are to be counted in the criminal history score, including uncounseled misdemeanor sentences where imprisonment was not imposed." Defendant's argument fails the second prong of *Strickland* on this basis.

## C. Defendant's sworn statements and existing Fourth Circuit case law does not support his guidelines arguments.

Defendant states, without proof, that his counsel advised his base offense level was 27, criminal history category VI, and guidelines of 130-163 months. *See* ECF No. 1235 at p. 4. Defendant claims he pled guilty to Count 1 of the Superseding Indictment with an expectation of receiving a guideline range promised by his counsel. *Id.* at p. 9. *Id.* at p. 5. Defendant finalizes this argument by claiming he could not have made an intelligent choice about whether to plea or go to trial without first being correctly appraised about his exposure under the sentencing guidelines. *Id.*

The Court should disregard this argument for two reasons. First, Defendant's own statements under oath contradict his claims. Defendant cannot pass the first *Strickland* prong for this reason. For example, during Defendant's change of plea hearing, the Court had the following exchange with him:

Court: Have you talked about how the sentencing guidelines might be applied in your case?

Defendant: Yes, sir.

Court: You understand that nobody is going to be able to determine the guidelines for your case until after your presentence report has been completed, and you and the Government have had an opportunity to challenge the facts reported by the probation officer?

Defendant: Yes, sir.

*See* Exhibit A, Change of Plea Transcript at p. 11.

Court: Has anyone made any prediction, prophesy, or promise as to what your sentence is going to be?

Defendant: No, sir.

*Id.* at ps. 15-16.

The second reason the Court should ignore Defendant's argument is because it is not supported by existing Fourth Circuit case law. Assuming Defendant's claims are true, the Fourth Circuit has

been generally unsympathetic towards ineffective assistance claims based on inaccurate predictions by counsel of the likely sentence. *See United States v. Foster*, 68 F.3d 86, 87-88 (4th Cir. 1995). In *Foster*, the Fourth Circuit rejected the defendant's ineffective assistance claim after he was sentenced as a career offender despite pleading guilty only upon assurances from his counsel to the contrary. *Id.* Similarly, in *United States v. Lambey*, the Fourth Circuit rejected the defendant's ineffective assistance claim where he was sentenced to 360 months despite his counsel's assurance he faced a sentencing guideline range of 78-108 months. 974 F.2d 1389, 1395-96 (4th Cir. 1992). These two instructive Fourth Circuit cases undermine Defendant's argument and his motion should be summarily denied on this basis also.

### D. Defendant's relevant conduct arguments are unsupported.

Defendant claims his counsel did not explain what relevant conduct was or how it may come into play in the calculation of the sentence. ECF No. 1235 at p. 2. He then contradicts his own argument by claiming his counsel advised him not to challenge the factual basis (relevant conduct) of the plea agreement to avoid the risk of losing acceptance points. *Id.* at p. 4. Defendant offers no proof for his two opposing claims. The only proof available comes from the sentencing transcript where Defendant's counsel objected to two relevant conduct sentencing enhancements. *See* Exhibit C, Sentencing Transcript at ps. 9 (managerial role enhancement), 11-12 (weapon enhancement). Despite Defendant's claims, counsel did object to relevant conduct in a manner designed to not risk losing acceptance points. Defendant cannot satisfy the first *Strickland* prong on this basis.

### IV.    CONCLUSION

Defendant failed to meet his high burden that his counsel was ineffective. The record in this case clearly shows that Defendant was satisfied with the effectiveness of his counsel and

that counsel's performance surpassed "an objective standard of reasonableness." The Court should summarily deny Defendant's motion.

Respectfully submitted,

ADAIR F. BOROUGHS
UNITED STATES ATTORNEY

By: s/ *C S Lietzow*
Christopher S. Lietzow (#12301)
Assistant U.S. Attorney
151 Meeting St., Ste. 200
Charleston, South Carolina
christopher.lietzow@usdoj.gov

October 23, 2024

Charleston, South Carolina

**EXHIBIT A**

<u>Change of Plea Transcript</u>

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
CHARLESTON DIVISION

```
* * * * * * * * * * * * * * *
UNITED STATES OF AMERICA      *
                              *   Case No. 2:19-cr-550
vs.                           *
                              *   December 8, 2020
LAMAR LOUIS JOHNSON           *
* * * * * * * * * * * * * * *
```

REPORTER'S OFFICIAL TRANSCRIPT OF THE
CHANGE OF PLEA HEARING HELD BEFORE
THE HONORABLE DAVID C. NORTON
UNITED STATES DISTRICT JUDGE
DECEMBER 8, 2020

APPEARANCES:

FOR THE GOVERNMENT:

    Everett Eugene McMillian
    US Attorneys Office (Florence)
    401 W. Evans Street
    Suite 222
    Florence, SC  29501
    843.665.6688

FOR THE DEFENDANT:

    William Lee Runyon, Jr.
    William L. Runyon Jr. Law Office
    Number 3 Gamecock Avenue
    Suite 303
    Charleston, SC  29407
    843.571.3515

Official Court Reporter:    Tana J. Hess, CRR, FCRR, RMR
                            U.S. District Court Reporter
                            Middle District of Florida
                            Tampa Division
                            801 N. Florida Avenue
                            Tampa, FL  33602
                            813.301.5207
                            tana_hess@flmd.uscourts.gov

Proceedings recorded by mechanical stenography using
computer-aided transcription software.

| | | |
|---|---|---|
| 12:40PM | 1 | THE COURT:  Y'all ready to go, Mr. Runyon? |
| 12:43PM | 2 | MR. RUNYON:  Yes, sir. |
| 12:43PM | 3 | THE COURT:  Okay.  Good.  Yes, sir, Mr. McMillian? |
| 12:44PM | 4 | MR. MCMILLIAN:  Your Honor, may it please the Court, |
| 12:44PM | 5 | the final matter for today is United States versus Lamar Louis |
| 12:44PM | 6 | Johnson, case number 2:19-550.  We're here today for a change |
| 12:44PM | 7 | of plea hearing. |
| 12:44PM | 8 | THE COURT:  Okay.  You want to swear Mr. Johnson for |
| 12:44PM | 9 | me, please, ma'am? |
| 12:44PM | 10 | COURTROOM DEPUTY:  Yes.  Please raise your right hand |
| 12:44PM | 11 | to be sworn. |
| 12:44PM | 12 | (Defendant sworn.) |
| 12:44PM | 13 | THE COURT:  Okay.  You're tall too, so you can go |
| 12:44PM | 14 | ahead and sit down and put that microphone in front of you. |
| 12:44PM | 15 | You can sit down too, Mr. Runyon, if you want to. |
| 12:44PM | 16 | So -- all right.  Mr. Johnson, it's my |
| 12:44PM | 17 | understanding that you wish to change the plea you previously |
| 12:44PM | 18 | entered to a plea of guilty to Count 1 of this indictment; is |
| 12:44PM | 19 | that correct? |
| 12:44PM | 20 | THE DEFENDANT:  Yes, sir. |
| 12:44PM | 21 | THE COURT:  Now, before I accept your plea, there are |
| 12:44PM | 22 | a number of questions I want to ask you to make sure it's a |
| 12:44PM | 23 | valid plea.  If you don't understand my questions or at any |
| 12:44PM | 24 | time you need to talk to your lawyer, you let me know, okay? |
| 12:44PM | 25 | THE DEFENDANT:  Yes, sir. |

| | | |
|---|---|---|
| 12:44PM | 1 | THE COURT: Okay. And the reason that's important, |
| 12:45PM | 2 | Mr. Johnson, is now that you've been sworn, your answers to my |
| 12:45PM | 3 | questions will be subject to the penalties of perjury or lying |
| 12:45PM | 4 | under oath. Do you understand that? |
| 12:45PM | 5 | THE DEFENDANT: Yes, sir. |
| 12:45PM | 6 | THE COURT: Okay. Mr. Johnson, how old are you, sir? |
| 12:45PM | 7 | THE DEFENDANT: 41. |
| 12:45PM | 8 | THE COURT: How far did you go in school? |
| 12:45PM | 9 | THE DEFENDANT: I got my GED. |
| 12:45PM | 10 | THE COURT: Good for you. Have you taken any drug or |
| 12:45PM | 11 | any medication or consumed any alcoholic beverages in the last |
| 12:45PM | 12 | 24 hours? |
| 12:45PM | 13 | THE DEFENDANT: I got -- I mean, I take medication, |
| 12:45PM | 14 | yes. |
| 12:45PM | 15 | THE COURT: Take medication. A doctor prescribes it? |
| 12:45PM | 16 | THE DEFENDANT: Yes, sir. |
| 12:45PM | 17 | THE COURT: It's given to you at the jail? |
| 12:45PM | 18 | THE DEFENDANT: Yes, sir. |
| 12:45PM | 19 | THE COURT: What is it? |
| 12:45PM | 20 | THE DEFENDANT: It's Tri -- |
| 12:45PM | 21 | THE COURT: How about -- those are hard to say. |
| 12:45PM | 22 | What's it for? |
| 12:45PM | 23 | THE DEFENDANT: For -- one of them for kidney -- |
| 12:45PM | 24 | THE COURT: Okay. |
| 12:45PM | 25 | THE DEFENDANT: ████████████████ |

|          |    |                                                      |
|----------|----|------------------------------------------------------|
| 12:45PM  | 1  | THE COURT:  All right.                               |
| 12:45PM  | 2  | THE DEFENDANT:  And one of them for high blood       |
| 12:45PM  | 3  | pressure.                                            |
| 12:45PM  | 4  | THE COURT:  Okay.  Do those medications you're taking|
| 12:45PM  | 5  | interfere in any way with your understanding of what's going on |
| 12:45PM  | 6  | here this afternoon?                                 |
| 12:45PM  | 7  | THE DEFENDANT:  No, sir.                             |
| 12:45PM  | 8  | THE COURT:  Okay.  Have you taken any -- have you    |
| 12:46PM  | 9  | ever been treated for mental illness or drug addiction? |
| 12:46PM  | 10 | THE DEFENDANT:  No.                                  |
| 12:46PM  | 11 | THE COURT:  Okay.                                    |
| 12:46PM  | 12 | THE DEFENDANT:  No, sir.                             |
| 12:46PM  | 13 | THE COURT:  Do you understand what's happening here  |
| 12:46PM  | 14 | this afternoon?                                      |
| 12:46PM  | 15 | THE DEFENDANT:  Yes, sir.                            |
| 12:46PM  | 16 | THE COURT:  Mr. Runyon, do you have any doubt as to  |
| 12:46PM  | 17 | Mr. Johnson's competence to enter a plea here this afternoon? |
| 12:46PM  | 18 | MR. RUNYON:  No, Your Honor, I do not.               |
| 12:46PM  | 19 | THE COURT:  Okay.  It appears to me that you are     |
| 12:46PM  | 20 | competent to plead to these charges, and I so find for the |
| 12:46PM  | 21 | purposes of the record.                              |
| 12:46PM  | 22 | Now, have you had plenty of time to discuss your    |
| 12:46PM  | 23 | case with your lawyer?                               |
| 12:46PM  | 24 | THE DEFENDANT:  Yes, sir.                            |
| 12:46PM  | 25 | THE COURT:  Are you satisfied with the job he's done |

| | | |
|---|---|---|
| 12:46PM | 1 | for you? |
| 12:46PM | 2 | THE DEFENDANT: Yes, sir. |
| 12:46PM | 3 | THE COURT: Has he done everything you asked him to |
| 12:46PM | 4 | do? |
| 12:46PM | 5 | THE DEFENDANT: Yes, sir. |
| 12:46PM | 6 | THE COURT: Has he failed to do anything you asked |
| 12:46PM | 7 | him to do? |
| 12:46PM | 8 | THE DEFENDANT: No, sir. |
| 12:46PM | 9 | THE COURT: You understand that under the |
| 12:46PM | 10 | Constitution and laws of the United States, you're entitled to |
| 12:46PM | 11 | a jury trial on these charges if you want one? |
| 12:46PM | 12 | THE DEFENDANT: Yes, sir. |
| 12:46PM | 13 | THE COURT: You also understand that if you wanted a |
| 12:46PM | 14 | jury trial, you'd have the right to the assistance of your |
| 12:46PM | 15 | lawyer for your defense on the charges contained in this |
| 12:46PM | 16 | Indictment, 19-550? |
| 12:46PM | 17 | THE DEFENDANT: Yes, sir. |
| 12:46PM | 18 | THE COURT: You also understand that if you wanted a |
| 12:46PM | 19 | jury trial, at your trial, you'd be presumed to be innocent, |
| 12:46PM | 20 | and the Government's required to prove you guilty by competent |
| 12:47PM | 21 | evidence and beyond a reasonable doubt before a jury could find |
| 12:47PM | 22 | you guilty? |
| 12:47PM | 23 | THE DEFENDANT: Yes, sir. |
| 12:47PM | 24 | THE COURT: Do you also understand that if you wanted |
| 12:47PM | 25 | a jury trial, that you would not have to prove that you were |

| | | |
|---|---|---|
| 12:47PM | 1 | innocent at your trial? |
| 12:47PM | 2 | THE DEFENDANT: Yes, sir. |
| 12:47PM | 3 | THE COURT: Do you also understand that if you wanted |
| 12:47PM | 4 | a jury trial, the witnesses for the Government would have to |
| 12:47PM | 5 | come into this Court, and they would testify in your presence, |
| 12:47PM | 6 | and your lawyer could cross-examine the Government's witnesses, |
| 12:47PM | 7 | object to the Government's evidence, and offer evidence in your |
| 12:47PM | 8 | defense? |
| 12:47PM | 9 | THE DEFENDANT: Yes, sir. |
| 12:47PM | 10 | THE COURT: You also understand that if you wanted a |
| 12:47PM | 11 | jury trial, you'd have the right to testify to that jury if you |
| 12:47PM | 12 | wanted to? |
| 12:47PM | 13 | THE DEFENDANT: Yes, sir. |
| 12:47PM | 14 | THE COURT: You understand you have a constitutional |
| 12:47PM | 15 | right not to testify if you don't want to? |
| 12:47PM | 16 | THE DEFENDANT: Yes, sir. |
| 12:47PM | 17 | THE COURT: You also understand that if you chose not |
| 12:47PM | 18 | to testify at your trial, the jury could not think that you |
| 12:47PM | 19 | were guilty based on the fact that you had exercised your |
| 12:47PM | 20 | constitutional right not to testify? |
| 12:47PM | 21 | THE DEFENDANT: Yes, sir. |
| 12:47PM | 22 | THE COURT: You also understand that if you wanted a |
| 12:47PM | 23 | jury trial, you'd have the right to the issuance of subpoenas |
| 12:47PM | 24 | to compel the attendance of witnesses to testify in your |
| 12:47PM | 25 | defense? |

|         |    |                                                          |
|---------|----|----------------------------------------------------------|
| 12:47PM | 1  | THE DEFENDANT: Yes, sir.                                  |
| 12:47PM | 2  | THE COURT: Now, if you plead guilty here this            |
| 12:47PM | 3  | afternoon and I accept your plea, you understand you're going |
| 12:48PM | 4  | to waive your right to a jury trial, the other rights we've |
| 12:48PM | 5  | just discussed. There's not going to be a jury trial, and I'm |
| 12:48PM | 6  | going to sentence you on the basis of this guilty plea after I |
| 12:48PM | 7  | consider your presentence report?                        |
| 12:48PM | 8  | THE DEFENDANT: Yes, sir.                                  |
| 12:48PM | 9  | THE COURT: You also understand if you plead guilty,      |
| 12:48PM | 10 | you're going to waive your right not to incriminate yourself |
| 12:48PM | 11 | since I'm going to ask you some questions about what you did in |
| 12:48PM | 12 | order to satisfy myself that you're guilty, and you'll have to |
| 12:48PM | 13 | acknowledge you're guilty of this charge?                |
| 12:48PM | 14 | THE DEFENDANT: Yes.                                       |
| 12:48PM | 15 | THE COURT: You also understand what you're pleading      |
| 12:48PM | 16 | guilty to is a felony, and as such, you could lose some of your |
| 12:48PM | 17 | valuable civil rights, such as your right to vote or right to |
| 12:48PM | 18 | ever possess any firearm or bullet?                      |
| 12:48PM | 19 | THE DEFENDANT: Yes, sir.                                  |
| 12:48PM | 20 | THE COURT: Having discussed your rights with you,        |
| 12:48PM | 21 | Mr. Johnson, do you still want to plead guilty?          |
| 12:48PM | 22 | THE DEFENDANT: Yes, sir.                                  |
| 12:48PM | 23 | THE COURT: Have you received a copy of this              |
| 12:48PM | 24 | Superseding Indictment in this case?                     |
| 12:48PM | 25 | THE DEFENDANT: Yes, sir.                                  |

| Time | Line | Text |

12:48PM 1  THE COURT:  Have you had plenty of time to go over

12:48PM 2  that Superseding Indictment plus all the paperwork the

12:48PM 3  Government's given?  I guess there's drug reports and there's

12:48PM 4  wiretaps and all that kind of stuff.

12:48PM 5  THE DEFENDANT:  Yes, sir.

12:48PM 6  THE COURT:  Okay.  Now, you're pleading guilty to

12:48PM 7  Count 1 of the Superseding Indictment which charges that

12:48PM 8  beginning -- this is a conspiracy Indictment that charges

12:49PM 9  beginning at a time unknown to the grand jury, but at least

12:49PM 10  around March 2017 until the date of the Indictment, here in

12:49PM 11  South Carolina and elsewhere, you knowingly and intentionally

12:49PM 12  did combine, conspire, agree, and have tacit understanding with

12:49PM 13  others, both known and unknown to the grand jury, to knowingly,

12:49PM 14  intentionally, and unlawfully possess with intent to distribute

12:49PM 15  5 kilograms or more of a mixture or substance containing a

12:49PM 16  detectable amount of cocaine.

12:49PM 17  Do you understand that if you went to trial on

12:49PM 18  this Indictment, the Government would have to prove the

12:49PM 19  following elements beyond a reasonable doubt:

12:49PM 20  Number 1.  That the conspiracy described in the

12:49PM 21  Superseding Indictment was willfully formed and was existing on

12:49PM 22  or about the alleged time.

12:49PM 23  Number 2.  You willfully became a member of that

12:49PM 24  conspiracy.

12:49PM 25  And number 3.  You distributed or agreed to

12:49PM 1    assist in the distribution of the quantity of controlled

12:49PM 2    substances stated in the Superseding Indictment, which is 5

12:49PM 3    kilograms or more of a mixture or substance containing a

12:49PM 4    detectable amount of cocaine, or the distribution of this

12:50PM 5    quantity was reasonably foreseeable to you and was within the

12:50PM 6    scope of your agreement and understanding of the conspiracy.

12:50PM 7              Do you understand that charge against you?

12:50PM 8         THE DEFENDANT: Yes, sir.

12:50PM 9         THE COURT: Do you understand the Government would

12:50PM 10   have to prove each and every of those three elements beyond a

12:50PM 11   reasonable doubt before a jury could find you guilty?

12:50PM 12        THE DEFENDANT: Yes, sir.

12:50PM 13        THE COURT: The Court finds that Mr. Johnson fully

12:50PM 14   comprehends and understands the nature of the charge against

12:50PM 15   him and generally what elements the Government would have to

12:50PM 16   prove if we had a trial. You understand that the maximum

12:50PM 17   possible penalties for this count is 10 years to life in jail,

12:50PM 18   $10 million fine, at least 5 years supervised release, and a

12:50PM 19   special assessment of $100?

12:50PM 20        THE DEFENDANT: Yes, sir.

12:50PM 21        THE COURT: You understand that since there's a

12:50PM 22   10-year mandatory minimum, that I will not give you any less

12:50PM 23   than 10 years in jail unless the Government makes a motion for

12:50PM 24   downward departure?

12:50PM 25        THE DEFENDANT: Yes, sir.

| | | |
|---|---|---|
| 12:50PM | 1 | THE COURT: You understand that if you plead guilty, |
| 12:50PM | 2 | the law requires you serve a term of supervised release? |
| 12:50PM | 3 | THE DEFENDANT: Yes, sir. |
| 12:50PM | 4 | THE COURT: And when you're on supervised release, |
| 12:50PM | 5 | you're restricted to the places you can go and the things you |
| 12:51PM | 6 | can do, and you have to report to authorities on a regular |
| 12:51PM | 7 | basis? |
| 12:51PM | 8 | THE DEFENDANT: Yes, sir. |
| 12:51PM | 9 | THE COURT: In your case, the term of supervised |
| 12:51PM | 10 | release is a minimum of 5 years. Do you understand that? |
| 12:51PM | 11 | THE DEFENDANT: Yes, sir. |
| 12:51PM | 12 | THE COURT: Do you also understand that -- it's a |
| 12:51PM | 13 | minimum of 5 years. Could be 7. Could be 10. Could be 15. |
| 12:51PM | 14 | Could be 20. |
| 12:51PM | 15 | THE DEFENDANT: Yes, sir. |
| 12:51PM | 16 | THE COURT: Okay. Do you also understand that if |
| 12:51PM | 17 | you're on supervised release and you violate a condition of |
| 12:51PM | 18 | your supervised release, you can be brought back into court. |
| 12:51PM | 19 | If it's proved by a preponderance of the evidence that you did |
| 12:51PM | 20 | violate a condition of your supervised release, you could be |
| 12:51PM | 21 | sent back to jail for the entire term of your supervised |
| 12:51PM | 22 | release? |
| 12:51PM | 23 | THE DEFENDANT: Yes. |
| 12:51PM | 24 | THE COURT: Has anyone threatened -- excuse me. Now, |
| 12:51PM | 25 | have you and your lawyer talked about the sentencing |

12:51PM 1    guidelines?

12:51PM 2            THE DEFENDANT:  Yes, sir.

12:51PM 3            THE COURT:  Have you talked about how the sentencing

12:51PM 4    guidelines might be applied in your case?

12:51PM 5            THE DEFENDANT:  Yes, sir.

12:51PM 6            THE COURT:  You understand that nobody is going to be

12:51PM 7    able to determine the guidelines for your case until after your

12:51PM 8    presentence report has been completed, and you and the

12:51PM 9    Government have had an opportunity to challenge the facts

12:52PM 10   reported by the probation officer?

12:52PM 11           THE DEFENDANT:  Yes, sir.

12:52PM 12           THE COURT:  Okay.  Do you understand that even after

12:52PM 13   your guidelines have been determined, I have the authority at

12:52PM 14   sentencing under some circumstances to depart from those

12:52PM 15   guidelines or to vary from those guidelines, either above those

12:52PM 16   guidelines or below those guidelines?

12:52PM 17           THE DEFENDANT:  Yes, sir.

12:52PM 18           THE COURT:  You also understand that at sentencing,

12:52PM 19   I'll examine the factors of 18 United States Code 3553(a),

12:52PM 20   which could result in a sentence of either above or below those

12:52PM 21   guidelines?

12:52PM 22           THE DEFENDANT:  Yes, sir.

12:52PM 23           THE COURT:  You also understand under some

12:52PM 24   circumstances, you or the Government may have the right to

12:52PM 25   appeal any sentence you might get?

12:52PM 1     THE DEFENDANT:  Yes, sir.

12:52PM 2     THE COURT:  You understand in the federal system,

12:52PM 3 parole has been abolished.  When you're sentenced to prison,

12:52PM 4 you're not going to be released on parole?

12:52PM 5     THE DEFENDANT:  Yes, sir.

12:52PM 6     THE COURT:  You also understand that if the sentence

12:52PM 7 is more severe than you expect it to be, you're still bound by

12:52PM 8 this guilty plea, and you have no right to withdraw it?

12:52PM 9     THE DEFENDANT:  Yes, sir.

12:52PM 10     THE COURT:  Has anyone threatened you or threatened

12:52PM 11 anyone else or forced you in any way to plead guilty here this

12:52PM 12 afternoon?

12:52PM 13     THE DEFENDANT:  No, sir.

12:52PM 14     THE COURT:  Okay.  Summarize the plea agreement for

12:53PM 15 me, Mr. McMillian.

12:53PM 16     MR. MCMILLIAN:  Your Honor, paragraph 1 of the plea

12:53PM 17 agreement states that the Defendant agrees to plead guilty to

12:53PM 18 Count 1 of the Superseding Indictment and sets forth the

12:53PM 19 potential penalties and elements of that charge that the Court

12:53PM 20 has already reviewed with the Defendant.

12:53PM 21         Paragraph 2 states that the Defendant agrees

12:53PM 22 that any monetary penalties imposed are due immediately and

12:53PM 23 collectible as civil judgments.

12:53PM 24         Paragraph 3 states the Defendant agrees to enter

12:53PM 25 into the BOP's inmate financial responsibility program in

12:53PM 1  connection with any fines or financial penalties imposed.

12:53PM 2  Paragraph 4 states that provided the Defendant

12:53PM 3  complies with the terms of this agreement, the Government

12:53PM 4  agrees to move to dismiss the remaining counts in the

12:53PM 5  Superseding Indictment at the time of sentencing, but that the

12:53PM 6  conduct that gives rise to those counts may still be considered

12:53PM 7  as relevant conduct.

12:53PM 8  Paragraph 5 states the Defendant understands

12:53PM 9  that the obligations of the Government under this plea

12:53PM 10  agreement are contingent upon him continuing to abide by all

12:53PM 11  federal, state, and local laws.

12:53PM 12  Paragraph 6 states the Defendant agrees to

12:53PM 13  voluntarily surrender any property that is subject to

12:54PM 14  forfeiture under the Superseding Indictment to the Government.

12:54PM 15  Paragraph 7 states the Defendant agrees to sign

12:54PM 16  over the title to any property that is subject to forfeiture to

12:54PM 17  the United States.

12:54PM 18  Paragraph 8 states the attorneys for the

12:54PM 19  Government agree to recommend that the Defendant not be

12:54PM 20  prosecuted for state crimes arising from the same conduct that

12:54PM 21  gives rise to this federal drug conspiracy conviction.

12:54PM 22  Paragraph 9 states the Defendant agrees that

12:54PM 23  he's met with his attorney for a sufficient amount of time and

12:54PM 24  has discussed his case with his attorney, including the right

12:54PM 25  to a jury trial and any defenses he may have, and that he's

| | | |
|---|---|---|
| 12:54PM | 1 | waiving that right and those defenses in order to plead guilty |
| 12:54PM | 2 | here today. |
| 12:54PM | 3 | Paragraph 10 states the Defendant has certain |
| 12:54PM | 4 | rights to appeal his conviction or sentence in a direct or |
| 12:54PM | 5 | collateral appeal under Section 2255, and that he's waiving his |
| 12:54PM | 6 | appellate rights with certain exceptions that are set forth in |
| 12:54PM | 7 | paragraph 10. |
| 12:54PM | 8 | Paragraph 11 states the Defendant is waiving any |
| 12:54PM | 9 | rights he has to obtain information regarding the prosecution |
| 12:54PM | 10 | of this case under the Freedom of Information Act or the |
| 12:55PM | 11 | Privacy Act. |
| 12:55PM | 12 | And paragraph 12 states that this written plea |
| 12:55PM | 13 | agreement contains the entire agreement between the parties, |
| 12:55PM | 14 | and no promises have been made outside of this agreement. It's |
| 12:55PM | 15 | signed by Mr. Johnson, Mr. Runyon, and by me. |
| 12:55PM | 16 | THE COURT: Okay. Mr. Johnson, are those the terms |
| 12:55PM | 17 | of your plea agreement as you understand them? |
| 12:55PM | 18 | THE DEFENDANT: Yes, sir. |
| 12:55PM | 19 | THE COURT: And this is your signature on the last |
| 12:55PM | 20 | page of your plea agreement? |
| 12:55PM | 21 | THE DEFENDANT: Yes, sir. |
| 12:55PM | 22 | THE COURT: And before you signed it, did you |
| 12:55PM | 23 | understand what you've agreed to do and what the Government is |
| 12:55PM | 24 | going to do in return? |
| 12:55PM | 25 | THE DEFENDANT: Yes, sir. |

|        |    |                                                         |
|--------|----|---------------------------------------------------------|
| 12:55PM | 1  | THE COURT: You understand earlier I told you that |
| 12:55PM | 2  | under some circumstances, you or the Government have a right to |
| 12:55PM | 3  | appeal any sentence you might get. You remember me telling you |
| 12:55PM | 4  | that? |
| 12:55PM | 5  | THE DEFENDANT: Yes, sir. |
| 12:55PM | 6  | THE COURT: You understand by signing this agreement, |
| 12:55PM | 7  | you've given up a portion of that right, which means you can |
| 12:55PM | 8  | only appeal for prosecutorial misconduct or ineffective |
| 12:55PM | 9  | assistance by your lawyer? |
| 12:55PM | 10 | THE DEFENDANT: Yes, sir. |
| 12:55PM | 11 | THE COURT: And when you're in jail, you can only |
| 12:55PM | 12 | attack your sentence because of prosecutorial misconduct, |
| 12:55PM | 13 | ineffective assistance by your lawyer, or changes in the law |
| 12:55PM | 14 | which benefit your sentence? |
| 12:55PM | 15 | THE DEFENDANT: Yes, sir. |
| 12:55PM | 16 | THE COURT: And you signed this back on |
| 12:56PM | 17 | November 11th, and here we are December 8th. We've been here |
| 12:56PM | 18 | about a month since you signed it. Do you still want to go |
| 12:56PM | 19 | forward with it? |
| 12:56PM | 20 | THE DEFENDANT: Yes, sir. |
| 12:56PM | 21 | THE COURT: Okay. Has anyone made you any promise |
| 12:56PM | 22 | other than your plea agreement to induce you to plead guilty? |
| 12:56PM | 23 | THE DEFENDANT: No, sir. |
| 12:56PM | 24 | THE COURT: Has anyone made any prediction, prophesy, |
| 12:56PM | 25 | or promise as to what your sentence is going to be? |

1    THE DEFENDANT:  No, sir.

2    THE COURT:  How about giving me a factual basis,

3 please, Mr. McMillian?

4    MR. MCMILLIAN:  Your Honor, if this case were to

5 proceed to trial, the Government would present evidence to show

6 that Mr. Johnson was a source of supply of cocaine to other

7 co-defendants in this case.

8        As the Court knows, this case was based

9 primarily on an FBI wiretap investigation.  One of the five

10 phones that was wiretapped was Mr. Johnson's phone.  It was

11 referred to as target telephone 5, and agents monitored

12 communications to and from that phone from February 13th of

13 2019 through March 14th, 2019.  During that time, Mr. Johnson

14 was intercepted on approximately 618 pertinent phone calls

15 discussing criminal activity.  The thrust of the large number

16 of those phone calls involved Mr. Johnson either obtaining or

17 redistributing or coordinating the distribution of kilogram or

18 multi-ounce quantities of cocaine.  He was also intercepted on

19 136 calls over target telephone 3 and 341 calls over target

20 telephone 4, which were phones used by other co-conspirators in

21 this case.

22        By way of example, as a result of intercepted

23 phone calls on March 1st, 2019, agents interdicted a half a

24 kilogram of cocaine from co-defendant Jarvis Behrens.  The

25 investigation reflects that Mr. Behrens obtained this half a

| | | |
|---|---|---|
| 12:57PM | 1 | kilo of cocaine through Mr. Johnson. |
| 12:57PM | 2 | Additionally, on July 10th of 2019, a search |
| 12:57PM | 3 | warrant was executed at Mr. Johnson's residence that resulted |
| 12:57PM | 4 | in agents recovering approximately 27 kilogram-sized wrappers |
| 12:57PM | 5 | that had cocaine residue on them. |
| 12:57PM | 6 | Finally, the Government would present evidence |
| 12:57PM | 7 | from at least four cooperating witnesses.  One of those |
| 12:57PM | 8 | witnesses would testify that during the course of this |
| 12:57PM | 9 | conspiracy, he obtained in excess of 5 kilograms of cocaine |
| 12:58PM | 10 | from Mr. Johnson. |
| 12:58PM | 11 | THE COURT:  Okay.  Mr. Johnson, do you agree with the |
| 12:58PM | 12 | prosecutor's summary of your involvement in this conspiracy to |
| 12:58PM | 13 | distribute cocaine? |
| 12:58PM | 14 | THE DEFENDANT:  Yes, sir. |
| 12:58PM | 15 | THE COURT:  Okay.  All right.  It's the finding of |
| 12:58PM | 16 | the Court in the case of United States of America versus Lamar |
| 12:58PM | 17 | Louis Johnson that Mr. Johnson is fully competent and capable |
| 12:58PM | 18 | of entering an informed plea, that his plea of guilty is a |
| 12:58PM | 19 | knowing and voluntary plea supported by an independent basis in |
| 12:58PM | 20 | fact containing each of the essential elements of the offense. |
| 12:58PM | 21 | His plea is, therefore, accepted and now adjudged guilty of |
| 12:58PM | 22 | that offense. |
| 12:58PM | 23 | Would you please sign this for me, Mr. Johnson? |
| 12:59PM | 24 | COURTROOM DEPUTY:  May it please the Court. |
| 12:59PM | 25 | THE COURT:  Yes, ma'am. |

| | |
|---|---|
| 12:59 PM | 1 |

     **COURTROOM DEPUTY:** The Defendant, Lamar Johnson,
having withdrawn his plea of not guilty entered August 11th,
2020, pleads guilty to Count 1 of the Superseding Indictment
after arraignment in open court. Signed the Defendant,
December 8th, 2020.

     **THE COURT:** Okay. Mr. Johnson, what's going to
happen now is the probation office may come up and interview
you. They'll prepare your presentence report. It'll be sent
to Mr. Runyon. Mr. Runyon will bring it up and go over it with
you, and you can make any objections or any corrections in that
report. Then the probation office will make a final report,
and when the final report is done, we'll be back together for
sentencing.

     **THE DEFENDANT:** All right. Can I ask you a question?

     **THE COURT:** You want to talk to your lawyer first
before --

     (Pause.)

     **THE COURT:** Yes, sir?

     **THE DEFENDANT:** Yeah, I just want to ask is there any
way -- I know once I'm -- I already took this plea. I know the
sentencing could take up to a year or more. I wanted to know
is there any way I could go up for bond or anything, being that
I already been arrested let's say a year and a half now? And I
went up -- I know I went up for bond last year on the 17th,
December 17th, and I know I'm making a plea right now, but I'm

The times in the left margin, from top to bottom, read: 12:59PM (lines 1–17), then 1:00PM (lines 18–25).

Line numbers 1 through 25 appear in the left margin.

| | | |
|---|---|---|
| 1:00PM | 1 | saying is there any way I could still have a chance at bond |
| 1:00PM | 2 | since I'm making a plea until sentencing? |
| 1:00PM | 3 | THE COURT: That's -- the circumstances have changed, |
| 1:00PM | 4 | and so if you want to make a motion for bond based on the new |
| 1:01PM | 5 | circumstances, you're welcome to do so. Once that's done, |
| 1:01PM | 6 | we'll set up a hearing. I can't do it right now, because I |
| 1:01PM | 7 | don't know what the background is, okay? If they did grant a |
| 1:01PM | 8 | bond, then they'd have to -- the probation office would have to |
| 1:01PM | 9 | do an inspection, where you're going to live, who you're going |
| 1:01PM | 10 | to live with, whether they got a telephone, and all that kind |
| 1:01PM | 11 | of stuff, so there's some things that have to be done, but if |
| 1:01PM | 12 | your question is can you make a motion to reduce your bond and |
| 1:01PM | 13 | get out of jail, the answer to that is yes. Now, whether it's |
| 1:01PM | 14 | going to happen after a hearing or not, I can't tell you that, |
| 1:01PM | 15 | but you have a right to do that, okay? |
| 1:01PM | 16 | THE DEFENDANT: Yes, sir. |
| 1:01PM | 17 | THE COURT: Does that answer your question? |
| 1:01PM | 18 | THE DEFENDANT: Yes, sir. |
| 1:01PM | 19 | THE COURT: Okay. Good. Anything else? |
| 1:01PM | 20 | MR. MCMILLIAN: Nothing from the Government, Your |
| 1:01PM | 21 | Honor. |
| 1:01PM | 22 | THE COURT: All right. Thank y'all. |
| | 23 | (End of proceedings.) |
| | 24 | |
| | 25 | |

```
1              *  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *
2                    UNITED STATES DISTRICT COURT
3                    MIDDLE DISTRICT OF FLORIDA
4
5                    REPORTER TRANSCRIPT CERTIFICATE
6         I, Tana J. Hess, Official Court Reporter for the United
   States District Court, Middle District of Florida, certify,
7  pursuant to Section 753, Title 28, United States Code, that the
   foregoing is a true and correct transcription of the
8  stenographic notes taken by the undersigned in the
   above-entitled matter (Pages 1 through 20 inclusive) and that
9  the transcript page format is in conformance with the
   regulations of the Judicial Conference of the United States of
10 America.
11
12              _____
                Tana J. Hess, CRR, RMR, FCRR
13              Official Court Reporter
                United States District Court
14              Middle District of Florida
                Tampa Division
15              Date:  January 28, 2022
16
17
18
19
20
21
22
23
24
25
```

**EXHIBIT B**

Plea Agreement

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
CHARLESTON DIVISION

| | |
|---|---|
| UNITED STATES of AMERICA | CRIM. NO.: 2:19-CR-550 |
| v. | |
| **LAMAR LOUIS JOHNSON,**<br>**A/K/A "MCJAG"** | **PLEA AGREEMENT** |

### General Provisions

This PLEA AGREEMENT is made this ___11___ day of _November_, 2020, between the United States of America, as represented by United States Attorney Peter M. McCoy, Jr. and Assistant United States Attorney Everett E. McMillian, and the Defendant, Lamar Louis Johnson, a/k/a "McJag," and Defendant's attorney, William L. Runyon, Jr.

IN CONSIDERATION of the mutual promises made herein, the parties agree as follows:

1.     The Defendant agrees to plead guilty to Count 1 of the Superseding Indictment now pending, which charges that beginning at a time unknown to the grand jury, but beginning at least in or around March 2017, and continuing thereafter, up to and including the date of the Superseding Indictment, in the District of South Carolina and elsewhere, the Defendant, **Lamar Louis Johnson, a/k/a "McJag,"** knowingly and intentionally did combine, conspire, agree and have tacit understanding with others, both known and unknown to the grand jury, to knowingly, intentionally and unlawfully possess with intent to distribute and distribute **5 kilograms or more of a mixture or substance containing a detectable amount of cocaine**, a Schedule II controlled substance, in violation of Title 21, United States Code, Sections 846, 841(a)(1), and 841(b)(1)(A).

In order to sustain its burden of proof, the Government is required to prove the following elements:



A.    The conspiracy described in the Superseding Indictment was willfully formed and was existing on or about the alleged time;

B.    The Defendant willfully became a member of the conspiracy; and,

C.    The Defendant distributed or agreed to assist in the distribution of the quantity of the controlled substance stated in the Superseding Indictment (5 kilograms or more of a mixture or substance containing a detectable amount of cocaine), or the distribution of this quantity was reasonably foreseeable to the Defendant and was within the scope of the Defendant's agreement and understanding in the conspiracy.

The possible penalties for this offense are:

21 U.S.C. 841(b)(1)(A):
FINE OF $ 10,000,000.00
AND/OR IMPRISONMENT FOR 10 YEARS TO LIFE
TERM OF SUPERVISED RELEASE OF AT LEAST 5 YEARS
SPECIAL ASSESSMENT OF $ 100.00

2.    The Defendant understands and agrees that monetary penalties [i.e., special assessments, restitution, fines and other payments required under the sentence] imposed by the Court are due immediately and subject to enforcement by the United States as civil judgments, pursuant to 18 USC § 3613.  The Defendant also understands that payments made in accordance with installment schedules set by the Court are minimum payments only and do not preclude the government from seeking to enforce the judgment against other assets of the defendant at any time, as provided in 18 USC §§ 3612, 3613 and 3664(m).

3.    The Defendant further agrees to enter into the Bureau of Prisons Inmate Financial Responsibility Program if sentenced to a term of incarceration with an unsatisfied monetary penalty.  The Defendant further understands that any monetary penalty imposed is not dischargeable in bankruptcy.

A.    Special Assessment: Pursuant to 18 U.S.C. §3013, the Defendant must pay a special assessment of $100.00 for each felony count for which he is convicted. This special assessment must be paid at or before the time of the guilty plea hearing.

B.    Restitution: The Defendant agrees to make full restitution under 18 U.S.C. § 3556 in an amount to be determined by the Court at the time of sentencing, which amount is not limited to the count(s) to which the Defendant pled guilty, but will include restitution to each and every identifiable victim who may have been harmed by his/her scheme or pattern of criminal activity, pursuant to 18 U.S.C. § 3663. The Defendant agrees to cooperate fully with the Government in identifying all victims.

C.    Fines: The Defendant understands that the Court may impose a fine pursuant to 18 U.S.C. §§ 3571 and 3572.

4.    Provided the Defendant complies with all the terms of this Agreement, the United States agrees to move to dismiss the remaining counts of the Superseding Indictment [and any other indictments under this number] at sentencing. The Defendant understands that the Court may consider these dismissed counts as relevant conduct pursuant to §1B1.3 of the United States Sentencing Guidelines.

5.    The Defendant understands that the obligations of the Government within the Plea Agreement are expressly contingent upon the Defendant's abiding by federal and state laws and complying with any bond executed in this case. In the event that the Defendant fails to comply with any of the provisions of this Agreement, either express or implied, the Government will have the right, at its sole election, to void all of its obligations under this Agreement and the Defendant will not have any right to withdraw his plea of guilty to the offense(s) enumerated herein.

## Forfeiture

6.    The Defendant agrees to voluntarily surrender to, and not to contest the forfeiture of any and all assets and property, or portions thereof, which are subject to forfeiture pursuant to any provision of law, including but not limited to, property in the possession or control of the Defendant or Defendant's nominees. Specifically, the defendant agrees to voluntarily surrender, and not contest the forfeiture of property identified in the Superseding Indictment, and any forfeiture Bill of Particulars.

A.    MONEY JUDGMENT/ PROCEEDS:

A sum of money equal to all proceeds the Defendant obtained directly or indirectly as the result of the drug offenses charged in the Superseding Indictment, and all interest and proceeds traceable thereto.

With regard to each and every asset listed in the Superseding Indictment or seized in a related investigation or administrative, state, or local action, the Defendant stipulates and agrees:

The Defendant agrees and consents to the forfeiture of these assets pursuant to any federal criminal, civil judicial or administrative forfeiture action. The Defendant also hereby agrees to waive all constitutional, statutory and procedural challenges in any manner (including direct appeal, habeas corpus, or any other means) to any forfeiture carried out in accordance with this Plea Agreement on any grounds, including that the forfeiture described herein constitutes an excessive fine, was not properly noticed in the charging instrument, addressed by the Court at the time of the guilty plea, announced at sentencing, or incorporated into the judgment.

To its forfeiture herein, if necessary as substitute property under 21 U.S.C. § 853(p), as made applicable by 18 U.S.C. § 982(b)(1) or any other statute, or in a separate administrative or civil judicial proceeding.

That the Defendant has or had a possessory interest or other legal interest in each item or property.

To assist the United States in the recovery of all assets by (i) taking whatever steps are necessary or requested by the United States to pass clear title to the United States; (ii) preventing the disbursement of any moneys and sale of any property or assets; (iii) not encumbering or transferring any real estate after the Defendant's signing of this Plea Agreement; and (iv) directing all financial institutions to turn over and surrender to the United States all funds and records regarding accounts listed in any document signed by the Defendant pursuant to this plea agreement, as criminal proceeds or substitute property.

The Defendant waives all rights to notice of forfeiture under Rule 32.2 and of any other action or proceeding regarding such assets. The Defendant consents and waives all rights to compliance by the United States with any applicable deadlines under 18 U.S.C. § 983(a). Any related administrative claim filed by the Defendant is hereby withdrawn.

Pursuant to Rule 32.2(b)(4), the Defendant agrees that the preliminary order of forfeiture will satisfy the notice requirement and will be final as to the Defendant at the time it is entered. In the event the forfeiture is omitted from the judgment,

the Defendant agrees that the forfeiture order may be incorporated into the written judgment at any time pursuant to Rule 36.

If the United States discovers that the Defendant has not fully disclosed all assets, the United States may seek forfeiture of any subsequently-discovered assets, and the Defendant agrees to the immediate forfeiture of any such assets.

The Defendant further agrees to make a full and complete disclosure of all assets over which Defendant exercises control and those which are held or controlled by nominees. The Defendant agrees that Federal Rule of Criminal Procedure 11 and U.S.S.G. § 1B1.8 will not protect from forfeiture, assets disclosed by the Defendant as part of his/her cooperation.   The Defendant further agrees to submit to a polygraph examination on the issue of assets if it is deemed necessary by the United States.

The Defendant agrees to waive any double jeopardy claims the Defendant may have as a result of a forfeiture proceeding against any of these properties as provided for by this Plea Agreement and agrees to waive any claims that the forfeiture described herein constitutes an excessive fine.

Forfeiture of the Defendant's assets shall not be treated as satisfaction of any fine, restitution, cost of imprisonment, or any other penalty the Court may impose upon the Defendant in addition to forfeiture. The United States may use the value of forfeited property for restitution, but is not required to do so.

7.    The Defendant also agrees to voluntarily transfer all right, title, interest and claim in the above-described property and/or assets to the United States of America.  Furthermore, the Defendant attests, under penalty of perjury, that the Defendant owns the above-described property and/or assets free of any liens and encumbrances, and that no other person or entity has a claim to the above-described property and/or assets.

## Merger and Other Provisions

8.    The Attorneys for the Government agree to recommend that the Defendant not be prosecuted for any similar or related state crimes stemming from the conspiracy described in the Superseding Indictment, so long as the Defendant complies with the terms of this Plea Agreement. The Defendant understands that this is only a recommendation and is not binding upon the Charleston County Solicitor's Office. Furthermore, the Defendant fully understands that he has no



right to withdraw his/her guilty plea should such recommendation not be followed by the Solicitor's Office.

9.    The Defendant represents to the court that he has met with his/her attorney on a sufficient number of occasions and for a sufficient period of time to discuss the Defendant's case and receive advice; that the Defendant has been truthful with his/her attorney and related all information of which the Defendant is aware pertaining to the case; that the Defendant and his/her attorney have discussed possible defenses, if any, to the charges in the Superseding Indictment including the existence of any exculpatory or favorable evidence or witnesses, discussed the Defendant's right to a public trial by jury or by the Court, the right to the assistance of counsel throughout the proceedings, the right to call witnesses in the Defendant's behalf and compel their attendance at trial by subpoena, the right to confront and cross-examine the government's witnesses, the Defendant's right to testify in his/her own behalf, or to remain silent and have no adverse inferences drawn from his/her silence; and that the Defendant, with the advice of counsel, has weighed the relative benefits of a trial by jury or by the Court versus a plea of guilty pursuant to this Agreement, and has entered this Agreement as a matter of the Defendant's free and voluntary choice, and not as a result of pressure or intimidation by any person.

10.    The Defendant is aware that 18 U.S.C. § 3742 and 28 U.S.C. § 2255 afford every defendant certain rights to contest a conviction and/or sentence. Acknowledging those rights, the Defendant, in exchange for the concessions made by the Government in this Plea Agreement, waives the right to contest either the conviction or the sentence in any direct appeal or other post-conviction action, including any proceedings under 28 U.S.C. § 2255. This waiver does not apply to claims of ineffective assistance of counsel, prosecutorial misconduct, or future changes in the law that affect the defendant's sentence. This agreement does not affect the rights or obligations



of the Government as set forth in 18 U.S.C. § 3742(b). Nor does it limit the Government in its comments in or responses to any post-sentencing matters.

11.  The Defendant waives all rights, whether asserted directly or by a representative, to request or receive from any department or agency of the United States any records pertaining to the investigation or prosecution of this case, including without limitation any records that may be sought under the Freedom of Information Act, 5 U.S.C. § 552, or the Privacy Act of 1974, 5 U.S.C. § 552a.

12.  The parties hereby agree that this Plea Agreement contains the entire agreement of the parties; that this Agreement supersedes all prior promises, representations and statements of the parties; that this Agreement shall not be binding on any party until the Defendant tenders a plea of guilty to the court having jurisdiction over this matter; that this Agreement may be modified only in writing signed by all parties; and that any and all other promises, representations and statements, whether made prior to, contemporaneous with or after this Agreement, are null and void.

| | |
|---|---|
| 11/11/20 | Lamar Louis Johnson |
| Date | DEFENDANT |
| 11/11/20 | William L. Runyon, Jr. |
| Date | ATTORNEY FOR THE DEFENDANT |
| | PETER M. MCCOY, JR. |
| | UNITED STATES ATTORNEY |
| 11/16/2020 | By: Everett E. McMillian |
| Date | ASSISTANT UNITED STATES ATTORNEY |

# U. S. DEPARTMENT OF JUSTICE
## Statement of Special Assessment Amount

**This statement reflects your special assessment only. There may be other penalties imposed at sentencing. This Special Assessment is due and payable at the time of the execution of the plea agreement.**

| ACCOUNT INFORMATION | |
|---|---|
| **CRIM. ACTION NO.:** | 2:19-CR-550 |
| **DEFENDANT'S NAME:** | Lamar Louis Johnson, a/k/a "McJag" |
| **PAY THIS AMOUNT:** | $100.00 |
| **PAYMENT DUE ON OR BEFORE:** | (date plea agreement signed) |

**MAKE CHECK OR MONEY ORDER PAYABLE TO:**
*CLERK, U.S. DISTRICT COURT*

PAYMENT SHOULD BE SENT TO:
**Clerk, U.S. District Court**
**J. Waties Waring Judicial Center**
**85 Broad Street**
**Charleston, South Carolina 29401**

OR HAND DELIVERED TO:
**Clerk's Office**
**J. Waties Waring Judicial Center**
**85 Broad Street**
**Charleston, South Carolina 29401 (Mon. – Fri. 8:30 a.m. – 4:30 p.m.)**

*INCLUDE DEFENDANT'S NAME ON CHECK OR MONEY ORDER (Do Not send cash)*

*ENCLOSE THIS COUPON TO INSURE PROPER and PROMPT APPLICATION OF PAYMENT*

**EXHIBIT C**

Sentencing Transcript

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
CHARLESTON DIVISION

UNITED STATES OF AMERICA,      )
                               )    September 29, 2021
                               )
        -versus-               )    Charleston, SC
                               )
LAMAR LOUIS JOHNSON,           )    2:19-550-1
                               )
        Defendant.             )

TRANSCRIPT OF SENTENCING

BEFORE THE HONORABLE DAVID C. NORTON
UNITED STATES DISTRICT JUDGE, presiding

A P P E A R A N C E S:

For the Government:    EVERETT E. MCMILLIAN, AUSA
                       US Attorney's Office
                       151 Meeting Street, Suite 200
                       Charleston, SC 29401

For the Defendant:     WILLIAM L. RUNYON, JR., ESQ.
                       Number 3 Gamecock Avenue, Suite 303
                       Charleston, SC 29407

Court Reporter:        KAREN E. MARTIN, RMR, CRR
                       PO Box 835
                       Charleston, SC 29402

Proceedings reported by stenographic court reporter.
Transcript produced with computer-aided transcription
software.

1                  Wednesday, September 29, 2021

2       (WHEREUPON, court was called to order at 11:05 AM)

3            THE COURT:  Take your seats.  Thanks.

4            Yes, sir, Mr. McMillian?

5            MR. McMILLIAN:  May it please the Court?  The

6  first matter this morning is the United States vs. Lamar

7  Louis Johnson, 2:19-550.  We're here today for a

8  sentencing hearing.

9            THE COURT:  Okay.  Everybody ready to go?

10           MR. McMILLIAN:  The Government's ready.

11           MR. RUNYON:  Defense is ready, Your Honor.

12           THE COURT:  All right.  I note there are some

13  objections that have been filed.  Have any of those -- are

14  those still valid objections or do you want to withdraw

15  them?

16           MR. RUNYON:  Well, Judge, I think I can address

17  them in the context of sentencing.  And I'm not

18  withdrawing that.

19           THE COURT:  Okay.

20           MR. RUNYON:  Particularly, the one concerning

21  his health.

22           THE COURT:  Okay.  Well, I'll put them in -- I'm

23  looking to see here.

24           MR. McMILLIAN:  And, Your Honor, I've -- I don't

25  know if I can make it simple or not.  But as to the

1   objection regarding the health, which would be the fourth

2   objection, the Government doesn't object to the Court

3   considering that as a 3553(a) factor.  So to that extent

4   it probably doesn't have any impact on the PSR itself and

5   may be considered moot.

6         And then the fifth objection, as to whether or

7   not the guidelines are mandatory, the Government

8   acknowledges that the Court has the ability to sentence

9   outside the guidelines through various means.

10        So those objections I think could be classified

11  as moot or we could concede four and five.  However, the

12  first three objections as to the criminal history points,

13  the firearm, leadership enhancements, the Government has

14  taken a look at those and we're not in a position to

15  concede those.

16        THE COURT:  Okay.  I mean, I think the one about

17  the health under the 3553(a) factors, the health is

18  relevant because one of the factors is to provide the

19  defendant with needed educational, vocational training,

20  medical care, other correctional treatment.  So it's a

21  valid consideration as to that.

22        But so let's go through, generally, the criminal

23  history objections, Paragraphs 60 through 74.  I'll be

24  glad to hear anything else you would like to say about

25  that, Mr. Runyon, or do you want to stand on what you

1    filed?

2         MR. RUNYON:  Pardon me for not being able to

3    stand, Judge.

4         THE COURT:  Well, I'll tell you, Mr. Runyon,

5    assuming you've had your shot, you can take your mask off

6    to talk so we can hear you better.

7         MR. RUNYON:  I've had my not only my first

8    shots, I've had my booster, too.

9         THE COURT:  All right.  And you might want to

10   move that microphone a little bit closer to you.

11        MR. RUNYON:  Your Honor, Mark Twain once said

12   that there were no sinners saved after the first 20

13   minutes of the pastor's sermon.  So I'm going to try to be

14   brief because I think we've got just a fairly cogent

15   objection here.

16        We've narrowed the objection down on criminal

17   history to particularly the marijuana.  But, Judge, when

18   you come right down to it, he was a young man at the time.

19   And, you know, that just -- that just is piling on at this

20   point in time considering the weight involved in this

21   case, considering the other factors in his case, and

22   considering the fact that despite the offers of the

23   Government, he finds himself not in a position to avail

24   himself of that offer.

25        Basically, most of his criminal history was when

1  he was a very, very young man.  And we'd ask the Court

2  to -- obviously, the Court can't disregard that.  But the

3  simple fact is, in all due consideration, the Court's seen

4  people just like Mr. Johnson whose young life has been

5  touched by marijuana.

6           And I'd point out, Judge, the crazy thing is

7  we're sitting down here and we're trying to fashion an

8  objection about his marijuana convictions.  And in

9  California and Oregon and the State of Washington,

10 marijuana is legal under state law.  It's not legal under

11 our state law.  And therefore, we'd ask the Court to if

12 not disregard those -- that criminal history, to at least

13 take into consideration the change of -- in our society as

14 it relates to those convictions and look at the real

15 objection we have here, Judge.

16          And I'm going to jump ahead.  We're going to ask

17 the Court and we ask the Court to consider this, his

18 health history.  I understand and we understand that when

19 he goes to the federal correctional institution, that he

20 always has the ability to file for a compassionate review

21 and what have you.  But my point is why go through all

22 those steps when the Court has the ability to have him

23 evaluated.  We know he's been treated over the last two

24 years minimally at least.  And the state of his health is

25 actually not clearly determined at this point in time.

1    In talking to the federal probation officer who

2    created the PSR, you know, there's no -- there's no

3    dispute about he has some serious health problems.  And it

4    would seem to me to be more logical rather than send him

5    off with a heavy sentence and then ask for compassionate

6    review and possibly come back and maybe have to review

7    that in the future, that if the Court would simply send

8    him off for evaluation, get a medical report, and then

9    under 3553 fashion a sentence that fits Mr. Johnson,

10    particularly since he's been sitting in jail for two

11    years.  I mean, that's the gist of our -- thrust of our

12    objections and what we're asking the Court to do today,

13    Judge.

14        THE COURT:  Okay.

15        All right.  How about do you want to respond to

16    the criminal history, Mr. McMillian?

17        MR. McMILLIAN:  Yes, Your Honor.  On the

18    criminal history, and Mr. Runyon is a fine attorney.  And

19    I think he's crafting the best argument he can.  But,

20    legally, I don't think that there's much dispute that the

21    guidelines Section 4A1.1A and 4A1.2E1 simply count each of

22    the convictions that are contested here as part of his

23    criminal history.  Convictions for crimes that are

24    punishable by more than a year and within 15 years are

25    counted.  So the law is very clear on that and there's not

1    really any question that the criminal history computation

2    is correct.

3            As far as the marijuana convictions, the fact is

4    those convictions stand today just as they did when they

5    were incurred.  And the fact that marijuana may be viewed

6    differently than some other drugs in other parts of the

7    country is something that perhaps the Court can consider

8    as a 3553(a) factor, but it doesn't factor into the

9    computation of the criminal history score.

10            So in the Government's view, all these are

11    things that the Court can certainly weigh in determining

12    the correct sentence.  But there's no miscalculation to

13    the PSR that needs to be corrected.  And in the

14    Government's view, no correction is needed under 3553(a)

15    either.  But we'll address that at the appropriate time.

16            So I think that's the first objection, Your

17    Honor.

18            THE COURT:  Okay.

19            Anything else, Mr. Runyon?

20            MR. RUNYON:  Judge, I'm not suggesting that the

21    calculation is wrong or incorrect.  I'm looking to the

22    Court, and I hate to say it this way, but I'm looking to

23    the Court to maybe apply a little common sense to

24    Mr. Johnson's situation and fashion a sentence now, or in

25    the future if the Court decides to have him evaluated

1  medically, that really makes sense.

2        Whether you want to call it under 3553,

3  obviously, under the guidelines all the numbers figure out

4  correctly.  And that's the frustrating part about the

5  sentencing because you've got the numbers figuring out

6  under the guidelines.  And then you've got the magic 3553

7  that says, well, you can consider all these other factors

8  and what have you.  We're looking -- frankly, Judge, we're

9  looking to make sure that Mr. Johnson has an opportunity

10  not to die in prison, quite frankly.

11        THE COURT:  Okay.  So as far as the criminal

12  history objection, which is Paragraphs 60 to 74, I think I

13  heard from both sides that everybody agrees that the

14  computations are correct under the guidelines.

15        MR. RUNYON:  That's correct, Your Honor.

16        THE COURT:  Okay.  And so I'll overrule your

17  objection as to the criminal history category.  The

18  marijuana convictions and all that probably have something

19  to do with the 3553 sentencing factors.  So we'll consider

20  them at that time.

21        The second, and I think the probation office has

22  made a response to the first objection, a three or

23  four-page response which I think the Court will adopt for

24  reasonings even though both sides agree the computations

25  are correct.

1    The second general objection is the role

2    enhancement, which is Paragraphs 49 through 56 and

3    Paragraph 97.  If you want to add something on to that

4    argument, Mr. Runyon, I'll be glad to hear from you.

5    MR. RUNYON:  Well, Judge, sometimes you've got

6    to shovel sand against the tide.  And there's no question

7    about the fact that Mr. Johnson's role in the total

8    conspiracy insofar as the supplying of amounts and what

9    have you, although there's some question as to how much,

10    but that was significant.  I'm not suggesting it wasn't

11    significant.  But he did not manage this conspiracy.  He

12    was a significant part but he wasn't a manager.  It's just

13    that simple.

14    THE COURT:  Okay.

15    Yes, sir, Mr. McMillian?

16    MR. McMILLIAN:  Your Honor, under the relevant

17    guideline provision, which is Guideline 3B1.1B, what's

18    required is the Government show that the organization had

19    five or more participants, and that the defendant

20    exercised some sort of managerial or supervisory authority

21    over any of them.  So here there's no doubt that the

22    recorded phone calls that are set forth in the PSR show

23    that the organization itself had far more than five

24    participants.  There were more than five drug dealers who

25    were obtaining drugs from Mr. Johnson and then

1    redistributing them.  And additionally, the PSR shows that

2    he exercised some level of authority over some of those

3    individuals.

4         I think the probation officer's response is very

5    relevant.  It identifies Paragraphs 29, 36, and 37 as

6    examples of where Mr. Johnson in one case handed off his

7    cell phone to another individual, another co-defendant in

8    the conspiracy who sort of ran this drug operation for a

9    few days while Mr. Johnson was out of town.  And

10   additionally, we have another defendant who I believe is

11   being sentenced next, Rashard Whitfield, who sold drugs at

12   the direction of Mr. Johnson on several occasions.

13        So the evidence is clear that the organization

14   had more than five members.  And Mr. Johnson had some

15   control over some of those members.  For that reason, I

16   think it falls within the Court's discretion to do between

17   a two and four-level enhancement.  And the PSR writes it

18   as a three-level enhancement, which is certainly

19   appropriate.

20        So the Government's position is not that he ran

21   the whole thing.  It's simply that he exercised some level

22   of control over others in the group.  And that's

23   sufficient to meet the guidelines.

24             THE COURT:  Anything else, Mr. Runyon?

25             MR. RUNYON:  Like I said, Judge, my shovel is

1   not big enough for the sand at this point in time.  But

2   the simple fact is that while he's a significant player

3   under the Government's case, he's certainly not the

4   manager.  But that's our position and we've got to stick

5   to it, Judge.

6           THE COURT:  All right.  I'll overrule your

7   objection with regard to role enhancement.  I think the

8   probation officer's four or five-page response lists the

9   facts which we'd take into consideration with regard to

10  his level in the conspiracy.  I think it's obvious that

11  there were many more than five people in the conspiracy.

12  It's also obvious that it looks like Mr. Johnson was the

13  hub of the conspiracy because that's where all the phone

14  calls ran through his phone.

15          MR. RUNYON:  Yes, sir.

16          THE COURT:  And if he's not going to be the hub,

17  why do you run them through his phone?  And I'll also

18  adopt the probation officer's response as the basis of

19  this ruling having -- and overrule the role objection.

20          All right.  Let's see here.  The third

21  objections are to the weapon enhancement, which is

22  Paragraphs 42 and 94.

23          MR. RUNYON:  Judge, I understand the law on

24  possession.  And I understand the law under the National

25  Firearms Act and what have you.  The fact that the weapon

```
 1   was in the house is, of course, extremely significant when
 2   it comes to a possible violation if it were charged.  But
 3   the simple fact is is that there is no indication.  And
 4   therefore we ask the Court not enhance this matter.
 5   There's no indication that the -- and Ms. Johnson clearly
 6   said from the very getgo that it was her gun.  And there's
 7   no indication that Mr. Johnson ever utilized the weapon in
 8   carrying out his role in the conspiracy.
 9             THE COURT:  Okay.
10             Yes, sir, Mr. McMillian?
11             MR. McMILLIAN:  Your Honor, again, I think that
12   the law on this is fairly clear from the Fourth Circuit.
13   The Government need not show that he used the firearm or
14   that he was the sole possessor of the firearm at issue.
15   The fact is that on July 10th, 2019, that two firearms
16   were found in Mr. Johnson's residence on Sugarberry Lane
17   as a result of a federal search warrant that also
18   recovered 27-kilogram sized wrappers with cocaine residue
19   on them, additional scale, food saver bags that were used
20   for cocaine storage, and six boxes of various calibers of
21   ammunition, some of which was found in his -- in the
22   master bedroom.
23             So, Your Honor, it's obvious that a significant
24   amount of drugs were either moved through that house or
25   that evidence of the drugs was being kept there in indicia
```

1    of drug distribution and the guns were found at the same

2    residence.  Based on the law, at that stage the burden

3    somewhat shifts to the defendant to show it's clearly

4    improbable that the guns had some connection to the

5    offense.

6              So in this case, this is not an instance where

7    the gun was found on Mr. Johnson, otherwise he would have

8    been charged with a 924(c) or perhaps a felon in

9    possession charge.  So, certainly, things could have been

10   much worse for him if the connection was more close.

11   However, given the minimal connection that's needed for

12   the enhancement and the preponderance of the evidence

13   standard, in the Government's view the firearms

14   enhancement is proper.

15             THE COURT:  Anything else, Mr. Runyon?

16             MR. RUNYON:  I'm not going to argue anymore

17   because I don't want the Government to think about that

18   924(c).

19             THE COURT:  All right.  I'll overrule your

20   objection with regard to the gun.  As outlined in the

21   probation officer's response to the objection is where the

22   law is.  The law is that the enhancement should be

23   supplied unless it's, quote, clearly improbable that the

24   weapon was connected with the offense.  I can't say it's

25   clearly improbable because in Mr. Johnson's bedroom, as

1   the Government pointed out, there was six boxes of

2   ammunition together with the scales and the drugs and the

3   money.  Just because his wife owned the gun doesn't

4   mean -- it's not possession of a gun, it's not ownership.

5   That's two separate things.

6          All right.  The fourth I think is the physical

7   condition.  We've already talked about the physical

8   condition.  I think you'll probably add some more on that

9   with regard to when I ask you about his sentence.

10         And the fifth one is the guidelines.  And the

11  guidelines are not mandatory.  I've got the ability to

12  depart from the guidelines or to vary from the guidelines.

13  So even though it reads like they're mandatory, they are

14  not mandatory.  I haven't taken them as mandatory in years

15  so I'm not going to take them as mandatory now.

16         All right.

17         MR. RUNYON:  Will you concede, Judge, that the

18  bench has ruled against me numerous times on that issue?

19         THE COURT:  Well, I may not be right but at

20  least I'm consistent, Mr. Runyon.

21         MR. RUNYON:  That's correct.

22         THE COURT:  Okay.  Having ruled on the

23  objections -- let's see here.  All right.  Mr. Johnson

24  pled guilty to Count 1 of the superseding indictment back

25  on December 8th of last year pursuant to a plea agreement.

```
 1    I accepted his plea at that time.  I then asked the
 2    probation office to prepare a Presentence Report which has
 3    been submitted -- prepared and submitted to both
 4    Government and defendant.  It's my understanding
 5    everybody's had plenty of time to review the Presentence
 6    Report and we've already talked about all the objections
 7    in the report.  Is that correct?
 8            MR. McMILLIAN:  That's correct, Your Honor.
 9            MR. RUNYON:  From the defense side, yes, Your
10    Honor, that's correct.
11            THE COURT:  Mr. Johnson, did you have plenty of
12    time to go over your Presentence Report with your lawyer?
13            THE DEFENDANT:  Um, no, sir.
14            THE COURT:  Okay.
15            THE DEFENDANT:  Huh-uh.
16            THE COURT:  Do you want to go over it now?
17            THE DEFENDANT:  Yeah, I guess if it's not too
18    late now.
19            THE COURT:  Then I'll take a break and you can
20    go over it with your lawyer and we'll start again.  All
21    right?
22            We have another sentencing at 11:30.  So take
23    Mr. Johnson and Mr. Runyon wherever you need to so we can
24    have the other sentencing.  And then you can bring them
25    back after that.
```

1    MR. RUNYON:  Thank you, Your Honor.

2    (WHEREUPON, a short break was taken.)

3    THE COURT:  Take your seats.  Thanks.

4    Yes, sir?

5    MR. McMILLIAN:  Your Honor, I believe the

6    defense has had time to consult and I believe that they

7    are ready to proceed.

8    THE COURT:  Okay.

9    All right.  The question I asked you,

10   Mr. Johnson, was did you have plenty of time to go over

11   your Presentence Report with your lawyer.  And you told me

12   that you didn't.  You've taken a couple minutes break.

13   Are you -- have you reviewed the report?

14   THE DEFENDANT:  Yes, I mean, I spoke to him.  I

15   really thought the objections, you know, that's what threw

16   me for a loop.  I thought the objections were really clear

17   that, you know, but I spoke to him and I see that I guess

18   we can't get over it, you know?  Especially the part about

19   my wife's gun, you know.  She got those guns in her name.

20   But I guess -- and then out of all the ammunition that

21   wasn't in there, but I heard the prosecution side said

22   that they were.  So I don't know how we could get over

23   something like that.

24   THE COURT:  Okay.  Well, I mean the Presentence

25   Report says that there were six boxes of ammunition found

1    in your room in the search warrant.

2            Isn't that right?

3            MR. McMILLIAN:  I want to be clear, Your Honor.

4    I believe that the -- we're kind of in the weeds, but I

5    believe there were six boxes of ammunition found.  Some of

6    that ammunition was found in his bedroom.  The other items

7    were found elsewhere not in his master bedroom.  I'm

8    sorry.  If I was unclear, I apologize.  I was speaking

9    quickly.  So I don't by any means want to misrepresent the

10   facts on that issue.

11           THE COURT:  Okay.  So the guns weren't in his

12   room.  The guns were owned by his wife.  But then, as I

13   said, possession and ownership are two different things.

14   But there were -- some of the ammunition was found in the

15   room along with the cocaine bag wrappers and the sealer

16   and some other things like that.

17           MR. McMILLIAN:  Those items were not found in

18   his bedroom.  They were all found elsewhere in the house.

19   The only items of evidence in his bedroom was some

20   miscellaneous rounds of ammunition.  Everything else was

21   elsewhere.

22           THE COURT:  Gotcha.

23           MR. McMILLIAN:  And the Government's assuming

24   for purposes of our argument that the firearms were owned

25   legally by his wife.

1        THE COURT:  Okay.

2        MR. RUNYON:  Your Honor?

3        THE COURT:  Yes.

4        MR. RUNYON:  I'm not sure that my client

5    understands the law on constructive possession as it

6    relates to the National Firearms Act and other -- so I

7    think that's where the confusion is.

8        THE COURT:  Okay.

9        MR. RUNYON:  And since we don't have to worry

10   about the 924(c), we need to get past that.

11       THE COURT:  Okay.  If in fact the Government

12   thought that he had possessed that firearm in connection

13   with a drug offense, they would have charged him with

14   924(c) which would have been a mandatory minimum of

15   whatever it is.  Obviously, the Government didn't take

16   that position.

17            But as far as the sentencing goes, it has to be

18   clearly improbable that the firearm was not connected to

19   the drug operation.  Clearly, the evidence in this case is

20   that the firearm is -- it's not improbable that the

21   firearm was connected with the drugs in this case even

22   though it was found in different rooms.  Some of the

23   ammunition was in his room.  But then the firearms, even

24   though they're owned by his wife, it still -- he doesn't

25   have to own them to possess them.  And constructive

1    possession means that you have the ability to use them

2    whether you own them or not.  Okay?

3           All right.  So, Mr. Johnson, are you comfortable

4    to go ahead with your sentencing here today?

5           THE DEFENDANT:  Um, yes, sir.

6           THE COURT:  Okay.  And this -- these objections,

7    I have to make a ruling on them.  If in fact Mr. Runyon

8    thinks my rulings are incorrect, that's what they have

9    appellate courts for.  And I'm not always right.  I just

10   do the best I can.  It may or may not be the last word on

11   this.  Okay?

12          All right.  So inasmuch as all parties have had

13   access to the report and all of the objections to the

14   report have been reviewed and ruled upon, I'll ask the

15   Clerk to file it under seal.  In the event of an appeal,

16   the Clerk will make it available to counsel for appellate

17   purposes.  Additionally, the probation officer made a

18   recommendation which will remain under seal until further

19   order of the Court.

20          In view of the fact that the objections have

21   been ruled on, I'm going to adopt the factual statements

22   in the Presentence Report as the findings of fact for the

23   purposes of sentencing.  It's my understanding based on my

24   rulings that nobody has any objection to the facts or the

25   guidelines in the report that have not already been ruled

1    upon; is that correct?

2            MR. McMILLIAN:  No other objection from the

3    Government, Your Honor.

4            MR. RUNYON:  No other objection from the

5    defense, Your Honor.

6            THE DEFENDANT:  Excuse me, sir?

7            THE COURT:  Yes?

8            THE DEFENDANT:  Can I at least say something

9    before sentencing?

10            THE COURT:  You'll get to say anything you want

11    to at sentencing.  I've just got to go through some --

12            THE DEFENDANT:  Oh, all right.  I thought you

13    was going with the sentencing now.

14            THE COURT:  One of the last things as a matter

15    of fact that I'm going to do is say, okay, Mr. Johnson,

16    what would you like to say about your sentencing.

17            THE DEFENDANT:  I'm just making sure.

18            THE COURT:  It's your life.  You get to talk

19    about it.  All right?

20            THE DEFENDANT:  Yes, sir.

21            THE COURT:  All right.  Based on the

22    calculation -- excuse me.  Based on the objections and the

23    facts as reported by the probation officer, it looks like

24    it's Offense Level 36, Criminal History Category VI, which

25    is 324 to 405 months imprisonment, five years supervised

1  release, and a hundred dollar special assessment.  Does

2  anyone have any further objection to the facts or the

3  guidelines?

4          MR. McMILLIAN:  No objection.

5          MR. RUNYON:  Your Honor, from the defense side,

6  we've already stated what our position is so --

7          THE COURT:  Right.

8          Okay.  Does the Government have a position with

9  regard to the sentence?

10         MR. McMILLIAN:  Yes, Your Honor.  You know, I'm

11 not going to go in and highlight all the facts that are

12 contained in the PSR.  I know the Court's reviewed that

13 and is well aware of the nature of Mr. Johnson's

14 involvement in the case.

15         But there are three things that stood out to me.

16 There's an intercepted call.  It's not detailed in the PSR

17 because it didn't really have any value as far as the

18 guidelines go.  But it's interesting nonetheless.  And I

19 referenced it during Mr. Johnson's bond hearing many

20 months ago.

21         In that call, Mr. Johnson refers to a quote by

22 James Brown.  James Brown called himself the hardest

23 working man in show business.  Mr. Johnson referred to

24 himself as the hardest working man in the snow business.

25 And at that hearing, I believe it was Task Force Officer

1  Desheers who is here with me today who testified that the

2  snow business is dealing cocaine.  And, you know, that

3  phone call was important.  And it was one that stood out

4  to the agents because Mr. Johnson referred to himself as a

5  large cocaine dealer.  And not only did he refer to

6  himself that way, but the facts bore it out independent of

7  his own admission on that.

8          And that is borne out in the guidelines that

9  we're looking at.  Mr. Johnson essentially is the highest

10 ranking member of the conspiracy that's charged in this

11 case.  And his guidelines reflect his role in the

12 conspiracy.

13         His guidelines are also driven very heavily by

14 his criminal history.  And regardless if some of it is ten

15 years old or not, or 15 years old, this would be a

16 different case if Mr. Johnson had a few convictions from

17 his youth.  I counted this morning 17 serious convictions.

18 I'm not talking about the traffic offenses and the small

19 things.  Seventeen drugs, violence, other convictions in

20 his record that span from his youth until the current day.

21 He has been in the system and out of the system many, many

22 times.  And he has continued to engage in very serious

23 multi-kilogram level criminal conduct that creates havoc

24 in our community.  So all of those issues are what drive

25 the guidelines to where they are.

1          And finally, you know, the PSR provides a very

2     good picture of the evidence that was collected in this

3     case.  But one thing that's notable, there's no historical

4     evidence in the PSR.  We're not taking the word of a bunch

5     of cooperators and putting it against Mr. Johnson.  The

6     evidence that's counted against him are kilogram wrappers

7     that were found, drugs that were seized, or phone calls

8     that were intercepted.  There are cooperating witnesses

9     who provided information.  We simply didn't pile that

10    information on top of Mr. Johnson because, frankly, the

11    evidence against him was strong enough.

12          So he's gotten some breaks in this case by not

13    having that happen.  And he's gotten breaks by the fact

14    that the PSR doesn't reflect that many of these drug deals

15    occurred while his children were with him.  You know,

16    those are things that occurred that aren't reflected in

17    the PSR.

18          Now, the Government is simply asking for a

19    guideline sentence in this case.  I think the guidelines

20    are accurately calculated.  They are significant.  There's

21    no doubt about that.  But it's rare that the Government

22    stands in front of Your Honor with someone with 17 prior

23    convictions who is at the top of a drug conspiracy that

24    was still engaged in it to this level.

25          So I'm glad to respond to any questions the

1    Court has or anything the defense wants to bring up, but

2    that's the Government's view.

3            THE COURT:  All right.

4            Mr. Runyon, I'll be glad to hear from you and

5    anybody you want to call with regard to the sentence -- or

6    sentencing.  And, of course, as to Mr. Johnson, I told him

7    he could already speak.  So I would like to hear from him.

8            MR. RUNYON:  Your Honor, here's where we are.

9    Like I said, my shovel keeps getting heavier every time --

10           THE COURT:  I think we need you get in front of

11   a microphone.

12           MR. RUNYON:  I'm sorry.  The shovel keeps

13   getting heavier every time I get into the sand pile.  The

14   simple fact, Judge, is we've got a defendant -- and I

15   understand what the PSR says.  And I'm not -- I'm not

16   taking issue with some of these positions the Government's

17   taken.  But the simple fact of the matter is, as I said

18   earlier, I'd like his -- the Court to at least consider

19   fashioning a sentence so that my client has an opportunity

20   not to die in prison.

21           Now he spent two years in the county jail

22   awaiting this day.  And he's been treated there minimally.

23   He's had a kidney biopsy.  There are certain things that

24   have happened that -- in his life that really reflect he's

25   got serious health issues.

1          Now, if the Court desires to enter the sentence

2     and we send him off, we file a motion for compassionate

3     consideration, that's fine.  But, of course, if we -- in

4     the course of that, if we appeal to the Fourth Circuit

5     after reviewing any transcripts and what have you, then

6     that might, quite frankly, delay the compassionate

7     consideration because you've got a question about the

8     possible jurisdiction of the Court in considering that.

9          What I would like the Court to do is send him

10    off, have him evaluated, have the medical report in front

11    of you so that the doctors can tell you -- not what I tell

12    you and not what we suppose and what have you.  He's got

13    serious health issues which have been confirmed which he's

14    been treated for by the Government in the last two years.

15    And we would ask the Court to consider sending him off or

16    having him evaluated here.  With the Government getting

17    ready to shutdown, I don't know how that's all going to

18    operate.  But the simple fact of the matter is they're

19    going to have money to do lots of things.  So they can

20    have money to evaluate my client medically.  And then give

21    the Court a report.  We've got some of the finest doctors

22    in the country right here in the City of Charleston at the

23    Med U and what have you.  And if you would get that

24    evaluation done as to his diagnoses, all of his diagnoses,

25    plus his prognosis and consider that in handing down a

1   sentence.

2         I'm not suggesting that under 3053 the Court's

3   going to give out any kind of patty cake sentence or

4   anything of that sort. But what I'm suggesting is that we

5   need -- there is a real need to have that information

6   before the Court so that you can make that decision when

7   you hand down the sentence.

8         THE COURT: Okay. Thank you. All right.

9   Anyone else you want to call with regard to besides

10   Mr. Johnson?

11         MR. RUNYON: Well, he has family here, Judge.

12   And I'm not sure that they are going to say anything

13   different. But the simple fact is --

14         THE COURT: Well, there's a young man in an

15   orange shirt that's raising his hand. So if you want to

16   say anything, talk to Mr. Runyon and then come on up here.

17   We've got to put you up here so we can hear you, sir.

18         MR. RUNYON: Go ahead.

19         THE COURT: Your name, sir?

20         THE DEFENDANT'S FATHER: My name is Louis

21   Johnson. I'm the father of Lamar Johnson.

22         THE COURT: Okay.

23         THE DEFENDANT'S FATHER: Judge, we all go

24   through changes. We all think about the bad things. But

25   I have some good things to say, too. You know, like, he

1   ain't said nothing good about him. But I believe that he

2   can be born again. I know him all my life, all my life.

3   He has seven kids, one adopted child. And I heard him say

4   that he came with him, but those kids came back. Those

5   are my grandkids.

6           Also I have my wife, his mother, with me today.

7   Through the school times, he was a good boy. 8th grade we

8   had to send him off to Wil Lou Gray. And he finished

9   there, came back, started working with me at Phillips

10  Industrial, played football through his high school year.

11  He's a good kid.

12          But, you know, I fell down, too. You know, I

13  can't tell you that I'm a great Christian man. And I

14  don't want to hold your time because I know you've got

15  other things to do. But we all fall down. But the Bible

16  says we've got to get back up. We can't lay there all our

17  life.

18          Through his years, yeah, he had some disbelief.

19  But yet he was still raising his children. He got two of

20  them right now that's finished school. They graduated,

21  two of them finished school and I think that's on Ashley

22  Phosphate Road. I've been out of school so long I can't

23  keep up with these schools.

24          THE COURT: They change the names all the times,

25  too.

1    THE DEFENDANT'S FATHER:  Yes, yes.  Like

2  St. Andrews, they all combined.  But anyway, he got two of

3  them that graduated.  Got two twins.  And his health is --

4  he haven't touched them yet. ·

5        He's a good kid.  I coach at the rec -- Mount

6  Pleasant Recreation Department.  I had a game yesterday

7  with one of the -- the eight year old.  He plays tackle

8  football.  And he plays tag -- the flag football.  And I

9  pray and I wish that he can get there just to see him how

10  he played.  He told me yesterday -- well, I'm talking

11  about him, but the little boy always talk about his daddy.

12  He's better than his daddy.  But yet I need him to come

13  out and prove, to see his son be better than his daddy.

14        It's so much good things I can say about him.

15  But all his kids look up to him.  And he's a good kid.

16  Like I said, we fall down but we got to get back up.  We

17  got to get back up, Your Honor.

18        And I can keep going on and on.  But I hope the

19  Court to be lenient.  Just sort of -- you know, I can't

20  tell you to slap him on the hand, you know, like we used

21  to get.  But I really got a lot to say that he's a good --

22  I supposed to say that.

23        His wife here.  My wife sometimes be good and

24  she be bad.  She argues at me because the kids running her

25  up the wall.  So, yeah.  But it's all good.  It's all

1   good.  It's part of life.  And I don't want to keep

2   talking but thank you, Your Honor.

3          THE COURT:  Thank you, Mr. Johnson.  Appreciate

4   it.

5          MR. RUNYON:  Thank you.

6          THE DEFENDANT:  Yes, Your Honor?

7          MR. RUNYON:  Mr. Johnson has something to say,

8   Judge.

9          THE COURT:  Okay.  Mr. Johnson, be glad to hear

10  from you.

11          THE DEFENDANT:  Yes, Your Honor.  I don't know

12  where to stand.

13          THE COURT:  Wherever you're comfortable.

14          THE DEFENDANT:  I don't want to say that all the

15  stuff was untrue that was said about me.  But as in the 17

16  convictions, that's -- I do not have 17 convictions at

17  all.  I don't know if he's looking at the wrong chart.  I

18  know my lawyer didn't want to say anything about it.  I

19  don't want to make you mad on the issue.  But that's

20  totally untrue.  I have at -- I know there's no way he

21  could say 7 -- I have 17 -- I have simple possession

22  charges.  I have, what, six charges at the most.  So I

23  just wanted to know where the 17, because all that's

24  piling up and just making me look worse, you know.  I just

25  -- at least I wanted to be truthful.  If I'm going to get

1  sentenced, sentence me with the truth not just piling up

2  lies on me.

3          But I wrote some stuff down, Your Honor.

4          THE COURT:  Sure.

5          THE DEFENDANT:  I just want to tell you, first

6  of all, I'd just like to say that I'm not the man the

7  prosecutor is portraying me to be.  When I first got

8  arrested, the agents told me that I was much different

9  from all of my co-defendants.  They said that they'd

10  follow me as I took my kids to and from school, as I took

11  them to McDonald's, and as I took them to football,

12  baseball, wrestling, and track and field practices.  They

13  said that they knew that I was a family man and that I had

14  the most to lose.  And they were absolutely right.

15          Then they said that I could be home in less than

16  a year if I provided them with the information that they

17  needed.  But when I told them that I couldn't cooperate

18  with them, it seemed like they really did everything in

19  their power to make my guidelines ridiculously high with

20  untrue things.

21          But now, just as the agent stated, I do have the

22  most to lose.  I have my wife, along with my seven

23  children, two of which I missed the whole pregnancy and

24  birth of while being incarcerated on this charge.  I would

25  love to be home in less than a year as it was offered to

1    me.  But before I put my family in danger by trying to get

2    out of trouble for some mistakes that I made, I'd much

3    rather pay for my wrongs myself.

4              So, Your Honor, I know that you probably tried

5    thousands of cases similar to mine.  But just as the agent

6    said, I do believe that I'm different.

7              I am a family man.  And I do admit to having

8    some bumps in the road in my past.  But I cleaned my act

9    up.  And I was doing great for nearly 15 years while

10   managing three different bars, which my father owned

11   throughout that period of time.  But I made a very costly

12   decision of going back to some old bad habits when I

13   started experiencing financial troubles.

14             So, Your Honor, I just hope and pray that you

15   take a very close look at this case and please have mercy

16   on me and also consider my health issues.  I'll be coming

17   up on three years of incarceration soon.  And that has put

18   my family in lots of financial strain without my help.

19             So I'd like to ask if you would allow me to

20   receive a lateral departure or variance, if possible, so I

21   can finish my time in a place that I'll have the

22   opportunity to work a job to help my family while

23   finishing my time.  And it'll also help me to address all

24   of my health issues much better.  Thank you for all your

25   time.

1          THE COURT:  Thank you.

2          Anything else, Mr. Runyon?

3          MR. RUNYON:  Um, no, Your Honor.

4          THE COURT:  Okay.

5          Anything else, Mr. McMillian?

6          MR. McMILLIAN:  Your Honor, to be clear --

7          THE COURT:  Wait a second.  I think this young

8   lady back here has been standing up.  I don't know if she

9   wants to say anything or not.

10          THE DEFENDANT'S WIFE:  Yes.  I'm his wife.

11          THE COURT:  Okay.  If you want to say anything,

12  come on up here please, ma'am.  And your name, please

13  ma'am.

14          THE DEFENDANT'S WIFE:  My name is Latoya Ancrum.

15  And I'm thinking with anybody else I would know him more

16  than most.  Just like when they came in the house, they

17  didn't know that I didn't know anything about what was

18  going on because I would have been gone, too.

19          Now, I know for a fact I've been trying to, I

20  guess, keep Lamar out of trouble ever since I met him.  I

21  known him since 1999.  And yes, he is an awesome father.

22  I can't tell you he's a great husband.  We've had our ups

23  and downs.

24          But what I can tell you is it's hard for me of

25  what he's going through because to me I'm feeling that

1    he's getting the softer part about the deal because I have

2    to deal with all of these kids by myself with just the

3    help of my inlaws.  I feel like he gets to sleep, eat, get

4    up, and do that all over again.  And I'm working three

5    jobs to take care of the household.

6            Now, I understand I'm just now learning the

7    difference between federal and state, so I'm not educated

8    within the law at all.  But I do know I refuse the broken

9    for the same reason.  And I thought me and him had that

10   same decision.  So as he said, he have not been in any

11   trouble within the past 15 years.  And yes, we did fall

12   into financial issues.  And I'm not sure why or how he

13   tried to get us out of it, which I know now he knows

14   wasn't the right direction.

15           So all I'm asking you is when you do decide to

16   sentence him as I know that will happen, please keep in

17   consideration -- I know you hear this every day.  But just

18   keep in consideration that not for myself, but my kids.  I

19   have twin boys he've never met or touched.  That's the

20   first time he's never been there for any of my kids in the

21   delivery room.  I mean, my OBGYN gave him the father award

22   because he never missed not one appointment.  And he

23   really is a family man.

24           And I think he was -- I think the prosecutor

25   said that he would drive with the kids to do this and

1    that, that was not proven.  It was said at a different

2    hearing.  So I know it's their job to paint a picture to

3    you.  But it's nothing his father can tell you that I

4    can't.  Nothing he can say that I can't because I know

5    him.

6             But what I will tell you is it's hard for me and

7    I feel like I'm being punished.  And I just want you to

8    keep that in consideration when you do make the

9    sentencing.

10            THE COURT:  Okay.  Thank you.

11            THE DEFENDANT'S WIFE:  And I appreciate it.

12            THE COURT:  Yes, ma'am.  Thank you.

13            Anything else?

14            MR. RUNYON:  No, Your Honor.

15            THE COURT:  Yes, sir?

16            MR. McMILLIAN:  Your Honor, I'm not trying to go

17   tit for tat on everything.  I think the only thing that

18   really may require a response is I want the record to be

19   clear.  The Government wants the Court to sentence on the

20   correct facts as well.  And my analysis of 17 convictions

21   comes from the Presentence Report.  I just recounted while

22   we sat here.  I'm sure the Court has reviewed those.  I

23   don't think there's an objection to their existence.  So

24   I'm glad to read them off.  Or I'm glad for the Court to

25   just accept what's in the PSR as proving what the criminal

1   history is.

2           THE DEFENDANT'S WIFE:  You just can't

3   (indiscernible) the Presentence Report.

4           THE COURT:  All right.

5           For the purposes of sentencing I have to --

6   under 18 United States Code 3553(a), I have to first

7   analyze the nature and circumstances of the offense.  It

8   is, I think everybody agrees, a serious offense.  There

9   were a lot of drugs involved, like 28 kilos of cocaine and

10  four ounces of marijuana.  There was some money involved.

11  So it was a serious offense.

12          And I have to look at the history and

13  characteristics of Mr. Johnson.  And, you know,

14  Mr. Johnson has a Criminal History Category VI, which is

15  as high as you can get based on the number of convictions.

16          I also have to look at the sentencing factors.

17  And again, one of the sentencing factors is reflect the

18  seriousness of the offense, which I've already done.

19          Promote respect for the law, Mr. Johnson has not

20  had a lot of respect for the law in the past.  I didn't

21  count the number of convictions.  I'm sure they are

22  outlined in the Presentence Report and they are from

23  records.  But I did notice that in Paragraph 60 he was

24  sentenced to marijuana, went to jail, got out on bond, and

25  got revoked.  He got his bond revoked.

1           Paragraph 61, 62, 63, 69, and 72 were simple

2    possession of marijuana convictions.  You know, I agree he

3    moved to Virginia, it's no problem.  But it's still

4    against the law in South Carolina.  And I have to say the

5    sentence should promote respect for the law.  Obviously,

6    you did something you knew was against the law.

7           In Paragraph 68, another marijuana conviction,

8    more serious one.  He went to jail, got back out on

9    parole, had his parole revoked.  Paragraph 64 had an

10   assault and battery high and aggravated nature, got out of

11   jail, had his probation or parole revoked.  Sixty-five, a

12   crack conviction, had his probation parole revoked.

13   Paragraph 70, a cocaine and marijuana conviction; 73, a

14   cocaine conviction; 74, a cocaine conviction.

15          On top of that, he had 11 more arrests.  Some of

16   those were combined with other ones and he pled guilty.

17   So that doesn't show a whole lot of respect for the law

18   when you get convicted and arrested for that many things.

19          Provide just punishment.  You know, I always say

20   just punishment is in the eye of the beholder.  What I

21   think is just, what Mr. McMillian thinks is just, what

22   Mr. Runyon thinks is just, what Mr. Johnson thinks is

23   just, everybody has different ideas.  I just do the best I

24   can.

25          Certainly, this sentence is going to afford

1    adequate deterrence to any further criminal conduct that

2    he has.  And certainly, this sentence will protect the

3    public from further crimes of the defendant because based

4    on his record, the public needs protection.

5            And again, as Mr. Runyon outlined, it will

6    provide him with needed educational or vocational training

7    and especially medical care or other correctional

8    treatment.

9            For that reason I'm going to recommend that he

10   serve his sentence in Butner Medical Institution in North

11   Carolina where his medical problems can be evaluated.  And

12   I can get a report from those medical problems.  And then

13   I can consider that on a compassionate release.  Because I

14   don't have any information except for secondhand

15   information about some kidney problems.  But once I get a

16   record from Butner, a medical report, I'll have the

17   information and I'll take that into consideration with

18   regard to a compassionate release.  Because one of the

19   things on compassionate release is his medical condition.

20   So it's proper to do it that way.  I don't have the

21   information to do it this way, in what I have today.

22           So having calculated and considered the advisory

23   sentencing guidelines and the relevant statutory factors

24   contained in 18 United States Code 3553(a), it's the

25   Judgment of the Court that the defendant, Lamar Louis

1    Johnson, is hereby committed to the custody of the Bureau

2    of Prisons for 324 months.  No fine.  Hundred dollar

3    special assessment.  Five years supervised release.

4             While on supervised release, the mandatory and

5    standard conditions of supervision.  Conditions 1 through

6    9 and 13 serve the statutory sentencing purposes of public

7    protection and rehabilitation.  Standard conditions 10 and

8    12 serve the statutory sentencing purpose of public

9    protection.  Standard condition 11 ensures that Mr.

10   Johnson does not engage in activities that may potentially

11   conflict with the other conditions of supervision and that

12   may pose risks to the defendant's probation officer.

13            Following special conditions.  Submit to

14   substance abuse testing to determine if he's used a

15   prohibited substance.  Contribute to the costs of the

16   program not to exceed the amount deemed reasonable by the

17   court-approved Probation's Sliding Scale for Services

18   because of his admitted substance abuse and distribution

19   of drugs.

20            All right.  Does anyone have any objection to

21   the form of that sentence?

22            MR. McMILLIAN:  No objection to the form.

23            MR. RUNYON:  No objections to the form, Judge.

24            THE COURT:  Okay.  And he's been in custody

25   since July 10th of 2019, so he gets credit for that time.

1          Are we dismissing some other charges?

2          MR. McMILLIAN:  Yes, Your Honor.  The Government

3  moves to dismiss the remaining counts of the indictment

4  and moves to incorporate the preliminary order of

5  forfeiture.

6          THE COURT:  Okay.

7          All right.  Mr. Johnson, you've got 14 days from

8  today to appeal this sentence.  If you can't afford a

9  lawyer, I'll appoint Mr. Runyon to represent you.  As soon

10  as I get the medical conditions report, file a motion for

11  compassionate release and I'll do it on its merits.  Okay?

12  Thank you very much.

13          MR. RUNYON:  Thank you very much, Your Honor.

14      (WHEREUPON, court was adjourned at 12:03 PM)

15                      * * *

16  I certify that the foregoing is a correct transcript from

17  the record of proceedings in the above-entitled matter.

18      s/Karen E. Martin              2/15/2022

19  Karen E. Martin, RMR, CRR        Date

20

21

22

23

24

25

# EXHIBIT D

## PSR

UNITED STATES DISTRICT COURT
DISTRICT OF SOUTH CAROLINA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| vs. | ) | PRESENTENCE INVESTIGATION REPORT |
| | ) | |
| LAMAR LOUIS JOHNSON | ) | Docket No.: 2:19CR00550-001DCN |
| a/k/a "McJag" | ) | Superseding Indictment |
| | ) | |

**Prepared for:**      **The Honorable David C. Norton**
United States District Judge

**Prepared by:**      **Daniel R. Schirra**
United States Probation Officer
Strom Thurmond Federal Building
1835 Assembly Street, Room 611
Columbia, SC 29201
803-253-3390
daniel_schirra@scp.uscourts.gov

**Assistant U.S. Attorney**
Everett Eugene McMillian
401 West Evans Street, Suite 222
Florence, SC 29501
843-665-6688
everett.mcmillian@usdoj.gov

**Defense Counsel**
William Lee Runyon, Jr., Retained
Number 3 Gamecock Avenue, Suite 303
Charleston, SC 29407
843-571-3515
runyonwilliamjr1@bellsouth.net

**Sentence Date:**      To be scheduled

**Offense:**      <u>Count One</u>: **Conspiracy to Possess with Intent to Distribute 5 Kilograms or More of Cocaine and a Quantity of Marijuana**
**21 U.S.C. §§ 841(a)(1), 841(b)(1)(A), and 846**
Minimum/Maximum Penalties: 10 years to Life imprisonment / $10,000,000.00 fine / At least 5 years supervised release / $100.00 special assessment fee
Class A Felony
*Date Offense Concluded:* July 10, 2019

**Adjudication:**      The defendant entered a plea of guilty as to <u>Count One</u> of the Superseding Indictment on December 8, 2020, pursuant to the terms of a written plea agreement.

**Release Status:**      On July 10, 2019, the defendant was arrested by federal authorities for the instant offense and made his initial appearance before the Honorable Bristow Marchant, United States Magistrate Judge. As the government moved for detention, the defendant waived his detention hearing, and he was ordered detained pending disposition of this case.

According to records obtained from the United States Marshals Service, the defendant has been in continuous federal custody since July 10, 2019.

**Detainers:**           None

**Codefendants:**        Theadore Bernard Gadsden      2:19CR00550-002DCN – Pled guilty on January 27, 2020; Awaiting sentencing

Jaton Lamont Edwards          2:19CR00550-003DCN – Awaiting trial

Jarvis Behrens                2:19CR00550-004DCN – Sentenced on January 6, 2021, to 78 months imprisonment followed by 4 years of supervised release

Theodore Bernard Gadsden      2:19CR00550-005DCN – Pled guilty on June 17, 2020; Awaiting sentencing

Pierce Nelson                 2:19CR00550-006DCN – Pled guilty on April 7, 2021; Awaiting sentencing

Antonio Miller                2:19CR00550-007DCN – Pled guilty on November 20, 2020; Awaiting sentencing

Deangelo Ravenel              2:19CR00550-008DCN – Pled guilty on April 7, 2021; Awaiting sentencing

Ryan Nelson                   2:19CR00550-009DCN – Pled guilty on February 3, 2021; Awaiting sentencing

Henry Kaneko                  2:19CR00550-010DCN – Awaiting trial

Constance S. Manigault        2:19CR00550-011DCN – Deferral of prosecution ordered on January 14, 2021

| | |
|---|---|
| Latrel Diquan Demaine Hamilton | 2:19CR00550-012DCN – Pled guilty on December 8, 2020; Awaiting sentencing |
| Damion Kareeb Brown | 2:19CR00550-013DCN – Pled guilty on November 18, 2020; Awaiting sentencing |
| Domaneck Ryan Ashley Dixon | 2:19CR00550-014DCN – Sentenced on April 9, 2021, to time served followed by 3 years of supervised release |
| Juan Bavista Angulo | 2:19CR00550-015DCN – Pled guilty on December 7, 2020; Awaiting sentencing |
| Rashard Whitfield | 2:19CR00550-016DCN – Awaiting trial |
| Tiemeyer O'Neil Gethers | 2:19CR00550-017DCN – Sentenced on April 9, 2021, to 30 months imprisonment followed by 3 years of supervised release |
| Timothy Robinson | 2:19CR00550-018DCN – Sentenced on April 14, 2021, to 21 months imprisonment followed by 3 years of supervised release |
| Orealius Syron Nelson | 2:19CR00550-019DCN – Pled guilty on February 24, 2021; Awaiting sentencing |
| **Related Cases:** | None |

**Lamar Louis Johnson, a/k/a "McJag"**
**Docket No. 2:19CR00550-001DCN**

### Identifying Data:

| | |
|---|---|
| **Date of Birth:** | August 26, 1979 |
| **Age:** | 41 |
| **Race:** | Black or African American |
| **Hispanic Origin:** | Non-Hispanic origin |
| **Sex:** | Male |
| | |
| **SSN#:** | 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 |
| **FBI#:** | 159125FB1 |
| **USM#:** | 34468-171 |
| **SC SID#:** | SC01112831 |
| **Client #:** | 6283103 |
| | |
| **Education:** | No HS Diploma or GED |
| **Dependents:** | Five children |
| **Citizenship:** | U.S. Citizen |
| **Country of Birth:** | United States |
| **Place of Birth:** | New York, NY |

**Residential Address:**
205 Sugarberry Lane
Moncks Corner, SC 29461
843-709-1206

**Alias(es):**
*Also Known As*: John Vanderhorst; McJag; Lamar Lewis Johnson

**Alternate IDs:**
*Alternative Social Security Number*: 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
*Alternative Date of Birth*: 5/29/1980

**Date Report Prepared:** April 16, 2021     **Date Report Revised:**

*Restrictions on Use and Redisclosure of Presentence Investigation Report.* Disclosure of this presentence investigation report to the Federal Bureau of Prisons and redisclosure by the Bureau of Prisons is authorized by the United States District Court solely to assist administering the offender's prison sentence (i.e., classification, designation, programming, sentence calculation, pre-release planning, escape apprehension, prison disturbance response, sentence commutation, or pardon) and other limited purposes, including deportation proceedings and federal investigations directly related to terrorist activities. If this presentence investigation report is redisclosed by the Federal Bureau of Prisons upon completion of its sentence administration function, the report must be returned to the Federal Bureau of Prisons or destroyed. It is the policy of the federal judiciary and the Department of Justice that further redisclosure of the presentence investigation report is prohibited without the consent of the sentencing judge.

4

## PART A. THE OFFENSE

### Charge(s) and Conviction(s)

1.    **Lamar Louis Johnson, a/k/a "McJag,"** is one of 17 codefendants[1] named in a fifty-count Superseding Indictment with a forfeiture allegation, which was filed in the District of South Carolina on February 25, 2020. **Johnson** is named in <u>Counts One, Twelve, Twenty-Three through Twenty-Six, and Thirty-Eight through Forty-Six,</u> as well as the forfeiture allegation of the Superseding Indictment.

2.    By way of background, the Superseding Indictment sets forth at all times relevant to this Superseding Indictment, the defendants were members and/or drug trafficking associates of a street gang known at the "Dorchester Terrace Crew" and/or "4-Mile." This street gang obtained bulk supplies of cocaine and other narcotics from interstate sources of supply and then redistributed the drugs to street-level drug dealers in the greater Charleston area. The gang members and associates threatened violence and used firearms to defend themselves and their criminal enterprise from rival drug dealers and gang members.

3.    <u>Count One</u> charges beginning at a time unknown to the grand jury, but beginning at least in or around March 2017, and continuing thereafter, up to and including the date of this Superseding Indictment, in the District of South Carolina and elsewhere, the defendants, **Lamar Louis Johnson, a/k/a "McJag";** Jaton Edwards, a/k/a "Julio"; Theodore Bernard Gadsden; Pierce Nelson, a/k/a "Paso"; Antonio Miller; DeAngelo Ravenel, a/k/a "Fast Cash"; Ryan Nelson, a/k/a "Clepto"; [Redacted Codefendant]; Constance S. Manigault; Latrel Diquan Demaine Hamilton, a/k/a "Trel Black," a/k/a "Latino"; Damion Kareeb Brown, a/k/a "D-Black"; Juan Bavista Angulo, a/k/a "Bush"; Domaneck Ryan Ashley Dixon, a/k/a "Dom"; Rashard Whitfield, a/k/a "Shard"; Tiemeyer O'Neil Gethers, a/k/a "T.O."; Timothy Robinson, Jr., a/k/a "Thriller"; and Orealius Syron Nelson, a/k/a "Syron," a/k/a "Kemo," knowingly and intentionally did combine, conspire, agree and have tacit understanding with each other and with others, both known and unknown to the grand jury, to knowingly, intentionally and unlawfully possess with intent to distribute and distribute heroin and marijuana, .both Schedule I controlled substances; and cocaine, cocaine base (commonly referred to as "crack cocaine"), a substance containing a detectable amount of methamphetamine, oxycodone, all Schedule II controlled substances. With respect to **Lamar Louis Johnson,** the amount involved in the conspiracy attributable to him as a result of his own conduct, and the conduct of other conspirators reasonably foreseeable to him, is 5 kilograms or more of cocaine and a quantity of marijuana, in violation of Title 21, United States Code, Sections 841(a)(1), 841(b)(1)(A), 841(b)(1)(D), and 846.

4.    <u>Count Twelve</u> charges on or about March 1, 2019, in the District of South Carolina, the defendant, **Lamar Louis Johnson, a/k/a "McJag,"** and DeAngelo Ravenel, a/k/a "Fast Cash," as principles, aider and abettors, and co-participants in a jointly undertaken activity, knowingly, intentionally and unlawfully did possess with intent to distribute 500 grams or more of cocaine, a Schedule II controlled substance; In violation of Title 21, United States Code, Sections 841(a)(1) and 841(b)(1)(B), and Title 18, United States Code, Section 2.

---

[1] Codefendants Theodore Bernard Gadsden and Jarvis Behrens were not named in the Superseding Indictment as they pled guilty to the original Indictment prior to the Superseding Indictment's filing.

5.     <u>Counts Twenty-Three through Twenty-Six and Thirty-Eight through Forty-Six</u> charge on or about the dates set forth below, in the District of South Carolina, the named defendants knowingly and intentionally did use a communication facility, to wit: a telephone, to facilitate the commission of a felony under the Controlled Substances Act, to wit: conspiracy to possess with intent to distribute and possession with intent to distribute and distribution of controlled substances as set forth above; and did aid and abet each other in the commission of the aforesaid offense, in violation of Title 21, United States Code, Sections 841(a)(1) and 846; All in violation of Title 21, United States Code, Section 843(b), and Title 18, Unites States Code, Section 2:

| Count | Date | Defendant(s) |
|:-----:|:----:|:-----------:|
| 23 | 3/4/19 | Antonio Miller<br>**Lamar Louis Johnson** |
| 24 | 2/22/19 | Antonio Miller<br>**Lamar Louis Johnson** |
| 25 | 3/1/19 | DeAngelo Ravenel<br>**Lamar Louis Johnson** |
| 26 | 3/2/19 | DeAngelo Ravenel<br>**Lamar Louis Johnson** |
| 38 | 3/2/19 | Rashard Whitfield<br>**Lamar Louis Johnson** |
| 39 | 3/3/19 | Rashard Whitfield<br>**Lamar Louis Johnson** |
| 40 | 3/1/19 | Tiemeyer O'Neil Gethers<br>**Lamar Louis Johnson** |
| 41 | 3/3/19 | Timothy Robinson, Jr.<br>**Lamar Louis Johnson** |
| 42 | 3/6/19 | Timothy Robinson, Jr.<br>**Lamar Louis Johnson** |
| 43 | 3/6/19 | Timothy Robinson, Jr.<br>**Lamar Louis Johnson** |
| 44 | 3/2/19 | Orealius Syron Nelson<br>**Lamar Louis Johnson** |
| 45 | 3/1/19 | Pierce Nelson<br>**Lamar Louis Johnson** |
| 46 | 3/6/19 | Pierce Nelson<br>**Lamar Louis Johnson** |

6.     In addition to the criminal charges, a forfeiture allegation is contained within the instant Superseding Indictment which states upon conviction for felony violation of Title 18 and 21, United States Code as charged in this Superseding Indictment, **Lamar Louis Johnson, a/k/a "McJag,"** and his codefendants shall forfeit to the United States all of the Defendants' right, title and interest in and to any property, real and personal, (a) constituting, or derived from any proceeds the Defendants obtained, directly or indirectly, as the result of such violation(s) of Title 21, United States Code, and all property traceable to such property; (b) used or intended to be used, in any manner or part, to commit or to facilitate the commission of such violations of Title 21, United States Code.

7. Pursuant to Title 21, United States Code, Sections 853 and 881, and Title 28, United States Code, Section 2461(c), the property which is subject to forfeiture upon conviction of the Defendants for offenses charged in this Indictment includes, but is not limited to, the following: *Proceeds/Forfeiture Judgment:* A sum of money equal to all property the Defendants obtained as a result of the drug offenses charged in the Indictment, and all interest and proceeds traceable thereto as a result for their violation of 21 U.S.C. §§ 841, 843; and 846.

8. On December 8, 2020, in accordance with the terms of a written plea agreement, **Lamar Louis Johnson, a/k/a "McJag,"** accompanied by his attorney, William Lee Runyon, Jr., appeared before the Honorable David C. Norton, United States District Judge, and pled guilty to <u>Count One</u> of the aforementioned Superseding Indictment, pursuant to the terms of a written plea agreement.

9. <u>Paragraph Four</u> of the plea agreement states provided the defendant complies with all terms of the agreement, the United States agrees to move to dismiss the remaining counts of the Indictment [and any other indictments under this number] at sentencing. The defendant understands the Court may consider these dismissed counts as relevant conduct, pursuant to §1B1.3 of the United States Sentencing Guidelines.

10. <u>Paragraph Six</u> of the plea agreement states the defendant agrees to voluntarily surrender to, and not to contest the forfeiture of any and all assets and property, or portions thereof, which are subject to forfeiture pursuant to any provision of law, including but not limited to, property in the possession or control of the defendant or defendant's nominees. Specifically, the defendant agrees to voluntarily surrender, and not contest the forfeiture of property identified in the Superseding Indictment, and any forfeiture Bill of Particulars.

11. <u>Paragraph Eight</u> of the plea agreement states the attorneys for the government agree to recommend that the defendant not be prosecuted for any similar or related state crimes stemming from the conspiracy described in the Superseding Indictment, so long as the defendant complies with the terms of this plea agreement. The defendant understands that this is only a recommendation and is not binding upon the Charleston County Solicitor's Office. Furthermore, the defendant fully understands that he has no right to withdraw his guilty plea should such recommendation not be followed by the Solicitor's Office.

12. <u>Paragraph Ten</u> of the plea agreement states the defendant is aware that 18 U.S.C. § 3742 and 28 U.S.C. § 2255 afford every defendant certain rights to contest a conviction and/or sentence. Acknowledging those rights, the defendant, in exchange for the concessions made by the government in this plea agreement, waives the right to contest either the conviction or the sentence in any direct appeal or other post-conviction action, including any proceedings under 28 U.S.C. § 2255. This waiver does not apply to claims of ineffective assistance of counsel, prosecutorial misconduct, or future changes in the law that affect the defendant's sentence. This agreement does not affect the rights or obligations of the government as set forth in 18 U.S.C. § 3742(b). Nor does it limit the government in its comments in or responses to any post-sentencing matters.

13. <u>Paragraph Eleven</u> of the plea agreement states the defendant waives all rights, whether asserted directly or by a representative, to request or receive from any department or agency of the United States any records pertaining to the investigation or prosecution of this case, including without

limitation any records that may be sought under the Freedom of Information Act, 5 U.S.C. § 552, or the Privacy Act of 1974, 5 U.S.C. § 552a.

**Pretrial Services Adjustment**

14.  None

**The Offense Conduct**

15.  According to information provided by multiple local and federal law enforcement agencies, beginning around the spring of 2014, an investigation commenced into the acts of violence between two rival criminal street gangs in the North Charleston area of South Carolina. This multiagency effort included: The Federal Bureau of Investigation (FBI); the U.S. Postal Inspector Service (USPIS); the South Carolina Law Enforcement Division (SLED); the North Charleston Police Department (NCPD); the Charleston Police Department (CPD); the Charleston County Sheriff's Office (CCSO); and the United States Attorney's Office. The first street gang, and the primary target of the investigation, was the Dorchester Terrace Crew, a/k/a 4-Mile, which operated out of the Dorchester Terrace neighborhood in North Charleston, SC. The Dorchester Terrace Crew consisted mostly of family members and residents of the neighborhood. The other criminal street gang was known as the Loudpack, a/k/a 5-Mile, and it operated out of the nearby Dorchester Waylyn neighborhood.

16.  Through interviews with cooperating informants, controlled drug purchases, pen register trap and trace data, physical surveillance, telephone toll data, forensic evidence, and local law enforcement incident reports, the investigation established members of DTC were working in concert distributing drugs throughout the greater Charleston area of South Carolina. Furthermore, the investigation established members of DTC were engaging in acts of violence against members of Loudpack and others in furtherance of their drug activity, to protect their "*turf*," and to retaliate against those they believed had committed acts of violence against their gang. Investigators made multiple ounce-quantity drug purchases of methamphetamine, heroin, cocaine, and crack cocaine from members of DTC. Additionally, other law enforcement actions led to the seizures of guns and drugs. Cooperating informants identified Joshua Porcher as the "*general*" of DTC, who had been one of the primary traffickers of heroin, cocaine, and marijuana for DTC until his death in November of 2018. Theadore Gadsden worked directly with or under J. Porcher and was considered to be the "*lieutenant*" of DTC. A confidential informant further described Gadsden as the "*shooter and robber*" in DTC who held a "*high standing*" due to his drug sales. J. Porcher's brother, Devant Porcher, was a mid-level member and drug distributor for DTC, who set a goal to find and retaliate against those who had murdered his brother.

17.  Through wiretap surveillance of high-ranking DTC gang member Theadore Gadsden's telephone, special agents learned **Lamar Louis Johnson, a/k/a "McJag,"** was a large source of drugs for members of DTC, including Gadsden. Through subsequent wiretap surveillance of **Johnson's** telephone, FBI special agents documented hundreds of pertinent telephone calls between **Johnson** and other members of DTC discussing drug transactions. Furthermore, **Johnson** was intercepted discussing drug transactions with members of DTC's rival street gang, Loudpack. The investigation revealed a number of street-level dealers worked for **Johnson,** including, but not limited to, Rashard Whitfield, Pierce Nelson, and Denzil Edwards. Additional individuals, such as

8

Tiemeyer Gethers and Timothy Robinson, routinely accompanied or further facilitated **Johnson's** drug distribution business. Following the murder of DTC leader J. Porcher on November 24, 2018, FBI special agents discovered Gadsden and **Johnson** became DTC's main sources of supply for illegal controlled substances. The following are a select sample of the hundreds of telephone calls intercepted on **Johnson's** telephone, which discussed drug transactions.

18. During the early afternoon of January 24, 2019, FBI special agents intercepted a telephone call Theadore Gethers made to **Johnson** concerning a cocaine order. Gadsden stated, "*...I need to gather a little something man. I need to put another seven on top of that sh\*t and whatever the half.*" Surveilling FBI special agents recognized Gadsden requested 7 ounces of cocaine ("*seven*") in addition to ("*on top of*") a half of a kilogram of cocaine he already ordered from **Johnson** previously ("*the half*"). Gadsden agreed to "*pull up right there*" to meet with **Johnson** to complete the transaction. *These quantities of cocaine will not be included in **Johnson's** total drug weight to avoid double-counting as they may have already been attributed to **Johnson** in Paragraph 42.*

19. On January 26, 2019, at 10:24 P.M., Theadore Gadsden was contacted by **Johnson** to follow up on complaints Gadsden had received about the cocaine **Johnson** sold to Gadsden. Specifically, Gadsden told **Johnson**, "*That n\*gga bring back two and a half of that sh\*t. That sh\*t different from my sh\*t for real man. I just give him the bread right out my pocket.*" **Johnson** replied, "*That's why I been telling you that been. I had, um, had about 4 or 5 different ones. All of them had different logo, but all of them, 'cause l bust all of them, so all of them have been crispy. But you know I ain't been broken them up. But sh\*t I done broke down them to 9s. I got 'em all, all of them been solid though.*" Gadsden responded, "*I want the one he had. I see the difference in that sh\*t. I about to gather up now and see what all I going to get. Know what I sayin'?*" Surveilling FBI special agents recognized Gadsden had complained that he was given back two and a half ounces of cocaine from a customer because his customer did not like the quality. This was from the same quantity of cocaine Gadsden had previously obtained from **Johnson**. Gadsden complained he had to give the customer a refund out of his own pocket. **Johnson** acknowledged there were differences in the "*4 or 5 different ones,*" which investigators recognized as a reference to 4 or 5 different kilograms of cocaine he was distributing from, since each had "*different logo[s].*" FBI special agents noted logos or stamps are often used to distinguish one group's product from another. Gadsden concluded the conversation by informing **Johnson** he would try to sell the cocaine he had and figure out how much money he could collect ("*gather up*"). *These quantities of cocaine will not be included in **Johnson's** total drug weight to avoid double-counting as they may have already been attributed to **Johnson** in Paragraph 42.*

20. On January 27, 2019, at 11:31 A.M., Theadore Gadsden contacted **Johnson** to discuss a drug transaction previously arranged on this date. Gadsden asked **Johnson**, "*How long you talking about?*" **Johnson** replied, "*Just about 10 minutes.*" Gadsden stated, "*I about to head right there.*" **Johnson** then informed Gadsden, "*I end up just bringing the situation, but I done had them in nenes.*" Gadsden asked, "*It ain't that one that bra had?*" **Johnson** responded, "*No, shouldn't be, I try to damn, um, divvy and make sure I get the other one. Remember, I told you all of them been different? But he had a halfway, so I know I had another half of this sh\*t. You gotta look at them. Like I say about 5 or 6 of them been different.*" Gadsden agreed, "*I'll see. The shake, this little shake I got fire. But sh\*t I rather change 'em in, but I'll look and see...I about to pull right there.*" Investigators recognized **Johnson** was meeting with Gadsden at a predetermined location which

had been previously discussed during an unmonitored call. During this call, **Johnson** revealed he was bringing a kilogram of cocaine [*"situation"*] which had already been broken down into 9-ounce packages ["*nenes*"] to Gadsden. When Gadsden questioned the quality of the cocaine again, **Johnson** reiterated *"No…about 5 or 6 of them been different,"* which referred to 5 or 6 kilograms of cocaine he had stored for distribution. *These quantities of cocaine will not be included in* **Johnson's** *total drug weight to avoid double-counting as they may have already been attributed to* **Johnson** *in Paragraph 42.*

21.  Following the transaction on January 27, 2019, FBI special agents intercepted additional telephone calls between Theadore Gadsden and **Johnson** concerning the poor quality of cocaine **Johnson** had supplied Gadsden. Gadsden discussed the need to swap out the poor-quality cocaine he had previously acquired from **Johnson** for better quality cocaine. Gadsden complained, *"I cooked and recooked that sh\*t…"* which referred to cooking cocaine into crack cocaine. Gadsden recalled he already returned 5 ounces of cocaine to **Johnson**, and he had an additional 23 ounces of cocaine in his possession, which equaled a total of 28 ounces of cocaine which **Johnson** owed to Gadsden. **Johnson** revealed he had three *"ninos"* (three 9-ounce quantities) of cocaine or 27 ounces total. Gadsden agreed to take the 27 ounces in return for the bad 28 ounces he previously acquired from Johnson. *These quantities of cocaine will not be included in* **Johnson's** *total drug weight to avoid double-counting as they may have already been attributed to* **Johnson** *in Paragraph 42.*

22.  On January 28, 2019, FBI special agents intercepted additional telephone calls between **Johnson** and Theadore Gadsden concerning the cocaine swap arranged on February 27, 2019 (*see Paragraph 21*). During the conversations, Gadsden informed **Johnson**, *"I'll meet you right there by my sister house."* Approximately 10 minutes later, surveilling law enforcement personnel observed **Johnson** in a dark gray Dodge pickup truck arrive and meet Gadsden at 3257 Meeting Street Road, which is the residence of Gadsden's sister, Kara Elaine Gadsden. While at 3257 Meeting Street Road, **Johnson** exited the Dodge pickup holding a small box and entered a light gray Nissan Pathfinder driven by Gadsden. After a short period of time, **Johnson** exited the Nissan Pathfinder and returned to his Dodge pickup. Both vehicles then left the location.

23.  From February 13, 2019, through February 15, 2019, FBI special agents intercepted Ryan Nelson, a/k/a *"Clept,"* make and receive multiple phone calls using **Johnson's** cell phone on **Johnson's** behalf. The individuals communicating with Nelson included Theadore Gadsden, Tiemeyer Gethers, Devon Simmons, Edgefield FCI BOP federal inmate Nathaniel Fabor, Timothy Robinson, and multiple unknown males. During the calls, Nelson reiterated **Johnson** was out of town and had left his phone with Nelson. Nelson informed many of the individuals that **Johnson** was on his way back and discussed preparations for transactions upon **Johnson's** return.

24.  For example, on February 13, 2019, FBI special agents intercepted Ryan Nelson use **Johnson's** telephone to discuss a kilogram quantity cocaine transaction with an unknown supplier in Atlanta, GA, that had fallen through. Specifically, the supplier informed Nelson, *"So we a no-go man."* Nelson replied, *"I feel you, what is the number on that sh\*t?"* The supplier replied, *"It was 34."* Nelson advised, *"Alright. Well sh\*t, I am gonna head on back then, and see if I can come up with the four before ole boy* [**Johnson**] *come back."* The supplier responded, *"Yeah man. I apologize for having you here all day man."* FBI special agents recognized Nelson had attempted to acquire a large quantity of cocaine from a source of supply in Atlanta, GA, but the deal had fallen through. The male informed Nelson the cost of the cocaine was $34,000.00 ("*34*"), which is consistent to

the price Johnson had noted in other calls he regularly paid for 1-kilogram quantities of cocaine. Nelson informed the supplier that he would return to Charleston, SC, and attempt to get more money together before Johnson ("*ole boy*") returned from out of town. Shortly following the failed cocaine transaction, Nelson used Johnson's phone to call an unknown male to inform him, "*Man, I come back empty man.*" On February 14, 2019, Nelson used Johnson's telephone to receive a call from Theadore Gadsden, who inquired into the failed cocaine transaction. Gadsden asked, "*How you looking?*" Nelson replied, "*I just leave, I coming back from up there now, I coming back empty though.*" Nelson reiterated Gadsden that Johnson was out of town until Friday during both conversations. While complaining about the failed drug transaction during a conversation with an unknown male on February 15, 2019, Johnson confirmed he had instructed "*Clep*" to contact "*this man, that man, and this man when I been head home*" to setup the drug transaction.

25. On February 15, 2019, FBI special agents intercepted Ryan Nelson use Johnson's telephone to call Tiemeyer Gethers. During the call, Nelson revealed, "*Sh\*t, ole boy* [Johnson] *wanted me to call and see if um you situated or whatever or gathered up so he can tip on out or whatever.*" Nelson specified, "*But um, he's* [Johnson] *been out of town he's on his way back up now. But he left his phone with me while he was gone. Trying to get everybody situated.*" Gethers asked Nelson if he was "*situated*" or if he "*done dead*" in reference to "*clean.*" Surveilling FBI special agents recognized this meant Gethers had asked Nelson if Johnson still had cocaine ("*clean*") for sale. Gethers asked to "*link up in a sec*" to obtain the quantity of cocaine. However, Nelson advised he was in Columbia, SC, and agreed to meet later in the day when he returned. Nelson, using Johnson's telephone, was continuing to assist in Johnson's drug distribution business by while Johnson was out of town.

26. On February 20, 2019, FBI special agents intercepted multiple telephone calls between cocaine supplier Antonio Miller and Johnson. During these calls, Johnson discussed a desire to purchase a quantity of cocaine with Miller. Johnson specified, in detail, pricing for the cocaine they could purchase, along with past and future profits from selling cocaine. Miller complained about the high price for the cocaine Johnson's source was charging. He informed Johnson he gets his cocaine for $32,000.00, but he paid three other people an additional $1,500.00 for drivers and/or security. Miller suggested to Johnson, "*It gotta be cheaper. You are going directly to the source. There isn't a third party. Directly to these people. They have it so jacked up...I will have to jack up my price...That sh\*t high.*"

27. On February 22, 2019, FBI special agents overheard a telephone call Johnson received from an unknown male (UM) discussing a marijuana transaction. Specifically, UM asked Johnson to sell him "*a little half, um zippy.*" Johnson replied, "*Alright, you say half a zip?*" UM responded, "*Yeah,*" and asked, "*What flavor you got?*" Surveilling special agents recognized UM asked for ½ of an ounce ("*zippy*") of marijuana based on their knowledge marijuana comes in different grades and flavors. Based on this information, Johnson was held accountable for agreeing to distribute ½ **ounce or 14.175 grams of marijuana** to UM for guideline sentencing purposes.

28. On February 22, 2019, FBI special agents intercepted a telephone call Antonio Miller made to Johnson to discuss their drug business, cocaine pricing, and an associate who had been arrested. During the call, Johnson repeatedly asked Miller to give him a good price for a quantity of cocaine. Johnson then stated, "*Well, let me get a halftime man,*" which special agents recognized to be a reference to half of a kilogram of cocaine. Miller responded, "*Man, sh\*t, I gotta see...I got*"

*to give* [my cousin] *something off my sh\*t."* **Johnson** then asked, *"How much you want to charge me for a halftime man?"* Miller replied, *"I dollaring this b\*tch out. I got 2,"* which surveilling special agents recognized to mean Miller was selling his supply of 2 kilograms of cocaine at $1,000.00 per ounce. **Johnson** agreed on the price and stated, *"Yeah, let me get a halftime." This quantity of cocaine will not be included in **Johnson's** total drug weight to avoid double-counting as it may have already been attributed to **Johnson** in Paragraph 42.*

29.    On February 22, 2019, law enforcement personnel conducted physical surveillance at 4997 Ballantine Drive, North Charleston, SC. Wiretap interceptions of **Johnson's** phone revealed he planned to acquire and sell cocaine to various people on this date. Investigators concluded one of the locations **Johnson** planned visit was the Ballantine Drive location. At approximately 11:00 A.M., officers observed **Johnson** stop by the residence for a short period and leave. At approximately 1:20 P.M., surveillance units observed Bernard Aaron Green and Courtney Nelson exit the residence. Green had a trash bag he put into a 2014 Honda Accord. As the vehicle left the location, NCPD Officer S. Tucker initiated a traffic stop on the vehicle for a moving violation. During a free air sniff of the vehicle, Officer Tucker's drug sniffing K-9 alerted to the presence of narcotics inside the vehicle, which led officers to search the vehicle. During the search, officers located approximately 10 ounces of cocaine and approximately 3 ounces of cocaine base in the trash bag Green had placed in the vehicle. There was also packaging consistent with the packaging of large amounts of cocaine. Based on their observations, law enforcement obtained a state search warrant for the Ballantine Drive residence. During a search of the residence, law enforcement discovered large compressed quantities of cocaine imprinted with *"A-1."* During numerous intercepted telephone conversations, **Johnson** admitted he and Ryan Nelson had just purchased half of a kilogram of cocaine from Green prior to Green's arrest. Specifically, during one of the conversations on February 24, 2019, **Johnson** revealed, *"Me and Clept just been to the mothaf\*ckin house right before that sh\*t, like a couple hours before the sh\*t, but I gone in and n\*gga* [Green] *had slide me with something. You know what I sayin?... Soon as he* [Green] *leave from his house, them boy been on his ass or whatever, and catch him...and go on back to the house and I think get a damn situation* [kilogram of cocaine]." *This quantity of cocaine will not be included in **Johnson's** total drug weight to avoid double-counting as it may have already been attributed to **Johnson** in Paragraph 42.*

30.    On March 1, 2019, FBI special agents intercepted a telephone call **Johnson** received from Tiemeyer Gethers concerning an arrangement for **Johnson** to purchase a quantity of cocaine from drug supplier DeAngelo Ravenel. Specifically, Gethers informed **Johnson**, *"He* [Ravenel] *said the nene at 9. He just staking them out...I got a stack for you too."* **Johnson** asked, *"Where we got to meet him?"* Gethers replied, *"In the west."* During subsequent calls, Gethers informed **Johnson** he was on the way to Ravenel's residence to facilitate **Johnson's** purchase of cocaine from Ravenel. Based on this information and additional information obtained through intercepted telephone sessions between **Johnson** and Ryan Nelson, surveilling special agents confirmed **Johnson** purchased 9 ounces of cocaine from Ravenel in exchange for $9,000.00 (*"nene at 9"*) in West Ashley, SC (*"in the west"*). *This quantity of cocaine will not be included in **Johnson's** total drug weight to avoid double-counting as it may have already been attributed to **Johnson** in Paragraph 42.*

31.    On March 1, 2019, FBI and SLED special agents intercepted **Johnson** making a telephone call to Pierce Nelson to discuss supplying Nelson with ½ of an ounce of cocaine. During a subsequent call, **Johnson** confirmed, "*Alright you just said a 14?*" Nelson replied, "*Yeah.*" **Johnson** then informed Nelson, "*I am about to be by Little Timmy* [Robinson]. *I am supposed to be picking him up. You want to meet me by the barber shop on D* [Dorchester Road]?" Nelson agreed. **Johnson** added, "*You can meet me there. I am about to pick up Little Timmy and take him round there.*" Surveilling SLED special agents followed **Johnson** and Robinson to Celebretiez Barbershop on Dorchester Road. There, agents observed a tan minivan enter the parking lot and park behind the barbershop. Robinson was then seen waving the minivan over to **Johnson's** truck. Nelson exited the van and walked to **Johnson** and Robinson, where a transaction occurred. *This quantity of cocaine will not be included in **Johnson's** total drug weight to avoid double-counting as it may have already been attributed to **Johnson** in Paragraph 42.*

32.    During the middle afternoon hours on March 1, 2019, FBI special agents intercepted a telephone call **Johnson** made to Theadore Gadsden concerning a large cocaine purchase. Gadsden requested **Johnson** arrange for the purchase of "*half*" (half of 1 kilogram of cocaine) from **Johnson's** drug supplier, later identified as DeAngelo Ravenel. Specifically, Gadsden asked, "*You can just pick me a little half, that's all I got right here where I at now.*" **Johnson** replied, "*You said a little what?*" Gadsden specified, "*Half of that*" (referring to half of a kilogram). **Johnson** agreed and informed Gadsden, "*Aight, I'm gonna tell him* [Ravenel] *to put a pause on it.*" Gadsden reaffirmed, "*Yea, I still want 'em though, a little half one right quick.*" **Johnson** agreed, "*That's a bet.*" Prior to meeting for the drug transaction on March 1, 2019, Gadsden contacted **Johnson** to change the meeting location because the area was "*hot*" due to a large police presence. Continuing on March 1, 2019, FBI special agents intercepted multiple telephone calls between **Johnson**, Gadsden, and an unknown male later identified as Jarvis Behrens concerning Behrens' help with facilitating Gadsden's purchase of drugs.

33.    Coinciding with these intercepted telephone calls on March 1, 2019, SLED Special Agents (SA) Blake and Scott were surveilling DeAngelo Ravenel's residence located at 1319 Jackwood Court in Charleston, SC. Their investigation had identified this location as a distribution point for large amounts of cocaine. While surveilling the location, special agents observed **Johnson** arrive at the location and meet with Ravenel. Ultimately, SAs Blake and Scott followed **Johnson** to the Charleston Sports Pub located at 1124 Sam Rittenberg Boulevard in Charleston, SC. After arriving there, the special agents observed an unknown male, later identified as Jarvis Behrens, obtain something from **Johnson's** truck and put the object into a gray Nissan Altima. When Behrens departed from the area in the Nissan with a female accomplice, CCSO Deputy Miller initiated a traffic stop on the Altima for window tint violation near the intersection of Bees Ferry Road and Dove Haven Court. As the vehicle came to a stop at the end of Dove Haven Court, Behrens fled from the front passenger seat while "*clutching his waist.*" SLED SA Black pursued Behrens behind an apartment building and observed him make a "*throwing motion with his right arm*" toward a pond. Law enforcement later located Behrens hiding between two apartment buildings behind a bush.

34.    After CCSO deputies and SLED special agents detained Jarvis Behrens, they returned to the Nissan Altima, where CCSO Deputy Miller deployed his K9 to track along the path Jarvis Behrens took around the apartment building in an effort to locate any potential articles he may have thrown while

fleeing. During the search, the K9 located a large, clear vacuum-sealed bag containing white powder in the pond. The package field-tested positive for cocaine, and the initial weight with the packaging was 510 grams. On April 28, 2020, a laboratory analysis confirmed Behrens had discarded 501 grams of cocaine during the foot pursuit with law enforcement. Following Behrens' arrest, FBI special agents intercepted a telephone call between **Johnson** and Theadore Gadsden discussing the seizure from Behrens and law enforcement activity in the area. The investigation concluded this quantity of cocaine was the same quantity of drugs which Gadsden had ordered from Ravenel by way of **Johnson** earlier the same day (*see Paragraph 32*). Based on this information, **Johnson** was held accountable for facilitating the sale of **501 grams of cocaine** to Theadore Gadsden for guideline sentencing purposes.

35.   During an intercepted telephone call on March 2, 2019, **Johnson** contacted Maurice Conyers. During the conversation, Conyers told **Johnson**, *"I'm so dead man."* **Johnson** asked, *"You talking about on the gas* (marijuana)*"* Conyers agreed, *"Yeah. Y'all got somethin…what you got? You got little one?"* **Johnson** advised, *"I got see exactly if it is one."* FBI special agents recognized Conyers had ordered 1 ounce (*"one"*) of marijuana (*"gas"*) from **Johnson**. Based on this information, **Johnson** was held accountable for agreeing to sell **1 ounce or 28.35 grams of marijuana** to Maurice Conyers for guideline sentencing purposes.

36.   On March 2, 2019, FBI special agents overheard Orealius Nelson, a/k/a *"Kemo,"* contact **Johnson** and ask, *"Everything still good?"* FBI special agents recognized **Johnson** expected Nelson to call him and request drugs. Specifically, **Johnson** responded, *"What you been trying to do?"* Nelson answered, *"Just a little 10 or something."* **Johnson** asked, *"You got, um $4…you say you got $4?"* Nelson agreed, *"Yeah."* FBI special agent recognized **Johnson** had agreed to sell Nelson 10 grams of cocaine (*"just a little 10"*) for $400.00 (*"$4"*). Shortly after the arranged transaction, **Johnson** contacted drug dealer Rashard Whitfield and advised, *"I got Kemo* (Nelson) *been callin and need damn near 10. You goin to do that for me or I need to come down?"* Whitfield asked, *"What he want, 10 grams?"* **Johnson** agreed, *"Yeah…he got the $4 for me."* FBI special agents recognized Whitfield had agreed to distribute 10 grams of cocaine to Nelson for $400.00 on behalf of **Johnson**. *This quantity of cocaine will not be included in Johnson's total drug weight to avoid double-counting as it may have already been attributed to Johnson in Paragraph 42.*

37.   On March 3, 2019, FBI special agents intercepted a telephone call **Johnson** received from Timothy Robinson concerning the purchase of 25 grams of cocaine with 3 grams of a cutting agent. Robinson informed **Johnson** he wanted to purchase a *"zippy"* (ounce) of cocaine for Robinson's brother-in-law. **Johnson** informed Robinson the cocaine would cost *"…like a band, or damn near, yeah, like $980.00."* **Johnson** confirmed Robinson wanted *"two-five and three,"* referring to 25 grams of cocaine mixed with 3 grams of a cutting agent. Robinson agreed. During a follow-up telephone call, Robinson advised he had the money from his brother-in-law and was on the way. FBI special agents confirmed **Johnson** then contacted one of his dealers, Rashard Whitfield, and informed him, *"Little Timmy about to come through. I need you to damn make him a two-five* [25 grams of cocaine] *and you can put the three* [3 grams of cutting agent] *on the side…he should have $980.00…he's gonna be there in a second."* *This quantity of cocaine will not be included in Johnson's total drug weight to avoid double-counting as it may have already been attributed to Johnson in Paragraph 42.*

14

38.  On March 4, 2019, FBI special agents intercepted multiple telephone calls between Loudpack gang member Antonio Miller and **Johnson** concerning past and future drug transactions, pricing, and an associate who had been arrested. During the conversation, Miller reiterated he purchased cocaine from his source in exchange for "*32*" or $32,000.00. **Johnson** complimented the low cost of the cocaine and asked, "*What you going to sell if for…I asked how much you sell it for?*" However, Miller informed **Johnson** he still had the cocaine. **Johnson** then informed Miller his "*people said they had a couple for me…What you want me to tell him? Grab them two?*" Miler replied, "*Yeah, I will grab one of them sh\*t.*" **Johnson** confirmed, "*Okay, you grab one. Let me call him real quick, grab one, and then I can send some money to grab the other one.*" FBI special agents recognized **Johnson** had informed Miller his drug source was willing to sell 2 kilograms of cocaine ("*a couple*"), and Miller had agreed to purchase one of the two kilograms ("*I will grab one of them sh\*t*"). Subsequent telephone calls and physical surveillance conducted on March 4, 2019, confirmed **Johnson** and Miller met on the same date to complete the transaction. Based on this information, **Johnson** was held accountable for facilitating the sale of **1 kilogram of cocaine** to Antonio Miller for guideline sentencing purposes. *The remaining 1 kilogram of cocaine will not be included in Johnson's total drug weight to avoid double-counting as it may have already been attributed to Johnson in Paragraph 42.*

39.  On March 6, 2019, **Johnson** received an order of 10 grams of cocaine from Orealius Nelson and an order of ½ of an ounce of cocaine from Pierce Nelson over the telephone. Through subsequent telephone calls with Robinson and the two customers, FBI special agents learned **Johnson** was on the way to pick up Robinson before conducting the arranged drug transactions. After **Johnson** picked Robinson up, FBI agents intercepted multiple subsequent telephone calls between **Johnson** and his two customers arranging to meet at "*Starvin Marvin*" seafood restaurant on Dorchester Road to complete the drug transactions. SLED special agents followed **Johnson** and Robinson to Marvin's Seafood restaurant, where they observed **Johnson** participate in two transactions. *These quantities of cocaine will not be included in Johnson's total drug weight to avoid double-counting as they may have already been attributed to Johnson in Paragraph 42.*

40.  On March 6, 2019, FBI special agents intercepted a telephone call Timothy Robinson made to **Johnson** concerning the purchase of marijuana. Robinson asked **Johnson** to "*Bring 2 ounces.*" **Johnson** replied, "*Two what? Gas?*" Robinson confirmed, "*Yeah, gas. I got to go serve Kim Sue, her lil, her sons at her house.*" Surveilling FBI special agents recognized Robinson had requested 2 ounce of marijuana (gas). During subsequent physical surveillance, law enforcement observed Robinson meet with **Johnson** at Marvin's Seafood restaurant to complete the arranged drug transaction. Based on this information, **Johnson** was held accountable for distributing **2 ounces or 56.7 grams of marijuana** to Timothy Robinson for guideline sentencing purposes (*28.35 grams per ounce x 2 ounces = 56.7 grams*).

41.  On March 7, 2019, FBI special agents intercepted Timothy Robinson call **Johnson** to request 18 grams of cocaine mixed with 3 grams of cutting agent. Specifically, Robinson stated, "*I need me a little solid 18 man.*" **Johnson** then contacted Whitfield and instructed him to "*make an 18 and 3*" for "*Little Timmy.*" Surveilling FBI special agents recognized **Johnson** had 18 grams of cocaine mixed with 3 grams of cutting agent prepared for Robinson (18 and 3). *This quantity of cocaine will not be included in Johnson's total drug weight to avoid double-counting as it may have already been attributed to Johnson in Paragraph 42.*

42. On July 10, 2019, state, local, and federal law enforcement personnel located and arrested **Johnson** at his residence, 205 Sugarberry Lane in Moncks Corner, SC, pursuant to a federal arrest warrant. During the arrest, officers noted rounds of ammunition in plain view in **Johnson's** master bedroom, but they did not seize them at the time. During a post-Miranda interview, **Johnson** acknowledged there were two firearms in his residence, but he asserted he did not know their location. **Johnson's** wife disclosed the two firearms were located in her daughter's bedroom, and she permitted law enforcement to locate and seize the two firearms. Following the arrest and firearm seizure, special agents obtained and executed a federal search warrant to seize the ammunition they had initially observed in **Johnson's** bedroom. Upon execution of the federal search warrant on July 10, 2019, law enforcement located and seized 6 boxes of varying calibers of ammunition, a bag containing 27 *"kilo wrappers"* with cocaine residue, a digital scale with cocaine residue, and food saver bag sealers. Based on this information, **Lamar Johnson** was held accountable for storing and preparing at least **27 kilograms of cocaine** at 205 Sugarberry Lane for guideline sentencing purpose.

43. Continuing on July 10, 2019, NCPD officers conducted a consensual search of 2708 Budds Avenue, North Charleston, SC. Information obtained throughout the course of the investigation established this residence was an additional known storage location for controlled substances utilized by **Johnson** and Rashard Whitfield. The owner and occupant, Fredretha Whitfield, provided law enforcement with her consent to search the residence. Officers were led to a back bedroom, which contained various personal items belonging to Rashard. Fredretha asserted the room did not belong to Rashard, but she had allowed him to store his property there after his residence had caught fire. During the search of Rashard's room, officers located quantities of marijuana and cocaine accompanied by a black digital scale and $4,105.00 in cash.

44. On February 6, 2020, FBI SA James Godsil and Task Force Officer (TFO) Jerome De Sheers interviewed a confidential informant pursuant to the terms of a proffer agreement. The confidential informant (hereafter referred to as CI) admitted he/she had been selling cocaine and crack cocaine since 2017. The CI revealed he/she purchased their cocaine from Theodore Gadsden, a/k/a *"Teddy,"* in 2-ounce quantities every two weeks. The CI explained Gadsden *"cooked"* the cocaine into crack cocaine at the CI's residence for him/her. The CI identified *"the twins,"* a/k/a Omar and Jamar Hamilton, and "Tat," a/k/a Tyrell Bess, as some of Gadsden's *"close"* associates and corroborated **"McJagger," a/k/a Johnson** was one of Gadsden's drug suppliers.

45. In summary, beginning on or before January 24, 2019, and continuing through July 10, 2019, **Lamar Louis Johnson, a/k/a "McJag,"** conspired with others to distribute cocaine and marijuana throughout the greater-Charleston area of South Carolina. A multi-agency investigation concluded Theadore Gadsden, a/k/a "Teddy," a/k/a "Chest," was a high-ranking member of a North Charleston area-based street gang known as the Dorchester Terrace Crew (DTC), which was responsible for distributing large amounts of various drugs throughout Charleston, SC. Through wiretap surveillance of Gadsden's telephone, special agents learned **Johnson** was a large source of drugs for members of DTC, including Gadsden. Through subsequent wiretap surveillance of **Johnson's** telephone, FBI special agents documented hundreds of pertinent telephone calls between **Johnson** and others discussing cocaine and marijuana transactions. The investigation revealed a number of street-level dealers worked for **Johnson,** including, but not limited to: Rashard Whitfield, Ryan Nelson, and Denzil Edwards. Additional individuals, such as Tiemeyer

Gethers and Timothy Robinson, routinely accompanied **Johnson** or further facilitated **Johnson's** drug distribution business. Following the murder of DTC leader J. Porcher on November 24, 2018, FBI special agents discovered Gadsden and **Johnson** became DTC's main sources of supply for cocaine. Following **Johnson's** arrest on July 10, 2019, at his residence in Moncks Corner, SC, federal law enforcement located and seized a total of 27 heat sealed kilogram quantity bags containing cocaine residue, two firearms, six boxes of ammunition, and a digital scale with cocaine residue.

46. Based on the evidence collected through the course of the investigation, **Lamar Johnson** was held accountable for the total drug quantities reflected in the chart below for guideline sentencing purposes.

### Cocaine

| Paragraph | Drug Quantity | Source |
|---|---|---|
| 34 | 501 grams | Seized from Jarvis Behrens during a cocaine sale between DeAngelo Ravenel and Theadore Gadsden arranged and facilitated by **Johnson** |
| 38 | 1,000 grams | Cocaine sale between **Johnson's** supplier and Antonio Miller arranged and facilitated by **Johnson** |
| 43 | 27,000 grams | 27 "*kilo wrappers*" located at **Johnson's** residence containing cocaine residue |
| Total | 28,501 grams | |

### Marijuana

| | | |
|---|---|---|
| 27 | 14.175 grams | Arranged sale to UM |
| 35 | 28.35 grams | Arranged sale to Maurice Conyers |
| 40 | 56.7 grams | Disturbed to Timothy Robinson |
| Total | 99.225 grams | |

47. Since these are differing controlled substances, they must be converted to their converted drug weight equivalent in order to establish an aggregate amount, pursuant to USSG § 2D1.1, Application Note 8(B). This is accomplished by the following method:

28,501 grams of cocaine x 200 grams of converted drug weight = 5,700,200 grams of converted drug weight equivalent

99.225 grams of marijuana x 1 gram of converted drug weight = 99.225 grams of converted drug weight equivalent

Based on the conversions listed above, **Lamar Johnson** has been held accountable for **5,700,299.22 grams or 5,700.29 kilograms of converted drug weight equivalent** for the purpose of establishing his base offense level for guideline sentencing purposes.

### Victim Impact

48.  There are no identifiable victims in this offense.

### Role Adjustment (includes consideration of all §3B adjustments)

49.  USSG § 3B1.1 sets forth the criteria used in determining whether a defendant qualifies for an Aggravating Role. Under subsection (a), a four-level increase is appropriate "if the defendant was a leader or organizer of a criminal activity that involved five or more participants or was otherwise extensive." Under subsection (b), a three-level increase is appropriate "if the defendant was a manager or supervisor of a criminal activity that involved five or more participants or was otherwise extensive." Subsection (c) provides for a two-level increase "if the defendant was a leader, organizer, manager, or supervisor of a criminal activity other than described in subsections (a) or (b)." Application Note 2 states "to qualify for an adjustment under this section, the defendant must have been the organizer, leader, manager, or supervisor of one or more other participants." Application Note 4 outlines factors for the Court to consider when making the determination as to whether a defendant is a leader/organizer or a manager/supervisor. These factors include "the exercise of decision-making authority, the nature of participation in the commission of the offense, the recruitment of accomplices, the claimed right to a larger share of the fruits of the crime, the degree of participation in planning or organizing the offense, the nature and scope of the illegal activity, and the degree of control and authority exercised over others."

50.  Based on the preponderance of the evidence uncovered during the course of the investigation, Lamar Johnson functioned as a manager, supervisor, *and* organizer *of at least one* or more other participants in a drug conspiracy operating in the greater-Charleston area of South Carolina, which involved five or more participants. As outlined throughout the Offense Conduct section of the report, intercepted telephone communications corroborated Johnson had formed an agreement to distribute drugs with at least five participants, including, but not limited to: Rashard Whitfield, Pierce Nelson, Denzil Edwards, Tiemeyer Gethers, Timothy Robinson, Antonio Miller, Theadore Gadsden, Bernard Aaron Green, Courtney Nelson, DeAngelo Ravenel, Jarvis Behrens, and Orealius Nelson.

51.  The investigation established Ryan Nelson was an individual who Johnson had tasked with monitoring Johnson's drug trafficking business while he was out of town. Specifically, as outlined in Paragraphs 23 through 25, between February 13, 2019, and February 15, 2019, special agents intercepted Nelson make and receive multiple phone calls to drug suppliers and local drug dealers using Johnson's cell phone. Individuals who Nelson communicated with on behalf of Johnson included: Tiemeyer Gethers, Theadore Gadsden, Devon Simmons, Edgefield FCI BOP federal inmate Nathaniel Fabor, Timothy Robinson, and multiple unknown males. During the calls, Nelson reiterated Johnson was out of town and had left his phone with Nelson. During other calls, Nelson inquired into dealers' drug inventories, revealed Johnson had instructed Nelson to call them, and discussed preparations for transactions upon Johnson's return.

52.  For example, on February 13, 2019, FBI special agents intercepted Ryan Nelson use Johnson's telephone to discuss a kilogram quantity cocaine transaction with an unknown supplier in Atlanta, GA, that had fallen through. Specifically, the supplier informed Nelson, *"So we a no-go man."* Nelson replied, *"I feel you, what is the number on that sh*t?"* The supplier replied, *"It was 34."*

Nelson advised, "*Alright. Well sh\*t, I am gonna head on back then, and see if I can come up with the four before ole boy* [Johnson] *come back.*" The supplier responded, "*Yeah man. I apologize for having you hear all day man.*" FBI special agents recognized Nelson had attempted to acquire a kilogram quantity of cocaine from a source of supply in Atlanta, GA, but the deal had fallen through. Shortly following the failed cocaine transaction, Nelson used Johnson's phone to call an unknown male and inform him, "*Man, I come back empty man.*" On the following day, Nelson used Johnson's telephone to inform Gadsden, "*I just leave, I coming back from up there now, I coming back empty though.*" Nelson reiterated that Johnson was out of town until Friday during both conversations. While complaining about the failed drug transaction during a conversation with an unknown male, Johnson confirmed he had instructed "*Clep*" to contact "*this man, that man, and this man when I been head home*" to setup the drug transaction. During a call with Tiemeyer Gethers, Nelson advised, "*Sh\*t, ole boy* [Johnson] *wanted me to call and see if um you situated or whatever or gathered up so he can tip on out or whatever.*" Nelson specified, "*But um, he's* [Johnson] *been out of town he's on his way back up now. But he left his phone with me while he was gone. Trying to get everybody situated.*" During additional telephone calls, FBI special agents learned Nelson routinely accompanied Johnson and had participated in the purchase of large quantities of cocaine with Johnson (*see Paragraph 29*).

53.   Additional information obtained during the investigation revealed Rashard Whitfield was a dealer who Johnson had tasked with mixing and distributing cocaine for him. During conversation with Whitfield, Johnson directed Whitfield to mix, prepare, and distribute quantities of drugs in exchange for funds Johnson would receive. Specifically, on March 2, 2019, FBI special agents overheard Johnson had agreed to supply Ornelius Nelson with 10 grams of cocaine for $400.00 (*see Paragraph 36*). Shortly after the arranged transaction, Johnson contacted Whitfield and informed him, "*I got Kemo* (Nelson) *been callin and need damn near 10. You goin to do that for me or I need to come down?*" Whitfield asked, "*What he want, 10 grams?*" Johnson agreed, "*Yeah...he got the $4 for me.*" FBI special agents recognized Whitfield had agreed to distribute 10 grams of cocaine to Nelson for $400.00 on behalf of Johnson.

54.   Furthermore, on March 3, 2019, FBI special agents intercepted a telephone call Johnson received from Timothy Robinson concerning the purchase of 25 grams of cocaine with 3 grams of a cutting agent for $980.00 (*see Paragraph 37*). Following the transaction arrangement, FBI special agents confirmed Johnson then contacted Whitfield, and informed him, "*Little Timmy about to come through. I need you to damn make him a two-five* [25 grams of cocaine] *and you can put the three* [3 grams of cutting agent] *on the side...he should have $980.00...he's gonna be there in a second.*"

55.   On July 10, 2019, NCPD officers conducted a consensual search of 2708 Budds Avenue, North Charleston, SC. Information obtained throughout the course of the investigation established this residence was a known storage location for controlled substances utilized by Johnson and Rashard Whitfield. During a search of Whitfield's room, officers located quantities of marijuana and cocaine accompanied by a black digital scale and $4,105.00 in cash (*see Paragraph 44*).

56.   Based on Johnson's exercise of decision-making authority, the nature of his participation in the commission of the offense, the degree of participation in planning or organizing the offense, the claimed right to a larger share of the fruits of the crime, and the nature and scope of the illegal activity, Johnson was determined to function as an organizer, manager, *and* supervisor *of at least one* or more other participants in a drug conspiracy, which involved five or more participants.

### Adjustment for Obstruction of Justice

57. The probation officer has no information indicating the defendant impeded or obstructed justice.

### Adjustment for Acceptance of Responsibility

58. During his Rule 11 hearing on December 8, 2020, Lamar Johnson agreed with the factual basis detailing his offense of conviction as presented by the government. During his presentence interview on April 22, 2021, Johnson was not questioned about any details concerning his offense of conviction but cooperated with the presentence investigation process. Based on his acknowledgment of his criminal conduct and cooperation with the United States Probation Office, Johnson will be afforded the appropriate reductions for Acceptance of Responsibility at this time.

## PART B. THE DEFENDANT'S CRIMINAL HISTORY / OFFENSE LEVEL COMPUTATIONS

### Juvenile Adjudication(s)

59. None

### Adult Criminal Conviction(s)

| | Date of Arrest | Conviction/ Court | Date Sentence Imposed/Disposition | Guideline | Points |
|---|---|---|---|---|---|
| 60. | 08/16/1997 (Age 17) | Possession of Marijuana w/Intent to Distribute, 1st Offense Dkt. #1997-GS-36-00354 Newberry County General Sessions Court Newberry County, SC | 09/18/1997 Sentenced under the Youthful Offender Act (YOA) to a term of imprisonment not to exceed 5 years suspended upon the service of 3 years probation and 250 hours of community service | 4A1.2(e)(3) | 0 |
| | | | 11/16/1998 *Revocation hearing*: Term of probation terminated | | |

Information concerning attorney representation was not available. However, in South Carolina, defendants have had the right to counsel since June 17, 1969, pursuant to the Defense of Indigent's Act outlined in South Carolina Section Code 17-3-0010. The Act sets forth that, "*any person entitled to counsel under the Constitution of the United States shall be so advised and if it is determined that the person is financially unable to retain counsel, then counsel shall be provided upon order of the appropriate judge unless such person voluntarily and intelligently waives his right thereto.*"

Court records reflect the defendant pled guilty as charged in an Indictment. The Indictment charged Lamar Louis Johnson did in the county and state aforesaid, on or about the 16th day of August,

1997, willfully, knowingly, and unlawfully possess with intent to distribute a quantity of marijuana, a schedule I controlled substance under provisions of Title 44, Chapter 53, Article 3 of the 1976 Code of Laws of South Carolina, as amended.

According to a Newberry County Sheriff's Office warrant affidavit, on August 16, 1997, at 2:45 A.M., deputies located more than one ounce of marijuana in the defendant's possession during a traffic stop on Interstate 26 in Newberry County, SC.

Records provided by the South Carolina Department of Probation, Parole, and Pardon Services (SCDPPPS) indicate the defendant failed to abide by the terms of his probation as outlined in a probation violation arrest warrant issued on August 10, 1998, and served on August 25, 1998. The warrant charged the defendant for failing to report as instructed and committing new criminal conduct having been arrested for Simple Possession of Marijuana. At his revocation hearing, the defendant's term of probation was judicially terminated.

| | | | | | |
|---|---|---|---|---|---|
| 61. | 09/09/1997 (Age 18) | Simple Possession of Marijuana Warrant #95339AQ Case #97022755M Mount Pleasant Municipal Court Mount Pleasant, SC | 09/12/1997 $154.50 fine | 4A1.2(e)(3) | 0 |

Information concerning attorney representation was not available. The above-referenced arrest and disposition were confirmed by records obtained from the Mount Pleasant Municipal Court, though no details concerning the facts of the offense were available.

| | | | | | |
|---|---|---|---|---|---|
| 62. | 01/11/1998 (Age 18) | Simple Possession of Marijuana Warrant #97674AQ Case #98000974M Mount Pleasant Municipal Court Mount Pleasant, SC | 01/23/1998 Convicted; Unspecified sentence | 4A1.2(e)(3) | 0 |

Information concerning attorney representation was not available. The above-referenced arrest and disposition were confirmed by records obtained from the Mount Pleasant Municipal Court, though no details concerning the facts of the offense or sentence imposed were available.

Lamar Louis Johnson, a/k/a "McJag"
Docket No. 2:19CR00550-001DCN

| | | | | | |
|---|---|---|---|---|---|
| 63. | 05/09/1998 (Age 18) | 1) Simple Possession of Marijuana Warrant #12157AR 2) Refusing to Leave Certain Public Places During Hours They Are Closed Warrant #12158AR 3) Seatbelt Law Violation Warrant #12159AR 4) Interference with Officers or Employees Warrant #12084MP Mount Pleasant Municipal Court Mount Pleasant, SC | 08/24/1998 1) $358.59 fine 2) $168.92 fine 3) $17.51 fine 4) $100.00 fine | 4A1.2(e)(3) | 0 |

Information concerning attorney representation was not available. The above-referenced arrest and dispositions were confirmed by records obtained from the Mount Pleasant Municipal Court, though no details concerning the facts of the offenses were available.

| | | | | | |
|---|---|---|---|---|---|
| 64. | 05/29/1998 (Age 18) | Assault and Battery of a High and Aggravated Nature (Common Law) Dkt. #1998-GS-10-06552 Charleston County General Sessions Court Charleston County, SC | 11/16/1998 Sentenced under the YOA to a term of imprisonment not to exceed 6 years<br><br>03/9/1999 Released to YOA parole<br><br>11/3/2003 *Revocation hearing*: Term of YOA parole revoked<br><br>10/1/2004 Released to YOA parole<br><br>02/17/2005 Term of YOA parole expired | 4A1.1(a) 4A1.2(k)(2) | 3 |

Information concerning attorney representation was not available. However, in South Carolina, defendants have had the right to counsel since June 17, 1969, pursuant to the Defense of Indigent's Act outlined in South Carolina Section Code 17-3-0010. The Act sets forth that, "*any person entitled to counsel under the Constitution of the United States shall be so advised and if it is determined that the person is financially unable to retain counsel, then counsel shall be provided upon order of the appropriate judge unless such person voluntarily and intelligently waives his right thereto.*"

The defendant was originally indicted for Lynching, 2nd Degree, but pled guilty to the lesser-included offense listed above. The original Indictment charged Lamar Johnson did in Charleston County on or about the 9th day of May, 1998, participate as part of a mob that inflicted an act of violence upon the body of Radonte Dean that did not result in death, but which resulted in physical injury to Radonte Dean. This is in violation of § 16-3-220 of the South Carolina Code of Laws (1976) as amended.

According to a Mount Pleasant Police Department affidavit, on May 9, 1998, the defendant Lamar *"Micky"* Johnson joined Craig Alston, George Drayton, and Antonio Campbell in committing a violent assault upon Radonte Dean by punching him in the face and attempting to choke him. Officers noted injuries consistent to the described assault. The victim's brother, Lenus Dean, witnessed the assault occur.

According to records provided by SCDPPPS, the defendant was released from custody to YOA parole on March 9, 1999. However, during a revocation hearing on November 3, 2003, the defendant was returned to custody. On October 1, 2004, the defendant was re-released to YOA parole, and his term of parole expired on February 17, 2005.

| 65. | 07/10/1998 (Age 18) | 1) Possession of Crack Cocaine Dkt. #1998-GS-10-08047 2) Resisting Arrest Dkt. #1998-GS-10-08048 Charleston County General Sessions Court Charleston County, SC | 11/16/1998 1) Sentenced under the YOA to a term of imprisonment not to exceed 5 years 2) Sentenced under the YOA to a term of imprisonment not to exceed 1 year

03/9/1999 Released to YOA parole

11/3/2003 *Revocation hearing*: Term of YOA parole revoked

10/1/2004 Released to YOA parole

02/17/2005 Term of YOA parole expired | 4A1.1(a) 4A1.2(k)(2) | 3 |

Information concerning attorney representation was not available. However, in South Carolina, defendants have had the right to counsel since June 17, 1969, pursuant to the Defense of Indigent's Act outlined in South Carolina Section Code 17-3-0010. The Act sets forth that, *"any person entitled to counsel under the Constitution of the United States shall be so advised and if it is determined that the person is financially unable to retain counsel, then counsel shall be provided upon order of the appropriate judge unless such person voluntarily and intelligently waives his right thereto."*

Records reflect the defendant pled guilty as charged in two Indictments. Indictment 1998-GS-10-08047 charged Lamar Louis Johnson did in Charleston County on or about the 10th day of July, 1998, willfully possess a quantity of Crack Cocaine, a controlled substance, in violation of § 44-53-375 of the South Carolina Code of Laws (1976) as amended.

Indictment 1998-GS-10-08048 charged Lamar Louis Johnson did in Charleston County on or about the 10th day of July, 1998, willfully and unlawfully resist the efforts of Detective Register of the Mount Pleasant Police Department, to make a lawful arrest of the said defendant. This is in violation of § 16-9-320(a) of the South Carolina Code of Laws (1976) as amended.

According to a Mount Pleasant Police Department affidavit, on July 10, 1998, Detective Register initiated a traffic stop on a vehicle operated by the defendant. When Detective Register approached the vehicle, the defendant attempted to flee. Detective Register struggled to detain the defendant, resulting in both parties being thrown to the roadway causing injuries to Detective Register's right hand and right knee. Once detained and placed in the rear of a patrol vehicle, the defendant then attempted to discard 0.7 grams of crack cocaine.

According to records provided by SCDPPPS, the defendant was released from custody to YOA parole on March 9, 1999. However, during a revocation hearing on November 3, 2003, the defendant was returned to custody. On October 1, 2004, the defendant was re-released to YOA parole, and his term of parole expired on February 17, 2005.

| 66. | 06/21/2000 (Age 20) | Disorderly Conduct Warrant #15259MP Mount Pleasant Municipal Court Mount Pleasant, SC | 08/14/2000 $199.00 bond forfeited | 4A1.2(a)(1) | 0 |
|---|---|---|---|---|---|

Information concerning attorney representation was not available. The above-referenced arrest and disposition were confirmed by records obtained from the Mount Pleasant Municipal Court, though no details concerning the facts of the offense were available. *As this offense was not adjudicated via a guilty plea, trial verdict, or nolo contendre plea, it does not meet the definition of a "prior sentence," pursuant to U.S.S.G. 4A1.2(a)(1).*

| 67. | 01/22/2001 (Age 21) | 1) Open Container of Beer or Wine in Motor Vehicle Warrant #Y501858 2) Driving Under Suspension Warrant #Y501859 3) Giving False Information Warrant #Y501860 Magistrate Court Charleston County, SC | 03/13/2001 1) $225.00 bond forfeited  03/22/2001 2) $1,000.00 fine paid 3) Time served in jail *(unspecified)* | 4A1.2(c)(1) | 0 |
|---|---|---|---|---|---|

Information concerning attorney representation was not available. The above-referenced arrest and dispositions were confirmed by records obtained from the South Carolina Highway Patrol, though no details concerning the facts of the offenses were available.

| 68. | 09/20/2001 (Age 22) | Possession with Intent to Distribute Marijuana, 2nd Offense Dkt. #2001-GS-08-02199 Berkeley County General Sessions Court Berkeley County, SC | 03/20/2002 10 years imprisonment suspended upon 90 days in jail, $1,000.00 fine, and 4 years of probation 06/12/2002 Released from custody 11/5/2003 *Revocation hearing*: Sentenced to 2 years imprisonment 10/01/2004 Released from custody | 4A1.1(a) 4A1.2(k)(1) 4A1.2(k)(2) | 3 |

Court records reflect the defendant was represented by counsel and pled guilty as charged in an Indictment. The Indictment charged Lamar L. Johnson did in Berkeley County on or about the 20th day of September, 2001, possess with intent to distribute a quantity of marijuana, a controlled substance, such possession not having been authorized by law. This is in violation of § 44-53-0370, of the South Carolina Code of Laws (1976) as amended.

According to a Berkeley County Sheriff's Department affidavit, on September 20, 2001, deputies executed a state search warrant at 3000 Harbour Lake Drive, Apartment 14D, which was the known address of the defendant. During their search, deputies located 2 pounds of marijuana in the defendant's dishwasher.

According to records provided by SCDPPPS, the defendant was released from custody and began his term of probation on June 12, 2002. However, records indicate the defendant failed to abide by the conditions of his probation as outlined in a probation violation arrest warrant issued on July 7, 2003, and served on October 3, 2003. The warrant charged the defendant for failing to report as instructed, committing new criminal conduct having been arrested for driving under suspension, failing to perform community service, failing to attend substance abuse counseling, and failing to pay monetary obligations. At his revocation hearing on November 5, 2003, the defendant's term of probation was revoked, and he was sentenced to 2 years imprisonment. Records reflect the defendant completed his sentence and was released from custody on October 1, 2004.

| | | | | | |
|---|---|---|---|---|---|
| 69. | 01/04/2003 (Age 23) | 1) Simple Possession of Marijuana Case #49713CF 2) Unlawful Possession of Beer or Wine Case #49174CF Mount Pleasant Municipal Court Mount Pleasant, SC | 01/28/2003 1) $304.75 fine 2) $118.00 fine | 4A1.2(e)(3) | 0 |

Information concerning attorney representation was not available. The above-referenced arrest and dispositions were confirmed by records obtained from the Mount Pleasant Municipal Court, though no details concerning the facts of the offenses were available.

| | | | | | |
|---|---|---|---|---|---|
| 70. | 01/21/2003 (Age 23) | 1) Possession of Cocaine, 1st Offense Dkt. #2003-GS-10-01366 2) Possession of Marijuana, 3rd Offense Dkt. #2003-GS-10-01368 Charleston County General Sessions Court Charleston County, SC | 11/05/2003 1) 2 years imprisonment with credit for 30 days of time served in jail 2) 30 days of time served in jail 10/01/2004 Released from custody | 4A1.1(a) | 3 |

Court records reflect the defendant was represented by counsel. As to Docket 2003-GS-10-01366, records reflect the defendant was originally indicted for *Possession with Intent to Distribute Cocaine*, but he pled guilty to the lesser-included offense listed above. The Indictment charged the defendant did in Charleston County on or about January 20, 2003, knowingly manufacture, distribute, dispense, deliver, purchase, or did aid, abet, attempt, or conspire to manufacture, distribute, dispense, deliver, or purchase; or did possess with intent to manufacture, distribute, dispense, deliver, or purchase a controlled substance or a controlled substance analogue, to wit: cocaine, in violation of 44-53-370 of the South Carolina Code of Laws (1976) as amended.

As to Docket 2003-GS-10-01368, records indicate the defendant pled guilty as indicted. The Indictment charged the defendant did in Charleston County on or about January 20, 2003, knowingly possess or constructively possess; or did aid, abet, attempt, or conspire to possess or constructively possess a controlled substance or a controlled substance analogue, to wit: marijuana, in violation of 44-53-370 of the South Carolina Code of Laws (1976) as amended.

According to a North Charleston Police Department (NCPD) affidavit, on January 20, 2003, NCPD officers observed the defendant along the side of a residence rolling a substance into a cigar or *"philly blunt."* When the defendant noted officers, he attempted to hide the cigar. When officers approached the defendant, they observed a quantity of crack cocaine in plain view on an outside picnic table. Next the crack cocaine, officers located the partially burnt cigar which was confirmed to contain a quantity of marijuana. As officers placed the defendant under arrest, they located a baggie in his left hand containing 3 grams of powder cocaine.

Records reflect the defendant completed his sentence and was released from custody on October 1, 2004.

| | | | | | |
|---|---|---|---|---|---|
| 71. | 04/03/2003 (Age 23) | Driving Under Suspension Case #65147CQ North Charleston Municipal Court North Charleston, SC | 04/29/2003 180 days in jail or $1,500.00 fine | 4A1.2(c)(1) | 0 |

Information concerning attorney representation was not available. The above-referenced arrest and disposition were confirmed by records obtained from the North Charleston Municipal Court, though no details concerning the facts of the offense were available. According to Court records, the defendant paid the fine.

| | | | | | |
|---|---|---|---|---|---|
| 72. | 10/07/2003 (Age 24) | 1) Possession of Marijuana Warrant #I097055 2) Physically Assault or Resisting Warrant #I097057 3) False Information to Police Warrant #I097058 North Charleston Municipal Court North Charleston, SC | 10/16/2003 1-3) 30 days in jail or $440.00 fine as to each count | 4A1.2(e)(3) | 0 |

Information concerning attorney representation was not available. The above-referenced arrest and disposition were confirmed by records obtained from the North Charleston Municipal Court, though no details concerning the facts of the offenses were available. According to Court records, a $440.00 fine balance remains for each count.

| | | | | | |
|---|---|---|---|---|---|
| 73. | 10/07/2003 (Age 24) | Possession of Cocaine, 1st Offense Dkt. #2003-GS-10-07434 General Sessions Court Charleston County, SC | 11/5/2003 2 years imprisonment with credit for 30 days of time served in jail  10/01/2004 Released from custody | 4A1.1(a) | 3 |

Court records reflect the defendant was represented by counsel. Records reflect the defendant was originally indicted for *Possession with Intent to Distribute Cocaine*, but he pled guilty to the lesser-included offense listed above after a waiver or presentment to the grand jury. The Indictment charged the defendant did in Charleston County on or about May 31, 2003, knowingly manufacture, distribute, dispense, deliver, purchase, or did aid, abet, attempt, or conspire to manufacture, distribute, dispense, deliver, or purchase; or did possess with intent to manufacture, distribute, dispense, deliver, or purchase a controlled substance or a controlled substance analogue, to wit: cocaine, in violation of 44-53-370 of the South Carolina Code of Laws (1976) as amended.

According to an NCPD affidavit, on May 31, 2003, officers responded to the Quality Inn Suites Motel located at 5525 North Arco Lane in North Charleston, SC, in reference to complaints of drug activity. Upon arrival, officers noted the strong odor of freshly burnt marijuana. During a subsequent probable cause search, officers located 7 individual baggies under a couch containing cocaine. Officers then observed the defendant throw an 8th bag of cocaine to the floor. During a post-Miranda interview, the defendant admitted ownership of all 8 baggies of cocaine.

Records reflect the defendant completed his sentence and was released from custody on October 1, 2004.

| 74. | 09/07/2005 (Age 26) | 1) Distribution of Cocaine Dkt. #2005-GS-10-08781 2) PWID Marijuana Dkt. #2005-GS-10-08782 General Court Sessions Charleston County, SC | 05/25/2006 1-2) 5 years imprisonment with credit for 63 days of time served in jail  05/1/2008 Released from custody to parole  12/23/2008 Term of parole expired | 4A1.1(a) | 3 |
|---|---|---|---|---|---|

Court records reflect the defendant was represented by counsel. As to Docket 2005-GS-10-08781, records reflect the defendant was originally indicted for *Trafficking Cocaine*, but he pled guilty to the lesser-included offense listed above. The original Indictment charged the defendant did in Charleston County on or about September 7, 2005, knowingly sell, manufacture, cultivate, deliver, purchase, or bring into this State; or did provide financial assistance or otherwise aid, abet, attempt, or conspire to sell, manufacture, cultivate, deliver, purchase, or bring into this State; or was knowingly having actual or constructive possession or knowingly attempted to become in actual or constructive possession of a controlled substance or a controlled substance analogue, to wit: cocaine, in excess of ten (10) grams. This is in violation of § 44-53-370 of the South Carolina Code of Laws (1976) as amended.

As to Docket 2005-GS-10-08782, records reflect the defendant pled guilty as indicted; however, the original Indictment was not provided by the Charleston County Clerk of Court. A Charleston County Sheriff's Department warrant affidavit charged on September 7, 2005, while at 5647 Dorchester Road, in the North Charleston section of the County and State aforesaid, the defendant did violate section 44-53-370, "*Possession with Intent to Distribute Marijuana*." The defendant did willfully and unlawfully aid, abet, and conspire with co-defendants Jason Kemp and Sonia White to purchase and possess with the intent to distribute a green plant-like material believed to be marijuana. The green plant material had a total approximate weight of 506 grams and had previously tested positive for marijuana. In addition, Lamar Johnson did discard a clear plastic bag containing approximately 19 grams of a green plant material from the vehicle upon observing metro detectives and another bag containing approximately 2 grams of a green plant-like material was located on the ground beside the driver's door. These substances field tested presumptive for the presence of marijuana (THC).

Records obtained from SCDPPPS indicate the defendant was released from custody to parole on May 1, 2008. Additional records reflect the defendant's term of parole expired on December 23, 2008.

**Criminal History Computation**

75.    The criminal convictions above result in a subtotal criminal history score of 18.

76.    The total criminal history score is **18**. According to the sentencing table in USSG Chapter 5, Part A, a criminal history score of **18** establishes a criminal history category of **VI**.

**Other Criminal Conduct**

| | Date of Arrest | Charge | Agency | Disposition |
|---|---|---|---|---|
| 77. | 03/22/1997 (Age 17) | Simple Possession of Marijuana Case #9701342 Warrant #65657AA | Lexington County Sheriff's Office Lexington County, SC | No records available |
| 78. | 05/09/1998 (Age 18) | Possession of Drug Paraphernalia Warrant #12805MP | Mount Pleasant Municipal Court Mount Pleasant, SC | 07/23/1998 Dismissed |
| 79. | 07/10/1998 (Age 18) | Simple Possession of Marijuana Warrant #F868077 | Mount Pleasant Police Department Mount Pleasant, SC | No records available |
| 80. | 06/29/1999 (Age 19) | Simple Possession of Marijuana Case #99023364N Warrant #79194BA | North Charleston Police Department North Charleston, SC | No records available |
| 81. | 11/07/1999 (Age 20) | 1) Driving Under Suspension 2) Reckless Driving 3) Abandoned Vehicle Case# 99040783N | North Charleston Police Department North Charleston, SC | 1-3) *Unknown* |
| 82. | 09/20/2001 (Age 22) | PWID Marijuana Within Proximity of School Dkt. #01-GS-08-02192 | Berkeley County General Sessions Court Berkeley County, SC | 03/20/2002 Nolle prossed; pled to other charges |

| | | | | |
|---|---|---|---|---|
| 83. | 01/21/2003 (Age 23) | PWID Crack Cocaine Proximity to School Dkt. #03-GS-10-01367 | Charleston County General Sessions Court Charleston County, SC | 11/05/2003 Nolle prossed |
| 84. | 05/31/2003 (Age 23) | PWID Cocaine Dkt. #03-GS-10-05384 | General Sessions Court Charleston County, SC | 11/03/2003 Nolle prossed |
| 85. | 05/31/2003 (Age 23) | 1) Assault on Police Case# 03019344N Warrant #86233CL 2) Simple Possession of Marijuana Warrant #86232CL | North Charleston Municipal Court North Charleston, SC | 07/24/2003 1-2) Nolle prossed due to ticketing the defendant under the alias John Al Vanderhorst |

According to Court records, the defendant was ticketed under the alias John Al Vanderhorst. He failed to appear for a hearing, and a bench warrant was issued on June 10, 2003. However, on July 24, 2003, the charges were nolle prossed when it was discovered the defendant was ticketed under the alias. He was charged under his real name and later pled guilty (*see Paragraph 72*).

| | | | | |
|---|---|---|---|---|
| 86. | 06/05/2005 (Age 25) | 1) Simple Possession of Marijuana Warrant #46295DH Case #05021310N 2) Driving Under Suspension Warrant #46296DH | Municipal Court North Charleston, SC | 04/21/2006 1-2) Nolle prossed |
| 87. | 09/07/2005 (Age 26) | 1) PWID Controlled Substance Proximity to School Dkt. #05-GS-10-08783 2) PWID Controlled Substance Proximity to School Dkt. #05-GS-10-08784 | Charleston County General Sessions Court Charleston County, SC | 05/25/2006 1-2) Nolle prossed; pled guilty to related charged |
| 88. | 12/06/2005 (Age 26) | 1) Trafficking in Cocaine Dkt. #06-GS-10-01659 2) PWID Cocaine Proximity to School Dkt. #06-GS-10-01660 | Charleston County General Sessions Court Charleston County, SC | 05/25/2006 1-2) Nolle prossed |

According to NCPD affidavits, on December 6, 2005, officers conducted a traffic stop on a vehicle operated by the defendant. After a drug-sniffing K9 alerted to the presence of illegal narcotics, officers located 127.5 grams of cocaine in the defendant's vehicle during a probable cause search. The incident occurred within one half of a mile from Hursey Elementary.

**Pending Charges**

89.  None

**Offense Level Computation**

90.  The 2018 United States Sentencing Commission Guidelines Manual is being used because it is currently in effect and was in effect when the offense was committed.

91.  United States v. Booker, 125 S. Ct. 738 (2005) "requires a sentencing court to consider Guideline ranges, see 18 U.S.C. § 3553(a)(4) (Supp. 2004), but it permits the court to tailor the sentence in light of other statutory concerns as well, see § 3553(a) (Supp. 2004)."

92.  Additionally, "consistent with the remedial scheme set forth in Booker, a district court shall first calculate (after making the appropriate findings of fact) the range prescribed by the guidelines. Then, the court shall consider that range as well as other relevant factors set forth in the guidelines and those factors set forth in § 3553(a) before imposing the sentence." United States v. Hughes, 401 F.3d 540 (4th Cir. 2005)

**Count One: Conspiracy to Possess with Intent to Distribute 5 Kilograms or More of Cocaine and a Quantity of Marijuana**

93.  **Base Offense Level:** The United States Sentencing Commission Guideline for a violation of 21 U.S.C. §§ 841(a)(1), 841(b)(1)(A), and 846 is found in USSG § 2D1.1(a)(5)(c)(4) and calls for a base offense level of 32 as the defendant was held accountable for at least 3,000 kilograms but less than 10,000 kilograms of converted drug weight (*see Paragraphs 27, 34, 35, 38, 40, 43, 46, and 47*).    **32**

94.  **Specific Offense Characteristics:** Pursuant to USSG § 2D1.1(b)(1), if a dangerous weapon (including a firearm) was possessed, increase by 2 levels (*see Paragraph 42*).    **+2**

95.  **Specific Offense Characteristics:** Pursuant to USSG § 2D1.1(b)(12), if the defendant maintained a premises for the purpose of manufacturing or distributing a controlled substance, increase by 2 levels (*see Paragraphs 42 and 43*).    **+2**

96.  **Victim Related Adjustment:** None    **0**

97.  **Adjustment for Role in the Offense:** Pursuant to USSG § 3B1.1(b), since the defendant functioned as a manager and supervisor of at least one or more other participants in criminal activity involving 5 or more participants, 3 levels are added (*see Paragraphs 49 through 56*).    **+3**

31

98.  **Adjustment for Obstruction and Related Adjustments:** None      <u>0</u>

99.  **Adjusted Offense Level (Subtotal):**      <u>39</u>

100. **Chapter Four Enhancement:** None      <u>0</u>

101. **Acceptance of Responsibility:** Pursuant to USSG § 3E1.1(a), the offense level is reduced 2 levels.      <u>-2</u>

102. **Acceptance of Responsibility:** Pursuant to USSG § 3E1.1(b), the offense level is reduced 1 additional level.      <u>-1</u>

103. **Total Offense Level:**      <u>36</u>

## PART C. OFFENDER CHARACTERISTICS

### Personal and Family Data

104. Lamar Louis Johnson was born on August 26, 1979, in Bronx, NY, to the marriage of Louis J. Johnson, Jr., and Georgette F. Johnson. The defendant's father, age 63, is currently employed as a truck driver and resides in Mount Pleasant, SC. His mother, age 61, is retired from MSC Shipping Company and resides with the defendant's father in Mount Pleasant, SC. Shortly after birth, the defendant's family moved to Mount Pleasant, SC, where he was raised by both parents and his paternal grandparents, Thomas and Eartha Lee McNeil. The defendant is an only child. Johnson described an overall good upbringing and denied suffering from any physical or verbal abuse during his formative years. Information obtained from LexisNexis and the defendant's spouse, Latoya Ancrum Johnson, corroborated the defendant's personal and family history.

105. Johnson is married and has seven children. On June 30, 2005, the defendant married Latoya Ancrum Johnson, age 39, in Charleston, SC. From this marriage, seven children were born: Mickaylah Johnson, age 20; Mckenzie Johnson, age 18; McKaijah Johnson, age 9; Mickeull Johnson, age 7; Mickhye Johnson, age 3; and twin boys, Mickhari and Mickhyree, ages 1. Furthermore, the defendant and his wife adopted their nephew, Daniel Swinton, age 10.

106. Prior to his arrest for the instant offense, Johnson reported he resided at 205 Sugarberry Lane, Moncks Corner, SC, with his wife and children since 2018. Public records obtained from Accurint LexisNexis reflect the defendant is most recently associated with an address at 1609 Longview Road in Mount Pleasant, SC. Records further reflect the defendant is associated with 3841 Leeds Avenue North Charleston, SC; 308 4th Avenue, Mount Pleasant, SC; 4000 Harbour Lake Drive, Apartment 14D, Goose Creek, SC; 5046 France Avenue, North Charleston, SC; 3719 Saint John's Avenue A, North Charleston, SC; and 8 Budds Avenue, North Charleston, SC.

### Physical Condition

107. Lamar Johnson stands 5'11" tall and weighs 190 pounds. He has brown eyes, black hair, and does not require the aid of corrective lenses. He denied having any noticeable scars or marks and reported the following tattoos: a bulldog on left forearm and *"McJag"* on his right arm.

Additionally, Johnson has top and bottom gold teeth implants. The defendant asserted he is not an associate or member of any criminal groups or organizations.

108. Johnson voluntarily disclosed through his counsel that he was diagnosed with a medical condition requiring universal precautions, which has caused additional medical complications since his arrest for the instant offense. Specifically, while incarcerated in the Charleston County Detention Center, Johnson had his kidney biopsied due to complications and continues to have deteriorating health as a result of his medical conditions. The defendant is unaware on his prognosis currently and has not heard back about the biopsy results as of the date of this report. Johnson advised he has recently been dealing with trouble walking due to an unknown muscle or nerve issue. An X-ray was performed at the detention center, but it did not reveal any causes of the issue. He was prescribed a steroid and advised an MRI may be needed, but he has not been taken to get one as of the date of this report.

## Mental and Emotional Health

109. Lamar Johnson reported he is in overall good mental and emotional health. The defendant reported he is not under the care of any mental health professionals or taking any prescription medications for any mental or emotional health disorders.

## Substance Abuse

110. Lamar Johnson disclosed he first began using marijuana at the age of 16 and began consuming alcohol at the age of 18. He admitted his drug and alcohol use progressed into adulthood and was using the substances daily until his arrest for the instant offense. The defendant advised he had never participated in substance abuse treatment prior to his arrest for the instant offense. However, since his arrest and incarceration at the Charleston County Detention Center for the instant federal offense, Johnson enrolled in Charleston County's Department of Alcohol and Other Drug Abuse Services (DOADAS). Johnson continues to actively participate in the program and believes he would benefit from continued drug treatment upon his release from incarceration.

**Information regarding participation in drug treatment and/or testing program is confidential and should not be disclosed on the public record, pursuant to 42 U.S.C. § 290dd-2.**

## Educational, Vocational and Special Skills

111. Lamar Johnson last completed the 11th grade at Wando High School in Mount Pleasant, SC. Johnson advised he got distracted and withdrew from school while attending the 12th grade. He later obtained his General Education Development certificate while incarcerated at the South Carolina Department of Corrections' "*Shock*" program around 1998 or 1999. The defendant stated he later obtained a welding certification from Trident Technical College in 2010.

## Military Service

112. Lamar Johnson has never served in the military.

### Employment Record

113.    Prior to his arrest for the instant offense, Lamar Johnson had been unemployed since 2018.

114.    Johnson reported he was previously employed as the manager at his father's restaurant, Corner Pocket, in Moncks Corner, SC, from 2015 to 2018 earning $2,000.00 per month.

115.    Johnson reported he held prior employment as a manager at his father's night club, Kandy Krush located in Goose Creek, SC, from 2012 to 2015, earning $2,000.00 per month.

116.    Lastly, Johnson indicated he was employed as a manager at his father's night club, Club Dramatic, in North Charleston, SC, from 2009 to 2012, earning $3,000.00 per month.

### Financial Condition: Ability to Pay

117.    Lamar Johnson asserted he has no assets or liabilities. He is presently incarcerated and has no monthly income. Records obtained through LexisNexis confirmed the defendant has no vehicles or property actively registered to his name. Based on his lack of financial resources, it does not appear Johnson will have the ability to pay a fine.

## PART D. SENTENCING OPTIONS

### Custody

118.    **Statutory Provisions:** The minimum/maximum term of imprisonment is 10 years to Life, pursuant to 21 U.S.C. §§ 841(a)(1), 841(b)(1)(A), and 846.

119.    **Guideline Provisions:** Based upon a total offense level of **36** and a criminal history category of **VI**, the guideline imprisonment range is **324 to 405 months**.

120.    If the guideline imprisonment range is in Zone D, the minimum term shall be satisfied by a sentence of imprisonment, pursuant to USSG § 5C1.1(f).

### Impact of Plea Agreement

121.    The plea agreement had no impact on the guideline calculations in this case.

### Supervised Release

122.    **Statutory Provisions:** The Court must impose a term of supervised release of at least 5 years, pursuant to 21 U.S.C. §§ 841(a)(1), 841(b)(1)(A), and 846.

123.    **In accordance with 18 U.S.C. § 3583(d), the following are mandatory conditions of supervision:**

    (1)    You must not commit another federal, state or local crime.
    (2)    You must not unlawfully possess a controlled substance.

(3) You must refrain from any unlawful use of a controlled substance. You must submit to one drug test within 15 days of release from imprisonment and at least two periodic drug tests thereafter, as determined by the court.

(4) You must make restitution in accordance with 18 U.S.C. §§ 3663 and 3663A or any other statute authorizing a sentence of restitution, if applicable.

(5) You must cooperate in the collection of DNA as directed by the probation officer, if applicable.

(6) You must comply with the requirements of the Sex Offender Registration and Notification Act (34 U.S.C. § 20901, et seq.) as directed by the probation officer, the Bureau of Prisons, or any state sex offender registration agency in the location where you reside, work, are a student, or were convicted of a qualifying offense, if applicable.

(7) You must participate in an approved program for domestic violence, if applicable.

124. Revocation of supervised release is mandatory if the defendant violates a condition of supervised release for possession of a controlled substance, possession of a firearm, refusal to comply with drug testing, or tests positive for illegal controlled substances more than three times over the course of one year, pursuant to 18 U.S.C. § 3583(g). This provision may be waived upon consideration of available treatment programs, or the individual's current or past participation in such programs, when considering any action against a defendant who fails a drug test administered in accordance with 18 U.S.C. § 3583(d).

125. **Guideline Provisions:** The guideline term of supervised release is 5 years, pursuant to USSG § 5D1.2(c).

126. **In accordance with USSG § 5D1.3(c), the following are standard conditions of supervision:**

(1) You must report to the probation office in the federal judicial district where you are authorized to reside within 72 hours of your release from imprisonment, unless the probation officer instructs you to report to a different probation office or within a different time frame. *This condition serves the statutory sentencing purposes of public protection and rehabilitation. 18 U.S.C. § 3553(a)(2)(C) and (D).*

(2) After initially reporting to the probation office, you will receive instructions from the court or the probation officer about how and when you must report to the probation officer, and you must report to the probation officer as instructed. *This condition serves the statutory sentencing purposes of public protection and rehabilitation. 18 U.S.C. § 3553(a)(2)(C) and (D).*

(3) You must not knowingly leave the federal judicial district where you are authorized to reside without first getting permission from the court or the probation officer. *This condition serves the statutory sentencing purposes of public protection and rehabilitation. 18 U.S.C. § 3553(a)(2)(C) and (D).*

(4) You must answer truthfully the questions asked by your probation officer. *This condition serves the statutory sentencing purposes of public protection and rehabilitation. 18 U.S.C. § 3553(a)(2)(C) and (D).*

(5) You must live at a place approved by the probation officer. If you plan to change where you live or anything about your living arrangements (such as the people you live with), you must notify the probation officer at least 10 days before the change. If notifying the probation officer in advance is not possible due to unanticipated circumstances, you must notify the probation officer within 72 hours of becoming aware of a change or expected change. *This condition serves the statutory sentencing purposes of public protection and rehabilitation. 18 U.S.C. § 3553(a)(2)(C) and (D).*

(6) You must allow the probation officer to visit you at any time at your home or elsewhere, and you must permit the probation officer to take any items prohibited by the conditions of your supervision that he or she observes in plain view. *This condition serves the statutory sentencing purposes of public protection and rehabilitation. 18 U.S.C. § 3553(a)(2)(C) and (D).*

(7) You must work full time (at least 30 hours per week) at a lawful type of employment, unless the probation officer excuses you from doing so. If you do not have full-time employment you must try to find full-time employment, unless the probation officer excuses you from doing so. If you plan to change where you work or anything about your work (such as your position or your job responsibilities), you must notify the probation officer at least 10 days before the change. If notifying the probation officer at least 10 days in advance is not possible due to unanticipated circumstances, you must notify the probation officer within 72 hours of becoming aware of a change or expected change. *This condition serves the statutory sentencing purposes of public protection and rehabilitation. 18 U.S.C. § 3553(a)(2)(C) and (D).*

(8) You must not communicate or interact with someone you know is engaged in criminal activity. If you know someone has been convicted of a felony, you must not knowingly communicate or interact with that person without first getting the permission of the probation officer. *This condition serves the statutory sentencing purposes of public protection and rehabilitation. 18 U.S.C. § 3553(a)(2)(C) and (D).*

(9) If you are arrested or questioned by a law enforcement officer, you must notify the probation officer within 72 hours. *This condition serves the statutory sentencing purposes of public protection and rehabilitation. 18 U.S.C. § 3553(a)(2)(C) and (D).*

(10) You must not own, possess, or have access to a firearm, ammunition, destructive device, or dangerous weapon (i.e., anything that was designed, or was modified for, the specific purpose of causing bodily injury or death to another person such as nunchakus or tasers). *This condition serves the statutory sentencing purposes of public protection and rehabilitation. 18 U.S.C. § 3553(a)(2)(C) and (D).*

(11) You must not act or make any agreement with a law enforcement agency to act as a confidential human source or informant without first getting the permission of the court. *A confidential human source or informant is a defendant who engages in the prohibited activity of associating with persons engaged in criminal activity for the purpose of furnishing information to or acting as an agent for a law enforcement or intelligence agency. The activities required of*

> *confidential informants or human sources may potentially conflict with conditions normally imposed by a court and acting as a confidential informant or human source is generally inconsistent with the rehabilitative and re-integrative goals of supervision. Additionally, such activities may also pose risks to the probation officers who supervise these individuals, especially when they have limited knowledge or no knowledge of the nature of the informant's activities.*

(12) If the probation officer determines that you pose a risk to another person (including an organization), the probation officer may require you to notify the person about the risk and you must comply with that instruction. The probation officer may contact the person and confirm that you have notified the person about the risk. *This condition serves the statutory sentencing purposes of public protection and rehabilitation. 18 U.S.C. § 3553(a)(2)(C) and (D).*

(13) You must follow the instructions of the probation officer related to the conditions of supervision. *This condition serves the statutory sentencing purposes of public protection and rehabilitation. 18 U.S.C. § 3553(a)(2)(C) and (D).*

### Probation

127. **Statutory Provisions:** The defendant is ineligible for probation because it is expressly precluded by statute, pursuant to 21 U.S.C. § 841(b)(1)(A) and 18 U.S.C. § 3561(a)(2).

128. **Guideline Provisions:** The defendant is ineligible for probation because probation has been expressly precluded by statute, pursuant to USSG § 5B1.1(b)(2).

### Fines

129. **Statutory Provisions:** The maximum fine is $10,000,000.00, pursuant to 18 U.S.C. § 3571(b).

130. A special assessment of $100.00 is mandatory, pursuant to 18 U.S.C. § 3013.

131. Costs of prosecution shall be imposed on the defendant as required by statute, pursuant to USSG § 5E1.5. In determining whether to impose a fine and the amount of such fine, the Court shall consider, among other factors, the expected costs to the government of any term of probation, or term of imprisonment and term of supervised release imposed, pursuant to USSG § 5E1.2(d)(7) and 18 U.S.C. § 3572(a)(6). These costs may include drug and alcohol treatment, electronic monitoring, and/or contract confinement costs. The most recent advisory from the Administrative Office of the United States Courts, dated July 1, 2019, provides the following monthly cost data:

|         | Bureau of<br>Prisons Facilities | Residential<br>Reentry Centers | Supervision by<br>Probation Officer |
|---------|-----------------|-----------------|-----------------|
| Daily   | $103            | $95             | $12             |
| Monthly | $3,121          | $2,874          | $373            |
| Annually| $37,448         | $34,493         | $4,472          |

132. **Guideline Provisions:** It does not appear the defendant has the ability to pay a fine. Therefore, the fine range has not been determined, pursuant to USSG § 5E1.2(a), (e), and Application Note 3.

**Restitution**

133. **Statutory Provisions:** Restitution is not applicable in this case, pursuant to 18 U.S.C. § 3663.

134. **Guideline Provisions:** Restitution is not an issue in this case.

**Recommended Special Conditions**

135. Under 18 U.S.C. § 3563(b) and § 3583(d), the Court is authorized to impose special conditions of probation or supervised release to the extent that such conditions: (1) are reasonably related to the nature and circumstances of the offense and the history and characteristics of the defendant; (2) are reasonably related to the purposes the sentence is to serve; (3) involve only such deprivations of liberty or property as are reasonably necessary for the relevant sentencing purposes; and (4) are consistent with any pertinent policy statements issued by the Sentencing Commission. Additionally, § 445 of the Guide to Judiciary Policy, Vol. 8, Disclosure of Special Conditions, recommends special conditions be disclosed to the parties and the Court. The following special condition of supervision will be recommended at sentencing.

**Special Condition**

(1) You must submit to substance abuse testing to determine if you have used a prohibited substance. You must contribute to the cost of such program not to exceed the amount determined reasonable by the Court approved U.S. Probation Office's "Sliding Scale for Services," and you will cooperate in securing any applicable third-party payment, such as insurance or Medicaid. *This condition is recommended based on the defendant's conduct involving the distribution of controlled substances and admitted substance abuse history outlined in Paragraph 110.*

## PART E. FACTORS THAT MAY WARRANT DEPARTURE

136. The probation officer has not identified any factors that would warrant a departure from the applicable sentencing guideline range.

## PART F. FACTORS THAT MAY WARRANT A SENTENCE OUTSIDE OF THE ADVISORY GUIDELINE SYSTEM

137.    The probation officer has no information concerning the offense or offender which would warrant a sentence outside the advisory guideline range, pursuant to 18 U.S.C. § 3553(a).

Respectfully Submitted,

Mary Elizabeth G. Windham
Chief United States Probation Officer

By:

Daniel R. Schira
United States Probation Officer

Reviewed and Approved By:

Jeremy A. Dean
Supervisory United States Probation Officer

DRS/6283103

**EXHIBIT E**

PSR Addendum

# ADDENDUM TO THE PRESENTENCE REPORT

**UNITED STATES DISTRICT COURT FOR THE DISTRICT OF SOUTH CAROLINA**
**United States v. Lamar Louis Johnson, a/k/a "McJag" Docket No. 2:19CR00550-001DCN**

## OBJECTIONS

By the Government

The presentence report was disclosed to the parties on April 23, 2021, and objections were due on or before May 10, 2021. As of May 14, 2021, Assistant United States Attorney Everett McMillian had submitted no objections to the presentence report.

By the Defendant

The presentence report was disclosed to the parties on April 23, 2021, and objections were due on or before May 10, 2021. On May 12, 2021, defense counsel William Lee Runyon, Jr., submitted multiple objections to the presentence report, which remain outstanding.

1. **Criminal History (Paragraphs 60 through 74):** There is entered an objection to the listing of alleged criminal activity over Ten (10) years ago even if they do not carry "points" in computation of criminal history and offense level computations on the following grounds:
   A. The age of the alleged violations renders them useless in assessing the Defendant's character.
   B. The marijuana violations should not be counted as approximately Ten (%) percent of the United States has rendered the substances legal under State Law.
   C. The age of the Defendant when charged.

**Probation Officer's Response**: 18 U.S.C. § 3661 establishes "no limitation shall be placed on information concerning the background, character, and conduct of a person convicted of an offense which a Court of the United States may receive and consider for the purpose of imposing an appropriate sentence." The probation officer is responsible for providing the Court with all available information concerning the defendant's criminal history which will assist the Court in reviewing the defendant's background and character. In generating the information outlined in the Prior Convictions section, the probation officer relied solely upon and used documents obtained from the National Crime Information Center (NCIC) database and multiple criminal courts throughout South Carolina.

The Introductory Commentary to USSG § 4A1.1, titled Part A – Criminal History notes The Comprehensive Crime Control Act sets forth four purposes of sentencing. (See 18 U.S.C. § 3553(a)(2).) A defendant's record of past criminal conduct *is directly relevant* to those purposes. A defendant with a record of prior criminal behavior is more culpable than a first offender and thus deserving of greater punishment. General deterrence of criminal conduct dictates that a clear message be sent to society that repeated criminal behavior will aggravate the need for punishment with each recurrence. To protect the public from further crimes of the particular defendant, the likelihood of recidivism and future criminal behavior must be considered.

Repeated criminal behavior is an indicator of a limited likelihood of successful rehabilitation. The commentary goes on to set forth the specific factors included in USSG §§ 4A1.1 and 4A1.3 are consistent with the extant empirical research assessing correlates of recidivism and patterns of career criminal behavior.

The defendant suggests *"alleged criminal activity over Ten (10) years ago...renders them useless in assessing the Defendant's character."* However, USSG § 4A1.2 Application Note 8 reiterates §§ 4A1.2(d)(2) and (e) establish the time period within which prior sentences are counted. As used in §§ 4A1.2(d)(2) and (e), the term "commencement of the instant offense" includes any relevant conduct. See § 1B1.3 (Relevant Conduct). Accordingly, Paragraph 18 of the presentence report notes January 24, 2019, as the earliest period of relevant conduct.

Pursuant to USSG § 4A1.1(a), add 3 points for each prior sentence of imprisonment exceeding one year and one month. USSG § 4A1.2(e)(1) further specifies that any prior sentence of imprisonment exceeding one year and one month that was imposed within fifteen years of the defendant's commencement of the instant offense is counted. Also count any prior sentence of imprisonment exceeding one year and one month, whenever imposed, that resulted in the defendant being incarcerated during any part of such fifteen-year period.

Paragraphs 64 and 65 outline the defendant's prior convictions for *Assault and Battery of a High and Aggravated Nature*, *Possession of Cocaine*, and *Resisting Arrest* on November 16, 1998. He received adult sentences under the Youthful Offender Act to terms of imprisonment not to exceed 6 years, 5 years, and 1 year, respectively. The resisting arrest related conviction did not receive criminal history points as it was treated as a single sentence with the cocaine related conviction, pursuant to USSG § 4A1.2(a)(2). Upon release from custody for these convictions, the defendant's parole was revoked on numerous occasions, and he was last released from custody on February 17, 2005. Since the defendant received a sentence exceeding more than one year and one month and was incarcerated for these convictions within 15 years of committing the instant federal offense, he received a total of 6 criminal history points pursuant to §§ 4A1.1(a) and 4A1.2(e)(1).

Paragraphs 70 and 73 outline the defendant's prior convictions for two counts of *Possession of Cocaine, 1st Offense*, which were counted separately since they were separated by intervening arrests (*see* USSG § 4A1.2(a)(2)), and *Possession of Marijuana, 3rd Offense* on November 5, 2003. He received sentences of 2 years imprisonment with credit for 30 days served in jail for each count of *Possession of Cocaine, 1st Offense*, and 30 days of time served in jail for *Possession of Marijuana, 3rd Offense*. The marijuana related conviction did not receive criminal history points as it was treated as a single sentence with one of the cocaine related convictions, pursuant to USSG § 4A1.2(a)(2). The defendant was released from custody after serving his sentences for the two *Possession of Cocaine, 1st Offense* convictions on October 1, 2004. Since the defendant received a sentence exceeding more than one year and one month and was incarcerated for this conviction within 15 years of committing the instant federal offense, he received a total of 6 criminal history points pursuant to §§ 4A1.1(a) and 4A1.2(e)(1).

Paragraph 74 outlines the defendant's prior conviction for Distribution of Cocaine and PWID Marijuana on May 25, 2006. He received sentences of 5 years imprisonment with credit for 63

days of time served in jail for each conviction. The marijuana related conviction did not receive criminal history points as it was treated as a single sentence with the cocaine related conviction, pursuant to USSG § 4A1.2(a)(2). The defendant was released from custody after serving his sentence on May 1, 2008. Since the defendant received a sentence exceeding more than one year and one month and was incarcerated for these convictions within 15 years of committing the instant federal offense, he received 3 criminal history points pursuant to §§ 4A1.1(a) and 4A1.2(e)(1).

As it pertains to revocations, USSG § 4A1.2(k)(1) sets forth in the case of a prior revocation of probation, parole, supervised release, special parole, or mandatory release, add the original term of imprisonment to any term of imprisonment imposed upon revocation. The resulting total is used to compute the criminal history points for §§ 4A1.1(a), (b), or (c), as applicable. USSG § 4A1.2(k)(2) adds revocation of probation, parole, supervised release, special parole, or mandatory release may affect the time period under which certain sentences are counted as provided in §§ 4A1.2(d)(2) and (e). For the purposes of determining the applicable time period, use the following: (A) in the case of an adult term of imprisonment totaling more than one year and one month, the date of last release from incarceration on such sentence (see § 4A1.2(e)(1)); (B) in the case of any other confinement sentence for an offense committed prior to the defendant's eighteenth birthday, the date of the defendant's last release from confinement on such sentence (see § 4A1.2(d)(2)(A)); and (C) in any other case, the date of the original sentence (see §§ 4A1.2(d)(2)(B) and (e)(2)).

Lastly, Paragraph 68 outlines a prior conviction for *Possession with Intent to Distribute Marijuana, 2nd Offense* on March 20, 2002. He received a sentence of 10 years imprisonment suspended upon 90 days in jail, $1,000.00 fine, and 4 years of probation. The defendant's term of probation was revoked on November 5, 2003, and he was sentenced to 2 years imprisonment. He was released from custody on October 1, 2004. Since the defendant received a revocation sentence exceeding more than one year and one month and was incarcerated for this conviction within 15 years of committing the instant federal offense, he received a total of 3 criminal history points pursuant to §§ 4A1.1(a), 4A1.2(e)(1), 4A1.2(k)(1), and 4A1.2(k)(2).

Despite suggesting convictions over 10 years old are *"useless"* *"even if they do not carry 'points' in computation of criminal history,"* Application Note 8 suggests that, even if the court finds that a sentence imposed *outside this time period* is evidence of similar, or serious dissimilar, criminal conduct, the court may consider this information in determining whether an upward departure is warranted under § 4A1.3 (Departures Based on Inadequacy of Criminal History Category (Policy Statement)). Therefore, the Court may still consider prior convictions outlined in Paragraphs 60, 61, 62, 63, 66, 67, 69, 71, and 72, which did not receive any criminal history points when determining an appropriate sentence, pursuant to 18 U.S.C. § 3553(a) and the Upward Departure provisions offered by the United States Sentencing Guidelines.

The defendant further suggests, *"The marijuana violations should not be counted as approximately Ten (%) percent of the United States has rendered the substances legal under State Law."* The Background Note to USSG § 4A1.2 sets forth prior convictions may represent convictions in the federal system, fifty state systems, the District of Columbia, territories, and foreign, tribal, and military courts. While the possession or distribution of marijuana may be

legal in some states, it was not legal in the state of South Carolina in which the defendant was convicted at the time he committed the offenses, and as such, was a violation of that state's law. The defendant argues the sentencing court should ignore prior state criminal convictions which prohibited the illegal possession or distribution for marijuana despite having been charged in the instant offense to a violation of federal law prohibiting the distribution of marijuana, in violation of 21 U.S.C. §§ 841(a)(1), 841(b)(1)(D), and 846. For all the reasons described above, no changes were made to the presentence report.

2. **Role Enhancement (Paragraphs 49 through 56 and 97)**: There is an objection entered as to his classification as a manager (paragraph 97). As his role in the alleged conspiracy was as a supplier and there is no evidence that he managed the conspiracy.

**Probation Officer's Response**: Pursuant to USSG § 3B1.1(b), since the defendant functioned as an organizer, manager, and supervisor of at least one or more other participants in criminal activity involving 5 or more participants, 3 levels were added.

USSG § 3B1.1 sets forth the criteria used in determining whether a defendant qualifies for an Aggravating Role. Under subsection (a), a 4-level increase is appropriate "if the defendant was a leader or organizer of a criminal activity that involved five or more participants or was otherwise extensive." Under subsection (b), a 3-level increase is appropriate "if the defendant was a manager or supervisor of a criminal activity that involved five or more participants or was otherwise extensive." Subsection (c) provides for a 2-level increase "if the defendant was a leader, organizer, manager, or supervisor of a criminal activity other than described in subsections (a) or (b)." Application Note 2 states "to qualify for an adjustment under this section, the defendant must have been the organizer, leader, manager, or supervisor of one or more other participants." Application Note 4 outlines factors for the Court to consider when making the determination as to whether a defendant is a leader/organizer or a manager/supervisor. These factors include "the exercise of decision-making authority, the nature of participation in the commission of the offense, the recruitment of accomplices, the claimed right to a larger share of the fruits of the crime, the degree of participation in planning or organizing the offense, the nature and scope of the illegal activity, and the degree of control and authority exercised over others."

USSG § 3B1.1, Application Note 1, specifies a "participant" is a person who is criminally responsible for the commission of the offense but need not have been convicted. A person who is not criminally responsible for the commission of the offense (e.g., an undercover law enforcement officer) is not a participant.

Based on the preponderance of the evidence uncovered during the course of the investigation, Lamar Johnson functioned as a manager, supervisor, *and* organizer *of at least one* or more other participants in a drug conspiracy operating in the greater-Charleston area of South Carolina, which involved five or more participants. As outlined throughout the Offense Conduct section of the report, intercepted telephone communications corroborated Johnson had formed an agreement to distribute drugs with at least five participants, including, but not limited to: Rashard Whitfield, Pierce Nelson, Denzil Edwards, Tiemeyer Gethers, Timothy Robinson, Antonio

Miller, Theodore Gadsden, Bernard Aaron Green, Courtney Nelson, DeAngelo Ravenel, Jarvis Behrens, and Orealius Nelson.

The investigation established Ryan Nelson was an individual who Johnson had tasked with monitoring Johnson's drug trafficking business while he was out of town. Specifically, as outlined in Paragraphs 23 through 25, between February 13, 2019, and February 15, 2019, special agents intercepted Nelson as he made and received multiple phone calls to drug suppliers and local drug dealers using Johnson's cell phone. Individuals who Nelson communicated with on behalf of Johnson included: Tiemeyer Gethers, Theodore Gadsden, Devon Simmons, Edgefield FCI BOP federal inmate Nathaniel Fabor, Timothy Robinson, and multiple unknown males. During the calls, Nelson reiterated Johnson was out of town and had left his phone with Nelson. During other calls, Nelson inquired into dealers' drug inventories, revealed Johnson had instructed Nelson to call them, and discussed preparations for transactions upon Johnson's return.

For example, on February 13, 2019, FBI special agents intercepted Ryan Nelson as he used Johnson's telephone to discuss a kilogram quantity cocaine transaction with an unknown supplier in Atlanta, GA, which had fallen through. Specifically, the supplier informed Nelson, "*So we a no-go man.*" Nelson replied, "*I feel you, what is the number on that sh\*t?*" The supplier replied, "*It was 34.*" Nelson advised, "*Alright. Well sh\*t, I am gonna head on back then, and see if I can come up with the four before ole boy* [Johnson] *come back.*" The supplier responded, "*Yeah man. I apologize for having you here all day man.*" FBI special agents recognized Nelson had attempted to acquire a kilogram quantity of cocaine from a source of supply in Atlanta, GA, but the deal had fallen through. Shortly following the failed cocaine transaction, Nelson used Johnson's phone to call an unknown male and inform him, "*Man, I come back empty man.*" On the following day, Nelson used Johnson's telephone to inform Gadsden, "*I just leave, I coming back from up there now, I coming back empty though.*" Nelson reiterated that Johnson was out of town until Friday during both conversations. While complaining about the failed drug transaction during a conversation with an unknown male, Johnson confirmed he had instructed "*Clep*" to contact "*this man, that man, and this man when I been head home*" to set up the drug transaction. During a call with Tiemeyer Gethers, Nelson advised, "*Sh\*t, ole boy* [Johnson] *wanted me to call and see if um you situated or whatever or gathered up so he can tip on out or whatever.*" Nelson specified, "*But um, he's* [Johnson] *been out of town he's on his way back up now. But he left his phone with me while he was gone. Trying to get everybody situated.*" During additional telephone calls, FBI special agents learned Nelson routinely accompanied Johnson and had participated in the purchase of large quantities of cocaine with Johnson (*see Paragraph 29*).

Additional information obtained during the investigation revealed Rashard Whitfield was a dealer who Johnson had tasked with mixing and distributing cocaine for him. During conversations with Whitfield, Johnson directed Whitfield to mix, prepare, and distribute quantities of drugs in exchange for funds Johnson would receive. Specifically, on March 2, 2019, FBI special agents overheard Johnson had agreed to supply Ornelius Nelson with 10 grams of cocaine for $400.00 (*see Paragraph 36*). Shortly after the arranged transaction, Johnson contacted Whitfield and informed him, "*I got Kemo* (Nelson) *been callin and need damn near 10. You goin to do that for me or I need to come down?*" Whitfield asked, "*What he want, 10*

*grams?*" Johnson agreed, "*Yeah...he got the $4 for me.*" FBI special agents recognized Whitfield had agreed to distribute 10 grams of cocaine to Nelson for $400.00 on behalf of Johnson.

Furthermore, on March 3, 2019, FBI special agents intercepted a telephone call Johnson received from Timothy Robinson concerning the purchase of 25 grams of cocaine with 3 grams of a cutting agent for $980.00 (*see Paragraph 37*). Following the transaction arrangement, FBI special agents confirmed Johnson then contacted Whitfield and informed him, "*Little Timmy about to come through. I need you to damn make him a two-five* [25 grams of cocaine] *and you can put the three* [3 grams of cutting agent] *on the side...he should have $980.00...he's gonna be there in a second.*"

On July 10, 2019, NCPD officers conducted a consensual search of 2708 Budds Avenue, North Charleston, SC. Information obtained throughout the course of the investigation established this residence was a known storage location for controlled substances utilized by Johnson and Rashard Whitfield. During a search of Whitfield's room, officers located quantities of marijuana and cocaine accompanied by a black digital scale and $4,105.00 in cash (*see Paragraph 43*).

Based on Johnson's exercise of decision-making authority, the nature of his participation in the commission of the offense, the degree of participation in planning or organizing the offense, the claimed right to a larger share of the fruits of the crime, and the nature and scope of the illegal activity, Johnson was determined to function as an organizer, manager, *and* supervisor *of at least one* or more other participants in a drug conspiracy, which involved five or more participants.

Pursuant to the Commentary at USSG § 6A1.3,

> "*In determining the relevant facts, sentencing judges are not restricted to information that would be admissible at trial. See 18 U.S.C. § 3661; see also U.S. v. Watts, 519 U.S. 148, 154 (1997) (holding that lower evidentiary standard at sentencing permits sentencing court's consideration of acquitted conduct); Witte v. U.S., 515 U.S. 389, 399-401 (1995) (noting that sentencing courts have traditionally considered wide range of information without the procedural protections of a criminal trial, including information concerning criminal conduct that may be the subject of a subsequent prosecution); Nichols v. U.S., 511 U.S. 738, 747-48 (1994) (noting that district courts have traditionally considered defendant's prior criminal conduct even when the conduct did not result in a conviction). Any information may be considered, so long as it has sufficient indicia of reliability to support its probable accuracy. Watts, 519 U.S. at 157; Nichols, 511 U.S. at 748; U.S. v. Zuleta-Alvarez, 922 F.2d 33 (1st Cir. 1990), cert. denied, 500 U.S. 927 (1991); U.S. v. Beaulieu, 893 F.2d 1177 (10th Cir.), cert. denied, 497 U.S. 1038 (1990). Reliable hearsay evidence may be considered. U.S. v. Petty, 982 F.2d 1365 (9th Cir. 1993), cert. denied, 510 U.S. 1040 (1994); U.S. v. Sciarrino, 884 F.2d 95 (3d Cir.), cert. denied, 493 U.S. 997 (1989). Out-of-court declarations by an unidentified informant may be considered where there is good cause for the non-disclosure of the informant's identity and there is sufficient corroboration by other means. U.S. v. Rogers, 1 F.3d 341 (5th Cir. 1993); see also U.S. v. Young, 981 F.2d 180 (5th Cir.), cert. denied, 508 U.S. 980*

> *(1993); U.S. v. Fatico, 579 F.2d 707, 713 (2d Cir. 1978), cert. denied, 444 U.S.
> 1073 (1980). Unreliable allegations shall not be considered. U.S. v. Ortiz, 993
> F.2d 204 (10th Cir. 1993).*
>
> *The Commission believes that use of a preponderance of the evidence standard is
> appropriate to meet due process requirements and policy concerns in resolving
> disputes regarding application of the guidelines to the facts of a case."*

The defendant provided no additional information or rationale as to why this role enhancement should not apply. In U.S. v. Terry, 916 F.2d 157 (4th Cir. 1990), and again in U.S. v. Love, 134 F.3d 595 (4th Cir. 1998), the Fourth Circuit Court of Appeals established "a mere objection to a finding in the presentence report is not sufficient to meet the defendant's burden of showing inaccuracy or unreliability. The defendant has the affirmative duty to make a showing that information contained within the presentence report is unreliable and, further, to articulate reasons why facts contained therein are untrue or inaccurate." Further, in U.S. v. Mondragon, 860 F.3d 227, 233 (4th Cir. 2017), the Fourth Circuit Court of Appeals held the defendant bears "an affirmative duty" to show "that the information in the presentence report is unreliable and articulate the reasons why the facts contained therein are untrue or inaccurate."

The probation officer acknowledges USSG § 3B1.1(a) calls for a four-level increase "if the defendant was a leader or *organizer* of a criminal activity that involved five or more participants or was otherwise extensive." Although the evidence reflects the defendant was clearly an organizer of criminal activity involving five or more participants, the probation officer recommended a three-level enhancement based on the factors outlined in § 3B1.1 Application Note 4 and Background Note. For the reasons outlined above, it is the position of the probation officer that a three-level enhancement was appropriately applied in this case, pursuant to USSG § 3B1.1(b). Therefore, no changes were made to the presentence report.

3. **Specific Offense Characteristics (Paragraphs 42 and 94):** The reference in Paragraph Ninety Four (94) is objected to as any reference to the weapon should not be counted as said weapon was owned by a family member. There are no facts suggesting it was utilized in any transaction.

**Probation Officer's Response:** Paragraph 94 provides for a guideline enhancement pursuant to USSG § 2D1.1(b)(1), which states the base offense level shall be increased by two levels if a dangerous weapon (including a firearm) was possessed. Application Note 3 to § 2D1.1 states "the enhancement for weapon possession in subsection (b)(1) reflects the increased danger of violence when drug traffickers possess weapons. The enhancement should be applied if the weapon was present, unless it is *clearly improbable* that the weapon was connected with the offense."

In generating the evidence outlined within the Offense Conduct section, the probation officer relied exclusively upon and utilized information provided by the United States Attorney's Office, including discovery documents. The contents of this information included investigative and surveillance reports prepared by federal and state law enforcement officers, physical and forensic evidence, intercepted wiretap communications, and corroborating information between members

7

of law enforcement. After independently reviewing this information, the probation officer concluded these statements and substantive evidence were credible based upon a preponderance of the evidence standard.

As outlined in Paragraph 42 of the presentence report, on July 10, 2019, state, local, and federal law enforcement personnel located and arrested Lamar Johnson at his residence, 205 Sugarberry Lane in Moncks Corner, SC, pursuant to a federal arrest warrant. During the arrest, officers noted rounds of ammunition in plain view in Johnson's master bedroom, but they did not seize them at the time. During a post-Miranda interview, Johnson acknowledged there were two firearms in his residence, but he asserted he did not know their location. Johnson's wife disclosed the two firearms were located in her daughter's bedroom, and she permitted law enforcement to locate and seize the two firearms. Following the arrest and firearm seizure, special agents obtained and executed a federal search warrant to seize the ammunition they had initially observed in Johnson's bedroom. Upon execution of the federal search warrant on July 10, 2019, law enforcement located and seized 6 boxes of varying calibers of ammunition, a bag containing 27 *"kilo wrappers"* with cocaine residue, a digital scale with cocaine residue, and food saver bag sealers.

In the scenario outlined in Paragraph 42 of the presentence report, it is not *"clearly improbable"* that the firearms found in the defendant's residence were used in connection with the drug offense to which he pled guilty. Pursuant to USSG § 1B1.3, Relevant Conduct, the defendant is accountable for all conduct regarding the *"acts and omissions committed, aided, abetted, counseled, commanded, induced, procured, or willfully caused by the defendant."* Based on the evidence obtained during his arrest and the subsequent execution of a search warrant at the residence, it is clear a weapon was present in a location where the defendant stored and prepared quantities of cocaine for distribution.

Furthermore, the Fourth Circuit Court of Appeals has consistently held that evidence of firearms in proximity to illegal drugs can support a conclusion that the firearms were possessed during the commission of the drug offense. *See* U.S. v. Harris, 128 F.3d 850 (4th Cir. 1997). The Court noted the test requires nothing more than that the guns be located in the same place where drugs were stored or distributed. In U.S. v. McAllister, 272 F.3d 228, 234 (4th Cir. 2001), the Fourth Circuit Court of Appeals established *"the government need only show that the weapon was possessed during the relevant illegal drug activity"* for the enhancement to be appropriately applied. The Fourth Circuit again affirmed in a published opinion the application of the guideline enhancement USSG § 2D1.1(b)(1) in U.S. v. Manigan, 592 F.3d 621 (4th Cir. 2010), where guns and drugs were recovered during the execution of a search warrant. Additional support for applying this enhancement can be found in U.S. v. Britt, 335 Fed. Appx. 289 (4th Cir. 2009), U.S. v. Johnson, 363 Fed. Appx. 247 (4th Cir. 2010), U.S. v. Buie, 441 Fed. Appx. 173 (4th Cir. 2011), and U.S v. Campos, 435 Fed. Appx. 274 (4th Cir. 2011). If the government establishes that a firearm was found in close proximity to drugs, the defendant bears the burden of showing that a connection was *"clearly improbable."* US v. Bolton, 858 F.3d 905, 912 (4th Cir. 2017). As the defendant has yet to meet that burden, no changes were made to the presentence report.

4. **Physical Condition (Paragraph 108)**: That the health history set out in paragraph One Hundred Eight (108) is not factored in making a determination of the relevance of his health history to the Applicable Guidelines.

**Probation Officer's Response**: The defendant may certainly advocate for a variance or departure from the advisory sentencing guidelines based on the defendant's health history; however, such a request would be more appropriately addressed in a sentencing memorandum filed with the Court. As the United States Probation Officer did not identify any issues pertinent to a sentence outside the guideline system, no changes have been made to the presentence report.

5. **Use of the United States Sentencing Guidelines**: Objection is entered to paragraph Ninety (90) and Ninety One (91) and Ninety Two (92) as they make the guidelines mandatory rather than advisory as set forth in Booker.

**Probation Officer's Response**: The defendant may have misunderstood Paragraphs 90, 91, and 92. These paragraphs do not at all suggest the United States Sentencing Guidelines are mandatory, but were rather included in the presentence report to acknowledge the Supreme Court and then the Fourth Circuit Court of Appeals set forth a sentencing court must only first "*consider*" the Guideline range in addition to "*other relevant factors set forth in the guidelines and those factors set forth in § 3553(a) before imposing the sentence.*" *See* U.S. v. Booker, 125 S. Ct. 738 (2005) and U.S. v. Hughes, 401 F.3d 540 (4th Cir. 2005). Therefore, no changes were made to the presentence report.

Respectfully Submitted,

Mary Elizabeth G. Windham
Chief United States Probation Officer

By: _____

Daniel R. Schirra
United States Probation Officer

Reviewed and Approved By:

_____

Jeremy A. Dean
Supervisory United States Probation Officer

Date:  May 21, 2021

DRS/6283103

9